## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

GRUBB LUMBER COMPANY, INC.,
individually and on behalf of all others
similarly situated,

                Plaintiff,

      v.

MASONITE CORPORATION, and
JELD-WEN, INC.,

                Defendants.

Civil Action No. ___3:18cv718___

**COMPLAINT - CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Grubb Lumber Company, Inc. ("Plaintiff" or "Grubb Lumber") brings this action on its own behalf and on behalf of all others similarly situated, to recover treble damages and other appropriate relief based on Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and JELD-WEN, Inc.'s ("Jeld-Wen") violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. In support of this Complaint, Grubb Lumber alleges, with knowledge as to its own acts and those taking place in its presence and upon information and belief as to all other matters, as follows:

## I.     NATURE OF ACTION

1.    This case challenges Defendants' collusive pricing and illegal scheme for "interior molded doors" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Jeld-Wen's violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Interior molded doors are a type of interior door made by sandwiching a wood frame and a hollow or solid core between two doorskins composed of a high-density fibrous mat and formed into a raised panel design. Interior molded doors attempt to simulate the aesthetics of solid wood doors at lower prices.

2.      The interior molded door is the most popular type of interior door in North America. Molded doorskins constitute the largest input cost of an interior molded door, comprising up to 70% of the cost of manufacturing a molded door. Defendants Masonite Corporation ("Masonite") and Jeld-Wen are vertically-integrated manufacturers, *i.e.*, they manufacture both molded doorskins as well as interior molded doors. Defendants control the majority (around 85%) of the market for interior molded doors and are the only manufacturers for doorskins, a necessary input for interior molded doors, in North America. Being the only two vertically-integrated interior molded door manufacturers in the U.S., Jeld-Wen and Masonite have significant power in both product markets.

3.      Historically, the market contained at least one significant non-integrated manufacturer of doorskins, Masonite, at least one significant non-integrated manufacturer of interior molded doors, Premdor, Inc., and numerous other non-integrated interior molded door manufacturers.

4.      Recognizing there was a strong incentive by door manufacturers to collude to increase the price of interior molded doors, the Department of Justice ("DOJ") in 2001 permitted Premdor, Inc. to acquire Masonite (and form a newly-integrated manufacturer of both doorskins and interior molded doors) only on the condition that Premdor/Masonite divest a doorskin manufacturing plant in Towanda, Pennsylvania to a new entity called CraftMaster, Inc. ("CMI").

5.      In 2012, however, Defendant Jeld-Wen acquired CMI, thereby eliminating the check on competition established by the DOJ's required divestiture. Between 2001 and 2012, both Jeld-Wen and Masonite also eliminated competition by acquiring a number of smaller interior door manufacturers.

6.     Additionally, Defendants have jointly sought to eliminate competition by stopping their longstanding practice of supplying doorskins to smaller interior door manufacturers. In furtherance of the conspiracy, Masonite announced in 2014 it would no longer sell doorskins to other door manufacturers. This unprecedented shift in business practice was plainly against Masonite's own economic interests, as it handed over that entire market to Jeld-Wen. Worse, it did so at a time when Jeld-Wen's doorskins were of poor quality.

7.     Around the same time, Jeld-Wen began taking adverse actions against third-party door manufacturers with which it had long-term supply agreements for doorskins by, among other things, raising prices notwithstanding its own declining costs. It also notified at least one third-party manufacturer that it would prematurely terminate its supply agreement, which was against the terms of the agreement. This conduct undermined the ability of independent manufacturers to compete with Defendants in the sale of interior molded doors.

8.     This market structure has enabled Defendants to repeatedly impose uniform price increases without any competitive constraints. *See infra* ¶¶ 80-103. Defendants communicated regularly regarding their pricing intentions. Numerous high-ranking executives from each company had worked at the other company at one point in time and had close relationships dating back to the 1980s. In fact, decisions on pricing at Masonite were made after one of its vice presidents traveled for days or weeks, returned with Jeld-Wen's planned price increases, and told a co-worker the pricing Masonite was going with. The vice president advised his co-worker that Masonite always had "the Jeld-Wen information," what Jeld-Wen's price increases would be before the price increases were publicly announced, and that at least from 2012 to the vice president's departure from Masonite in 2014, Masonite never undercut Jeld-Wen's prices for

interior molded doors. This was the case even when Masonite's profit margin could have handled a lower sale price in an effort to earn more market share.

9. As it discussed in its annual reports, during this time Jeld-Wen shifted from its old strategy that focused on increasing market share and that "often led to competing on price" to a new strategy Jeld-Wen characterized as "pricing optimization." When sales forces have incentives to pursue increases in market share, such incentives can run counter to cartel activity. For this reason, a shift away from a pricing policy focused on increasing market share can be suggestive of a conspiracy.

10. Defendants' price increases cannot rationally be explained by normal market forces, such as key input costs, and supply and demand factors. Key input costs for raw materials, such as wood, resin, wax, oil, sealer, paint, and packaging, and for energy, such as electric power prices, natural gas prices, and boiler fuel decreased while Defendants increased their prices. Masonite employees analyzed data and ran pricing scenarios based on market factors, such as the price of raw materials, transportation costs, and expected demand, and were often surprised to learn that the Board and the company's top executives intended to impose price increases that were substantially in excess of what they believed the market would accept.

11. The interior molded door industry possesses market characteristics that are well recognized to enable and facilitate collusion in such a way that would inflict widespread harm on Sub-Class 1 (defined below), including the fact that (a) it is a highly concentrated oligopoly, with Defendants controlling 85% of the market, (b) there are significant barriers to entry, (c) there are no economic substitutes for interior molded doors, (d) interior molded doors are standardized products with a high degree of interchangeability, and (e) there are ample opportunities to conspire through trade associations and other meetings. In addition, there is a history of collusion in the

residential door industry generally – with Defendants or their predecessors having pled guilty to antitrust violations in the 1990s – and as to Defendants specifically, as alleged herein at ¶ 79.

12.     These collusive pricing practices have harmed Plaintiff and Sub-Class 1, which have paid more for interior molded doors than they would have paid absent the collusion and unlawful conduct.

13.     Additionally, because Jeld-Wen unlawfully acquired the assets of its direct competitor, CMI, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, which substantially lessened competition in both the doorskins and interior molded doors market, Plaintiff and members of Sub-Class 2 (defined below) have been forced to pay higher prices for interior molded doors than they would have paid absent Jeld-Wen's unlawful behavior.

14.     In an October 5, 2018 post-trial opinion on the issue of divestiture in *Steves & Sons, Inc. v. JELD-WEN, Inc.*, Civ. No. 3:16-cv-545, 2018 WL 4855459 (E.D. Va. Oct. 5, 2018), a case in which an independent door manufacturer brought a Section 7 claim against Jeld-Wen, Judge Payne stated the following:

> Here, as the jury found, and the record shows, ***the merger substantially reduced competition in the doorskin industry***. Less than two years after the merger reduced the number of suppliers from three to two, one of those suppliers essentially withdrew from the market, ***thereby depriving the Independents [non-vertically integrated door manufacturers] of that key component of a reliable supply source***.
>
> . . . Although the Court could solve Steves' supply problem by ordering JELD-WEN to supply Steves' requirements for a long term, ***that alternate remedy would not restore competition in the industry as a whole***. And, ***the record proves that the lessened competition has adversely affected the Independents [non-vertically integrated door manufacturers]*** *other than Steves*. So simply securing a long-term supply for Steves ***would not aid those manufacturers***.

*Id.* at *38 (emphasis added).

15.     Because doorskins are a necessary component of interior molded doors, any lessening of competition in the doorskins business necessarily results in a lessening of competition in the interior molded doors industry, thus injuring Plaintiff and Sub-Class 2 members in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.     THE PARTIES

16.     Plaintiff Grubb Lumber is a Delaware Corporation with its principal place of business in Wilmington, Delaware. Grubb Lumber purchased interior molded doors directly from Defendants during the Class Period (defined below).

17.     Defendant Masonite is a corporation organized under the laws of Delaware. Masonite's principal place of business is One Tampa City Center, 201 North Franklin Street, Suite 300, Tampa, Florida 33602. Masonite is a wholly owned subsidiary of Masonite International Corporation. Masonite is registered with the Virginia State Corporation Commission as a foreign corporation and maintains a registered agent in Virginia.

18.     Defendant Jeld-Wen is a corporation organized under the laws of Delaware. Jeld-Wen's principal place of business is 2645 Silver Crescent Drive, Charlotte, North Carolina 28273. Jeld-Wen is a wholly owned subsidiary of JELD-WEN Holding, Inc. Jeld-Wen is registered with the Virginia State Corporation Commission as a foreign corporation and maintains a registered agent in Virginia.

## III.     JURISDICTION AND VENUE

19.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries Plaintiff and the other Sub-Class members have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Jeld-Wen's violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

21.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

22.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold interior molded doors throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District.

## IV.     CLASS ALLEGATIONS

23.     Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of two sub-classes (the "Sub-Classes") consisting of:

> All persons or entities that purchased interior molded doors in the United States from at least as early as October 24, 2012 through the present (the "Class Period") directly from: (1) either of the Defendants, their subsidiaries, affiliates or joint-ventures ("Sub-Class 1"); and (2) Defendant Jeld-Wen, its subsidiaries, affiliates or joint-ventures ("Sub-Class 2").

Excluded from the Sub-Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

24. The Sub-Classes are so numerous that joinder of all members is impracticable. On information and belief, hundreds or thousands of individuals and entities geographically dispersed around the country purchased interior molded doors from Defendants during the Class Period.

25. There are questions of law or fact common to the Sub-Classes, which predominate over any questions that may affect individual members of the Sub-Classes, including:

a. Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain and/or stabilize the prices of interior molded doors in the United States;

b. The identity of other participants of the alleged combination or conspiracy, if any;

c. The duration of the alleged combination or conspiracy and the acts carried out by Defendants and their co-conspirators, if any, in furtherance of the combination or conspiracy;

d. Whether the alleged combination or conspiracy violated the Sherman Act;

e. Whether the combination or conspiracy had the effect of artificially inflating the price of interior molded doors sold in the United States during the Class Period;

f. Whether Defendant Jeld-Wen's conduct violated the Clayton Act;

g. Whether Defendant Jeld-Wen's unlawful acquisition of CMI caused Plaintiff and other Sub-Class members to pay more for interior molded doors than they otherwise would have paid during the Class Period;

h. Whether Defendants' conduct caused injury to the Sub-Class members;

i.      Whether Defendants undertook actions to conceal their unlawful conspiracy and whether Jeld-Wen undertook actions to conceal how substantially its acquisition of CMI would lessen competition in the markets for molded doorskins and interior molded doors; and

j.      The measure and amount of damages incurred by the Sub-Classes.

26.     Plaintiff is a member of both Sub-Classes and its claims are typical of the claims or defenses of the Sub-Classes. Plaintiff and all Sub-Class members were damaged by Defendants' actions, which caused them to pay artificially inflated prices for interior molded doors. There are no defenses that are unique to Plaintiff.

27.     Plaintiff will fairly and adequately protect the interests of the Sub-Classes because Plaintiff's interests are coincident with, and not antagonistic to, those of the other Sub-Class members.

28.     Plaintiff is represented by counsel who are capable and experienced in the prosecution of class action and antitrust litigation.

29.     Adjudicating the claims of the Sub-Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Sub-Classes would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

30.     The Sub-Classes are ascertainable either from Defendants' records or through self-identification in the claims process.

## V.  INTERSTATE TRADE AND COMMERCE

31.  Defendants' conduct as described in this Complaint was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

32.  During the Class Period, Defendants manufactured, sold and/or shipped interior molded doors in a continuous and uninterrupted flow of interstate commerce. The price-fixing combination or conspiracy in which Defendants participated, and Jeld-Wen's unlawful acquisition of CMI, had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## VI.  FACTUAL ALLEGATIONS

**A.  Background On The Market for Interior Molded Doors**

33.  "Interior molded doors" are a type of composite wood door used primarily in residential construction and remodeling, including the construction and remodeling of multi-family and apartment housing, for closets, rooms, and hallways. An interior composite wood door is made by sandwiching a wood frame and a hollow or solid core between two doorskins. The doorskins used to manufacture an interior composite wood door generally come in three types: hardboard, veneered and molded. While some interior doors are made of solid wood, the vast majority use composite wood materials to create their hollow or solid cores and doorskin components.

34.  Interior molded doors, which are the most popular type of interior door in North America, have a doorskin that is made from a high-density fibrous mat formed into a raised panel design. Interior molded doors attempt to simulate the aesthetics of solid wood doors at lower prices. (Unlike interior molded doors, hardboard or veneered doors have a flat surface. The doorskin of an interior hardboard door is typically a multi-ply facing of wood such as pine, and

the doorskin of an interior veneered door is typically plywood with a thin veneered overlay of a wood such as birch or oak.)

35.     Interior composite wood door manufacturers sell to distributors, building supply outlets, home centers and lumber yards. Consumers purchasing doors to repair, renovate or remodel an existing home typically purchase doors from retail building supply outlets. Builders and contractors purchase doors primarily from distributors, lumber yards, home centers and building supply outlets.

36.     The market for interior molded doors is closely connected to the upstream market for interior molded doorskins. Two doorskins are required for each composite wood door. Molded doorskins constitute the largest input cost of a molded door, comprising up to 70% of the cost of manufacturing a molded door.

37.     Masonite and Jeld-Wen are the only two owners of doorskin production facilities in the western hemisphere and operate eight of the nine largest doorskin facilities in the world. Smaller foreign doorskin manufacturers in Turkey, Romania and China, such as Teverpan, Kastamonu and Yildiz, respectively, are unable to supply doorskins of a sufficient quantity, quality, and range of product lines necessary to satisfy the needs of U.S. door manufacturers. As such, Defendants are the only domestic manufacturers of interior molded doorskins, controlling nearly 100% of that market.

38.     Jeld-Wen began manufacturing molded doorskins in the early 1970s, and it has owned and operated nine molded doorskin manufacturing plants, six of which Jeld-Wen built itself. In the early 1980s, Jeld-Wen acquired the doorskins division of Weyerhaeuser. From that time until the 1990s, Jeld-Wen supplied doorskins to domestic manufacturers of interior molded doors but did not manufacture interior molded doors.

39.     In or around the 1990s, Jeld-Wen decided to manufacture and sell interior molded doors as well as doorskins for those doors, making Jeld-Wen vertically integrated.

40.     Shortly after Jeld-Wen became vertically integrated, it went on a buying spree of independent interior molded door manufacturers. Among its acquisitions, Jeld-Wen acquired Michigan Birch Door of Chesterfield, Michigan along with its Doorcraft of Vermont division based in Ludlow, Vermont. Jeld-Wen also acquired an interior door manufacturing plant in Hartselle, Alabama from Young Door in 1990, and Morgan Door Co. in Oshkosh, Wisconsin in 1998.

41.     The other major manufacturer of doorskins was Masonite, which began the production of doorskins in the 1970s. Prior to 2001, Masonite was a subsidiary of International Paper. At that time, Masonite manufactured doorskins for interior molded doors at plants in Laurel, Mississippi and Towanda, Pennsylvania, and sold those doorskins to non-vertically integrated door manufacturers.

42.     In September 2000, International Paper sold Masonite to Premdor, Inc. and Premdor U.S. Holdings, Inc. (collectively, "Premdor"), then the largest manufacturer and merchandiser of interior molded doors in the world. Premdor's market position was also the product of an aggressive series of mergers and acquisitions in the late 1980s and 1990s, including a merger in 1989 with Century Wood Door, a Canadian company that itself had experienced significant growth, including the acquisition of Crown Door Corp., making it one of the largest door manufacturers in the United States at the time. Other Premdor acquisitions included the purchase of The Walled Lake Door Co. of Cameron, Texas in 1992, and the acquisition of the door fabrication operations of Georgia Pacific in 1998.

43.     Thus, by 2000, Masonite and Jeld-Wen dominated the market for the manufacture of molded doorskins, with Masonite alone accounting for more than 50% of the market. A third entity, Fibramold, a Chilean joint venture in which Premdor had an equity interest, accounted for less than 10% of the interior molded doorskins used for the manufacture of interior molded doors in the United States. These were the only three firms with significant sales of interior molded doorskins in the United States at that time, as a small number of other molded doorskins manufacturers each sold less than one percent of the interior molded doorskins in the United States.

44.     In 2000, Premdor was the dominant domestic manufacturer of interior molded doors, with a more 40% share of that market. Jeld-Wen was the only other large domestic producer of interior molded doors. Nine other non-vertically integrated molded door manufacturers each had a market share of less than 5%.

45.     In 2001, the United States Department of Justice ("DOJ") filed a civil antitrust action seeking to block the acquisition of Masonite by Premdor.

46.     As the DOJ explained, allowing Premdor to acquire Masonite's doorskins business and create a new vertically-integrated manufacturer would harm competition in the downstream market for interior molded doors:

> . . . Masonite acts as a significant competitive constraint in the interior molded door market. Premdor and the non-party firm [Jeld-Wen] have an incentive to attempt to coordinate pricing by reducing output. Coordination would reduce the output of interior molded doors, and lead to higher door prices. However, such an output reduction would also reduce the output of interior molded doorskins sold in the United States, harming Masonite. Thus, Masonite would have an incentive to disrupt such coordination through increased sales to the other non-vertically integrated interior door manufacturers. After the proposed transaction, a vertically integrated Premdor/Masonite combination will not have the same incentive to defeat coordination in the interior molded door market by increasing sales to the non-integrated door manufacturers since the combined company

would be competing against those door manufacturers, and would benefit from an increase in the prices of interior molded doors.[1]

47.     The DOJ further explained that a vertically-integrated Masonite/Premdor would have an incentive to coordinate with the already vertically-integrated Jeld-Wen:

> Documentary evidence obtained from the defendants suggests that the non-party firm, as a fully vertically integrated manufacturer, has certain cost advantages over Masonite and Premdor that it has used to lower prices to build market share. This differing cost structure among the dominant firms is an impediment to coordination. The evidence from the defendants suggests that post-acquisition, the cost structures of the two vertically integrated firms would be more closely aligned, decreasing the opportunity for the non-party firm to increase its market share profitably through lower prices, and thus increasing the non-party firm's incentive to coordinate with the combined Premdor/Masonite. In fact, Masonite recognized that the non-party firm's incentive to gain market share by lowering price would diminish if it faced a strong, integrated competitor.[2]

48.     In order to address these competitive concerns, as a condition for allowing Premdor to acquire Masonite, the DOJ required Premdor to divest assets related to the production of molded doorskins at a facility in Towanda, Pennsylvania, including the Towanda plant, as well as an exclusive world-wide right to the "CraftMaster" name and molded doorskin design names, intellectual property related to the manufacture and sale of molded doorskins, a customer list, and the right to hire Masonite employees.

49.     This divestiture resulted in the creation of CMI as a stand-alone competitive force. It was intended to allow CMI to manufacture and sell all designs and sizes of interior molded doorskins that Masonite sold at the time in the United States, with the stated aim of maintaining competition in the domestic interior molded doors market. (As alleged below, however, this salutary aim was undone by Jeld-Wen, which acquired CMI in 2012.)

---

[1] Competitive Impact Statement at 8-9.
[2] *Id.* at 9.

50. After completing the acquisition of Masonite, Premdor, Inc. changed its name to Masonite International Corp.

**B. Market Characteristics Conducive to Collusion**

**1. The United States Market for Interior Molded Doors is Conducive to Collusion Because it is Controlled by Just Two Producers.**

51. There has been substantial consolidation among the manufacturers of interior molded doors.

52. After Premdor's acquisition of Masonite, there was substantial additional consolidation that eliminated competitive doorskin manufacturers. In 2002, Masonite acquired the remaining interests in Fibramold, which became a wholly-owned subsidiary of Masonite, renamed Masonite Chile S.A. Fibramold, the joint venture in which Premdor held an equity interest, was the only other doorskin manufacturer besides Jeld-Wen and Masonite that the DOJ considered to be significant when evaluating Premdor's acquisition of Masonite.

53. In 2002, Masonite also acquired a majority ownership interest in Sacopan Inc., a Canadian company, which just prior to that time had begun to manufacture wood composite molded door facings at a new state-of-the art facility in Sacré-Coeur, Québec. From that time, Sacopan operated as a subsidiary of Masonite. In 2008, Masonite acquired the remaining interest in Sacopan.

54. Both Premdor (now Masonite) and Jeld-Wen had undergone significant growth by acquisition in the late 1980s and 1990s. *See* ¶¶ 39-50, above. This pattern continued after Premdor acquired Masonite, with Jeld-Wen, Masonite and the newly formed CMI continuing to acquire door manufacturers. For example:

- In 2005, CMI acquired C&S Door, a door manufacturer founded in 1976 with plants in Christiansburg, Virginia, and Ozark, Alabama. As a result of this acquisition, CMI became a vertically-integrated manufacturer.

- In February 2010, CMI acquired Illinois Flush Door Co. in Plainfield, Illinois, a manufacturer and distributer of a full line of interior doors, which had been in business since 1944.

- In March 2010, Masonite acquired Ledco, Inc. (previously known as Lake Erie Door Company), a premier interior door manufacturer that had been in the business of selling door products since 1964, and which had a strong wholesale customer base east of the Rockies.

- In October 2010, Masonite acquired Lifetime Doors, Inc., an interior door manufacturer specializing in molded, veneer, prefinished, and bifold doors that had been manufacturing and selling high quality door products since 1947.

- In October 2012, Jeld-Wen acquired CMI, the manufacturer and marketer of interior molded doors and doorskins that operated a manufacturing plant in Towanda, Pennsylvania, which the DOJ required Premdor to divest in 2001 to alleviate competitive concerns arising out of Premdor's acquisition of Masonite from International Paper.

- In August 2017, Jeld-Wen acquired Milliken Millwork, Inc., a leading provider of doors and related value-added services in the Midwest region of the United States that was founded in 1953.

- In April 2018, Jeld-Wen acquired American Building Supply, Inc. a provider of doors, millwork, and related value-added services based in Sacramento, California, which was founded in 1985.

55. This industry consolidation has resulted in Jeld-Wen and Masonite controlling 85% of the interior molded door market, with the rest controlled by a handful of small, regional interior molded door manufacturers, as demonstrated by this excerpt from a Masonite investor presentation:



56. The competitive landscape that emerged in the wake of Jeld-Wen's 2012 acquisition of CMI consisted of two dominant, vertically-integrated door manufacturers with incentives to coordinate, which is exactly what the DOJ had warned of when it required Premdor to divest the assets represented by CMI in the first place.

57.     A high degree of concentration facilitates the successful operation of a price-fixing conspiracy, because it gives competitors transparency into one another's production capabilities and capacity, and makes it easier for competing producers to coordinate their behavior.

58.     Because of their high collective market shares for each product, Defendants collectively are able to and did exercise market power, including the ability to raise prices and erect barriers to entry to the markets.

**2.     The United States Market for Interior Molded Doors is Conducive to Collusion Because of the Existence of High Barriers to Entry.**

59.     A collusive arrangement that raises prices above competitive levels would, under normal circumstances, attract entrants to the market. Where there are significant barriers to entry, however, entrants are less likely. With regard to interior molded door sales in the United States, high barriers to entry, especially those artificially erected by Defendants, have prevented entrants into the market.

60.     Since doorskins are required for interior molded doors, entry into the market for interior molded doors requires access to doorskins. However, the barriers to entry in the doorskin manufacturing business are formidable. As was explained in a 2014 Masonite investor presentation (excerpted below), the interior doorskins business is not easy to replicate and takes approximately four years and a $100-$150 million capital investment.



61.    These high barriers to entry helped facilitate Defendants' conspiracy, as they ensured that no new competitors would be able to enter the market to undermine their collusive prices and pricing terms.

**3.    Price Inelasticity for Interior Molded Doors Makes the Industry Susceptible to Collusion.**

62.    When a seller of goods or services can increase prices without suffering a substantial reduction in demand, pricing is considered inelastic. Price inelasticity facilitates collusion, allowing producers to raise their prices collectively without triggering customer substitution and lost sales revenue.

63.    Pricing for interior molded doors is highly inelastic, in large part because no close substitutes exist for interior molded doors. Interior doors are a necessity for residential and commercial buildings for new construction markets, and if an interior door is broken, it must be replaced. Solid wood doors are not close substitutes for interior molded doors because they are

significantly more expensive and are typically used only in the most expensive homes. Flat-faced flush doors with hardboard or veneered facings are not close substitutes for interior molded doors because they are lower in quality and lack aesthetically pleasing designs, and are therefore less attractive to consumers and are typically used only in entry-level homes or in utility rooms and garages.

64.     A hypothetical small but significant increase in the price of interior molded doors by a cartel would not cause a significant number of purchasers to utilize other materials in lieu of interior molded doors, nor would such a hypothetical price increase cause so much switching to other products that the increase would be unprofitable. Historically, changes in the price of interior molded doors have not had a significant impact on the demand for hardboard or veneered flush doors.

65.     Because the price for interior molded doors is highly inelastic, Defendants were able to and did collectively raise prices to supra-competitive levels without losing revenues.

### 4.     For the Most Part, Interior Molded Doors are Standardized Products with a High Degree of Interchangeability.

66.     Both Masonite and Jeld-Wen make very similar versions of many of the interior molded door models, including the more popular ones, and those interior molded doors do not differ significantly in quality, appearance or use. As a result, those interior molded door models are functionally interchangeable.

67.     When products are interchangeable, the primary way companies can win business is by competing on price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products.

68.     Interior molded doors are produced and sold in standard dimensions.

69. Here, although one Defendant may have offered a style of interior molded door that was not offered by the other, during the Class Period the majority of interior molded door sales were of interior molded door models offered by both Defendants.

70. Where a product like an interior molded door is interchangeable, economics suggests that cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price-fixing agreement.

**5.      Defendants Had Many Opportunities to Collude.**

71. At least throughout the Class Period, the interior molded door industry provided ample opportunities for Defendants to collude and fix the prices of interior molded doors, through trade association meetings and analyst phone calls.

72. Defendants are members of the Window & Door Manufacturers Association, a trade association that has been in existence since 1927, originally known as the National Door Manufacturers Association. Senior executives from both Jeld-Wen and Masonite currently serve on the Board of Directors of the WDMA. The WDMA holds a number of annual meetings that have been attended by Defendants' representatives, including the Spring Meeting & Legislative Conference jointly sponsored by the National Lumber & Building Material Dealers Association, the Executive Management Conference, the National Architectural Door Conference, and the Technical & Manufacturing Conference.

73. Defendants are members of and/or attended meetings organized by other trade associations as well, including the World Millwork Alliance and the Northeastern Retail Lumber Association.

74. Defendants also attended other trade shows and conventions, such as The International Builders' Show, which is organized by the National Association of Home Builders, which takes place in January or February each year in Orlando or Las Vegas.

75.     When owned by private equity firms, both Masonite and Jeld-Wen held IPOs in 2013 and 2017, respectively. Masonite and Jeld-Wen are covered by several of the same financial analysts and executives from both companies attend and make presentations at some of the same annual investor conferences, such as the J.P. Morgan Homebuilding & Building Products Conference, the Baird Global Industrial Conference, and the Deutsche Bank Global Industrials and Materials Summit.

76.     The opportunities for collusion are also enhanced because a number of senior executives have worked for both Masonite and Jeld-Wen and have close professional relationships with their former colleagues. The interior molded door industry is essentially a highly inbred, "good old boy" network that is comprised of the same players who have been working together since the 1980s. For example, Philip Orsino, who served as Chief Executive Officer and President of Jeld-Wen from August 2011 to March 2014, previously served as the chief executive at Masonite and its predecessor entities from 1984 to 2005. After Orsino became chief executive at Jeld-Wen, he brought other former Masonite employees to work at Jeld-Wen. A Vice President of Sales at Masonite under Orsino's leadership from 1981 to 2007 became VP of Sales SE at Jeld-Wen in 2011 when he left Masonite. Also, Robert Merrill, who currently serves as Executive Vice President of Sales & Marketing at Jeld-Wen and was CEO of CMI when it was acquired by Jeld-Wen, is a former Masonite executive.

77.     Other former Jeld-Wen employees are now employed at Masonite. For example, an individual who was a Regional Sales Manager at Jeld-Wen from 2004 to March 2009 and a Regional Manager at CMI from August 2009 to September 2012, when it was acquired by Jeld-Wen, is now a Product Sales Manager at Masonite.

78.     Through communications with colleagues whom they had known and worked with for years at competing companies, Masonite and Jeld-Wen shared information about their intentions to raise prices and the amount of those price increases before they were known to the public.

**6.     The Residential Door Industry's History of Collusive Behavior**

79.     The residential door industry for years has been highly concentrated, and there is a history of antitrust violations by door manufacturers. In the 1990s, the DOJ investigated collusion in the residential door industry and several door manufacturers, including Defendants' predecessors and subsidiaries, pleaded guilty to conspiring to fix the prices of residential doors and paid substantial fines:

- Premdor, the predecessor to Masonite, *see* ¶¶ 42-50, above, pled guilty and paid a $6 million fine.

- Michigan Birch Door Manufacturers Inc., a subsidiary of Jeld-Wen, pled guilty and agreed to pay a $1.55 million criminal fine.

- Illinois Flush Door Inc., which was subsequently acquired by CMI and in turn acquired by Jeld-Wen, pled guilty and agreed to pay a $160,000 criminal fine.

- LEDCO, Inc., which was subsequently acquired by Masonite, pled guilty and agreed to pay a $250,000 criminal fine.

- Steves & Sons, one of the few residential door manufacturers not yet engulphed by Jeld-Wen or Masonite, pled guilty and was fined $650,000.

- Southwood Door Company of Quitman, Mississippi, pled guilty and was fined $25,000.

## C.     The Conspiracy

80.     Starting at least as early as 2012, Defendants engaged in a conspiracy to raise, fix, maintain and or stabilize the prices of interior molded doors.

81.     Since Jeld-Wen's 2012 acquisition of CMI, Jeld-Wen and Masonite have adopted numerous uniform price increases on interior molded doors. In some instances, Jeld-Weld was the first to announce price increases for interior molded doors and in some instances, Masonite first announced the price increase. In all instances, the price increase was quickly followed by an announcement from the other manufacturer matching the price increase.

82.     These price increases were larger and in a different form than prior price increases. Historically, price increases would be in amounts such as 25 cents or $1 per door. Beginning around 2012, Defendants started increasing prices by percentages.

| Company | Notice Date | Effective Date | Increase |
|---|---|---|---|
| Jeld-Wen | 11/15/2012 | 2/4/2013 | 3-5% |
| Masonite | 12/6/2012 | 3/18/2013 | 3-6% |
|  |  |  |  |
| Jeld-Wen | 8/6/2013 | 10/7/2013 | 4% |
| Masonite | 8/13/2013 | 9/30/2013 | 5% |
|  |  |  |  |
| Masonite | 10/31/2013 | 2/3/2014 | 5% |
| Jeld-Wen | 11/18/2013 | 1/27/2014 | 5% |
|  |  |  |  |
| Jeld-Wen | 6/9/2014 | 8/11/2014 | 9.5% |
| Masonite | 6/17/2014 | 8/18/2014 | 8% |
|  |  |  |  |
| Masonite | 12/1/2014 | 3/2/2015 | 5-7% |
| Jeld-Wen | 12/3/2014 | 3/2/2015 | 5-6% |
|  |  |  |  |
| Masonite | 10/26/2015 | 2/1/2016 | 3-5% |
| Jeld-Wen | 10/28/2015 | 2/1/2016 | 3-5% |
|  |  |  |  |
| Masonite | 10/4/2016 | 1/1/2017 | 5-7% |
| Jeld-Wen | 10/18/2016 | 1/3/2017 | 5% |
|  |  |  |  |
| Jeld-Wen | 3/6/2018 | 5/7/2018 | 6% |
| Masonite | 3/2018 | 6/1/2018 | 6% |

| Company | Notice Date | Effective Date | Increase |
|---------|-------------|----------------|----------|
|         |             |                |          |
| Jeld-Wen | 10/8/2018 | 12/17/2018 | 7% |
| Masonite | 10/8/2018 | 12/15/2018 | 7-9% |

83.     An independent door manufacturer with whom Jeld-Wen and Masonite compete in the sale of interior molded doors has alleged in a lawsuit against Jeld-Wen that in an August 2014 meeting with Jeld-Wen, Jeld-Wen's CEO touted its June 9, 2014 price increase of 9.5% as something that was good for doormakers and complained that Masonite had followed with "only" an increase of 8%. Jeld-Wen's willingness to discuss its pricing with a competitor is consistent with conspiratorial pricing behavior.

84.     In a 2016 annual report, Jeld-Wen discussed a new pricing strategy that it began to implement in 2014, shifting from an old strategy that "often led to competing on price" to a new strategy emphasizing "pricing optimization."[3] A shift in pricing policy from increasing market share to increasing unit profits is consistent with conspiratorial pricing behavior.

85.     Defendants' price increases alleged herein cannot rationally be explained by normal market forces, such as key input costs or supply and demand factors. The largest input cost of interior molded doors are interior molded doorskins. Since Defendants are vertically integrated, they control those costs and their price increases have outpaced any increase to their raw material and other costs. The markets for residential new construction and remodeling, which are the primary drivers of demand for interior molded doors, have remained strong since 2012. The capacity for manufacturing doorskins has shifted as Jeld-Wen a) closed doorskin plants in Washington and North Carolina, and a converted plant in Iowa, but b) opened a new larger plant

---

[3] Jeld-Wen 2016 10K, p. 44.

in Louisiana, leaving overall industry-wide doorskin capacity utilization in the range of 60% to 70%.

86.     A Masonite sales director was tasked with using internal software to run pricing scenarios based on market factors, such as the price of raw materials, transportation costs, and expected demand. When the sales director presented price increases based on market data, he suggested hikes that his analysis indicated the market would absorb well. His proposed price increases were presented to senior executives and the Board of Directors, who made the ultimate decision as to the amount of the increase. Instead of relying on the sales director's analyses, ultimate price increases implemented were at times substantially higher than what the sales director believed a competitive market would support based on the data he analyzed.

87.     Pricing decisions at Masonite were often made after a Vice President of Strategic Initiatives returned from days or weeks of travel and had obtained information about Jeld-Wen's intended price increases. Masonite employees knew Jeld-Wen's price increases before they were publicly announced.

88.     During the relevant time period, Masonite never undercut Jeld-Wen's pricing for interior molded doors, even if Masonite's profit margin could have handled a lesser sale price in an effort to take more market share.

89.     Defendants' ability to raise prices has been facilitated by their refusal to provide doorskins to third-party manufacturers as evidenced by the fact that Defendants imposed the largest of these increases after Masonite abruptly stopped selling doorskins to third-party, independent manufacturers in 2014.

90.     Prior to Jeld-Wen's acquisition of CMI in 2012, Masonite, CMI, and Jeld-Wen each aggressively competed in the sale of doorskins to smaller, independent, non-integrated door

manufacturers, such as Steves & Sons (the entity that sued Jeld-Wen), Lynden Door Inc., Haley Bros., Unidoor Corporation, Excel Interior Door, and ABS.

91.     In seeking regulatory approval of the CMI acquisition, Jeld-Wen tried to assuage concerns held by these independent door manufacturers and the DOJ that the acquisition would hurt competition in the doorskin market. It did so by entering into long-term supply agreements with several of these independent door manufacturers. As a result of these supply agreements and Jeld-Wen's representations concerning the continued supply of doorskins, the DOJ did not challenge Jeld-Wen's acquisition of CMI.

92.     The marketplace began to change in 2014 when, in furtherance of the conspiracy, Masonite announced during an investor presentation on June 25, 2014 that it would no longer supply doorskins to third parties:

> Only Masonite and JELD-WEN service the entire North American market. And other door assembly companies are smaller and much more regionally focused. And importantly, the other smaller. . . door assembly manufacturers have to get their facing [i.e., doorskins] from somebody else. They're not vertically integrated in their facings. And we, at Masonite, have determined that we will not sell our facings into—to competition. ***So, that only leaves one other outlet for them to get their facings from in North America.*** (emphasis added).

93.     In its statement, Masonite offered no explanation for why it was exiting the doorskins market. But Masonite's statement that its exit would leave only one other outlet, Jeld-Wen, from which independent door manufacturers could purchase doorskins in North America makes no sense unless viewed as an explicit acknowledgment to its co-conspirator Jeld-Wen that Masonite was ceding the entire doorskins market to Jeld-Wen.

94.     Masonite's refusal to sell doorskins to other door manufacturers is against Masonite's economic self-interest absent a conspiracy with Jeld-Wen. Since doorskins are the primary component of interior molded doors, a manufacturer's ability to control the doorskin

market directly impacts the interior molded door market. By exiting the doorskin market, Masonite gave Jeld-Wen monopoly power within the (non-captive use) doorskin market. Jeld-Wen was then able to use this power in the doorskin market to entirely control a major cost input for the non-vertically integrated, *i.e.*, independent, door manufacturers.

95.     In effect, without competition from Masonite, Jeld-Wen has had the ability to price doorskins to door manufacturers at a level whereby Jeld-Wen can extract all the profits for the sale of the door. It was not in Masonite's economic self-interest to simply gift Jeld-Wen the entire non-captive use doorskin market, foregoing the doorskin revenue that Masonite would have earned from the non-vertically integrated door manufacturers that make up around 15% of the interior molded door market. Masonite has excess capacity in its doorskin production facilities, and, due to the significant upfront and fixed costs of doorskin manufacturing plants, would be incentivized to increase sales in order to maximize production and revenue from doorskins.

96.     Masonite's exit from the doorskins market is all the more suspicious given the fact that Jeld-Wen, its only real competitor, was experiencing pronounced and protracted quality control issues with its doorskins. It is implausible that, absent an anti-competitive agreement with Jeld-Wen, Masonite would exit a market in which it would have been poised to dominate given its largest competitor's quality control issues.

97.     Jeld-Wen has, in fact, utilized its dominant position in the doorskin market, facilitated by its acquisition of CMI and its agreement with Masonite, to harm independent door manufacturers. Contrary to its representations to the DOJ as to the competitive significance of its long-term supply relationships with third-party door manufacturers, Jeld-Wen's relationship with those independent manufacturers has been extremely contentious, particularly since Masonite's departure from the doorskin market.

98.    Notwithstanding that its key input costs for raw materials (wood, resin, wax, oil, and sealer; paint; and packaging) and for energy (electric power prices, natural gas prices, and boiler fuel) decreased every year, Jeld-Wen substantially increased the prices it charged independent door manufacturers for doorskins. Jeld-Wen also changed the way it dealt with doorskin defects and limited reimbursements for those defects.

99.    Faced with these difficulties in sourcing doorskins, thereby undermining their ability to compete in the interior molded door market, in 2016, Steves, a smaller door manufacturer that purchased doorskins from Jeld-Wen, filed a complaint against Jeld-Wen alleging that Jeld-Wen's 2012 acquisition of CMI harmed competition, violating section 7 of the Clayton Act. Steves and Jeld-Wen had a long-term supply agreement, but Jeld-Wen sent a notice of termination in September 2014, effective September 2021. In 2018, a jury found in favor of Steves and awarded nearly $60 million in total damages (past and future lost profits before trebling, and including breach of contract damages).

100.    Jeld-Wen was able to engage in such conduct because of the lack of any alternative supply for doorskins in the U.S. market.

101.    When threatened with the loss of doorskins from Jeld-Wen, Steves sought but was unable to find any alternative source of supply. It approached Masonite, but Masonite refused to enter into a long-term supply agreement and would only sell to Steves on a spot basis. Additionally, Masonite would only do so at prices *37% higher* than the prices Jeld-Wen charged under its supply agreement with Steves. This was an abrupt shift from Masonite's prior willingness to sell doorskins to Steves, before its 2014 announcement that it would stop selling doorskins to independent door manufacturers. Previously, Steves was able to purchase millions of doorskins from Masonite between 2006 and 2012 when Steves entered into its supply relationships with Jeld-Wen. Also in

2012, Masonite had offered to enter into a long-term supply relationship with Steves prior to Steves entering into such a relationship with Jeld-Wen.

102.    Steves also explored sourcing its doorskins from foreign suppliers but was unable to fulfill its doorskin requirements from those suppliers. Those foreign suppliers only offered a limited number of doorskin designs and sizes and also had serious quality deficiencies.

103.    This conduct has undermined the ability of independent door manufacturers to compete with Defendants in the sale of interior molded doors, enabling Defendants to impose numerous matching anticompetitive price increases on the Sub-Class Members.

## VII.    VIOLATIONS OF THE ANTITRUST LAWS

104.    Beginning in at least 2012 and continuing through the present, Defendants have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of interior molded doors in the United States.

105.    Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of interior molded doors sold in the United States. These activities included:

(a)    participation in meetings, conversations, and communications to discuss the price and pricing terms for the sale of interior molded doors in the United States;

(b)    agreement during those meetings, conversations, and communications to raise prices and to otherwise fix, raise, maintain, or stabilize prices for interior molded doors sold in the United States; and

(c)    taking numerous steps, as set forth above, to implement and maintain the conspiracy.

106.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

107.    Throughout the Class Period, Plaintiff and the other Sub-Class members purchased interior molded doors from Defendants (or their subsidiaries or controlled affiliates) at supra-competitive prices.

108.    Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Jeld-Wen's acquisition of CMI also violates Section 7 of the Clayton Act, 15 U.S.C. § 18.

## VIII.   FRAUDULENT CONCEALMENT TOLLED THE STATUTES OF LIMITATIONS

109.    Plaintiff and members of the Sub-Classes had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiff and members of the Sub-Classes were unaware of Defendants' conspiracy, the harm that was to result from the unlawful acquisition, or of facts sufficient to place it on notice of the conspiracy or the claims set forth herein.

110.    In fact, Defendants have publicly stated that they have policies in place to ensure compliance with federal and state laws.

111.    Masonite's publicly available antitrust compliance policy provides:

> Fair trade and competition laws – often referred to as "antitrust laws" – vary from country to country and, in some cases, even within a single country depending on the jurisdiction.
>
> As a general rule, these laws:
>
> • Prohibit agreements or understandings between competitors that undermine competition;
>
> • Regulate the behavior of dominant companies; and
>
> • Require prior review and in some instances clearance for mergers, acquisitions and certain other transactions, in order to

prevent transactions that would substantially reduce competition.

Every country where Masonite does business has some form of fair trade, competition, or antitrust law. Thus, you should be fully familiar with Masonite's Antitrust Policy as it applies to where you do business. If you have any doubt about whether a practice is legal or permitted under Masonite's policies, you should contact the Legal Department immediately.

**II. OUR POLICY**

- **Never** enter into an agreement or an understanding with a competitor, or a group of competitors, about any aspect of Masonite's business without the approval of the Legal Department. Many, if not most, agreements with a competitor are criminal offenses that can result in large fines and prison terms.

- **Do not ever agree** with a competitor about: (1) Masonite's prices or terms and conditions of sale; (2) which customers Masonite will or will not sell to, or in what geographic areas it will sell or not sell; or (3) the price that Masonite will bid or offer to a customer or class of customers. These agreements are always illegal, and will result in your **immediate** dismissal. . . .

Masonite Values Operating Guide.

112.    Jeld-Wen's publicly available antitrust compliance policy states:

Business activities must be conducted in accordance with applicable antitrust and competition laws. Some of the most serious antitrust offenses are agreements between competitors that limit independent judgment and restrain trade, such as agreements to fix pricing, or to divide a market for customers, territories, products or purchases. Any communication with a competitor's representative, no matter how innocent it may seem at the time, may later be subject to legal scrutiny and form the basis for accusations of improper or illegal conduct. Directors, officers and employees should avoid situations from which an unlawful agreement could be inferred. By bringing competitors together, trade associations can raise antitrust concerns, even though such groups serve many legitimate goals. The exchange of sensitive information with competitors regarding topics such as pricing or billing practices can potentially violate antitrust and competition laws and should be avoided.

Jeld-Wen Code of Business Conduct and Ethics (2017).

113. Defendants and their co-conspirators affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiff and the Classes from at least October 24, 2012 through at least June 29, 2016, when residential door manufacturer Steves & Sons filed its Complaint for Injunctive and Declaratory Relief, Damages, and Specific Performance against Jeld-Wen, for the first time publicly disclosing facts pertaining to Defendants' alleged anticompetitive conduct and illegal scheme. Before Steves' June 29, 2016 complaint, Plaintiff and the Classes did not learn or discover the operative facts giving rise to their claims, despite due diligence. Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least June 29, 2016.

## A. Active Concealment of the Conspiracy

114. Defendants engaged in an illegal scheme to fix prices in violation of the federal antitrust laws. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

115. Through their misleading, deceptive, false and fraudulent statements and material omissions, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiff and the Sub-Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiff and the Sub-Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiff and the Sub-Classes into paying unjustifiably higher prices for interior molded doors.

116. These false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of interior molded doors to artificially inflated levels.

## B. Plaintiff Exercised Reasonable Diligence.

117. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing.

Plaintiff and members of the Sub-Classes received pricing information from one or both of Defendants, and Plaintiff reasonably considered the market for interior molded doors to be competitive. Jeld-Wen's October 24, 2012 acquisition of CMI consolidated the doorskins market into a duopoly, and further greatly consolidated the interior molded doors market. Price increases following the creation of a duopoly market are not unexpected due to limited competition, and thus, Plaintiff and the Sub-Classes had no reason to suspect anything other than that Defendants' price increases on interior molded doors were merely a consequence of the duopoly market for doorskins and further consolidation in the interior molded doors market. While interdependent price increases are not unlawful, coordination of pricing and price increases among competitors is. Plaintiff and the Sub-Classes had no reason to investigate, and no way to know that these prices were higher than they should have been due to the conspiracy and the unlawful anticompetitive conduct alleged herein before June 29, 2016.

118.    A reasonable person under the circumstances could also not have been alerted to the unlawfulness of Jeld-Wen's acquisition of CMI until Steves' June 29, 2016 complaint. Accordingly, Plaintiff and members of the Sub-Classes under the circumstances would not have been alerted to investigate the legitimacy of Defendants' pricing and price increases before Steves' June 29, 2016 complaint, particularly in light of the DOJ's approval of the acquisition.

119.    Because of Defendants' concealment of their illicit conduct, Plaintiff and the Sub-Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

120.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiff and the Sub-Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiff and the other members of the Sub-

Classes were unaware of Defendants' unlawful conduct and did not know they were paying supra-competitive prices for interior molded doors throughout the United States during the Class Period.

121.     For these reasons, Plaintiff's claims are timely under both the federal laws identified herein.

## IX.     ANTI-COMPETITIVE EFFECTS

122.     As a result of Defendants' unlawful conduct, Plaintiff and the other Sub-Class members have been injured in their business and property because they have paid more for interior molded doors than they would have paid absent the collusion and unlawful acquisition.

123.     Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

(a)     price competition in the markets for interior molded doors has been artificially restrained;

(b)     prices for interior molded doors sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

(c)     purchasers of interior molded doors from Defendants have been deprived of the benefit of free and open competition in the markets for interior molded doors.

124.     Jeld-Wen's 2012 acquisition of CMI had at least the following effects:

(a)     the effect of the 2012 merger has been and will continue to be substantially to lessen competition, or to tend to create a monopoly, in the United States interior molded doors market;

(b)     it has caused price increases in the market for interior molded doors both because of higher doorskin prices incorporated into higher prices for interior molded doors and also because it has given Jeld-Wen the power, unilaterally and

35

in coordination with the other largest remaining competitor, to raise prices for interior molded doors to levels substantially higher than they would be but for the merger; and

(c)     the 2012 merger has caused the supply of doorskins to be of lower quality, which necessarily impaired the quality of the doors sold by Jeld-Wen and the independent door manufacturers to which it sold those doorskins to the detriment of Plaintiff and the other purchasers of interior molded doors.

## COUNT I— PLAINTIFF AND SUB-CLASS 1 AGAINST DEFENDANTS
### Violations of The Sherman Act, 15 U.S.C. § 1

125.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

126.    Beginning in at least 2012, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of interior molded doors in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

127.    Plaintiff and the other members of Sub-Class 1 have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiff and Sub-Class 1 members have paid more for interior molded doors than they otherwise would have paid in the absence of Defendants' conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

128.    Accordingly, Plaintiff and Sub-Class 1 members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

### COUNT II—PLAINTIFF AND SUB-CLASS 2 AGAINST JELD-WEN ONLY
#### Violation of the Clayton Act, Section 7, 15 U.S.C. § 18

129.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

130.     Defendant Jeld-Wen unlawfully acquired the assets of its competitor CMI, as detailed above, thereby substantially lessening competition in the United States interior molded doors market.

131.     As set out in the complaint Steves filed against Jeld-Wen, the unlawful 2012 merger has harmed, and threatens to continue to harm, millions of consumers across the United States. At the "upstream" level of doorskins, it has substantially reduced the availability of doorskins; caused the remaining supply of doorskins to be of lower quality, and higher price, than they would have been but for the merger; and made it much more difficult for any competitor to enter and strengthen competition. At the "downstream" level of interior molded doors, including the level in which Plaintiff and Sub-Class 2 do business as direct purchasers of interior molded doors from Jeld-Wen, it has caused additional price increases, not only when higher doorskin prices are incorporated into higher prices for interior molded doors, but also because it has given Jeld-Wen the power, unilaterally and in coordination with the other largest remaining competitor, to raise prices for interior molded doors to levels substantially higher than they would be but for the merger.

132.     Whereas independent door manufacturers were able to purchase doorskins, a major material component in the manufacturing of interior molded doors, from Jeld-Wen, Masonite, and CMI prior to Jeld-Wen's acquisition of CMI, the acquisition has substantially lessened competition in the doorskins market. Even further lessening competition, in June 2014 Masonite stopped selling doorskins to independent door manufacturers. Presently, Jeld-Wen has monopoly power in the doorskins market.

133.    Because doorskins are a necessary component of interior molded doors and represent the largest cost in producing an interior molded door, the reduction of competition in the doorskins market has resulted in a significant reduction in competition in the interior molded door market, whereby independent interior molded door manufacturers are no longer able to effectively compete in the interior molded door market.

134.    Before the acquisition, Plaintiff and the other members of Sub-Class 2 were able to purchase interior molded doors from a wide array of sellers, such as Jeld-Wen, Masonite, CMI, Steves & Sons, and other independent interior molded door manufacturers. Jeld-Wen's acquisition of CMI, however, not only increased concentration in the interior molded doors market by combining two of the largest sellers of interior molded doors, but also resulted in Jeld-Wen's monopoly power in the doorskins market, which has also had anticompetitive effects in the interior molded doors market. Independent interior door manufacturers are no longer able to effectively compete in the interior molded doors market because Jeld-Wen substantially increased the price it charged for doorskins notwithstanding its own declining costs, changed the terms on which it handled defective products in the face of increasing quality concerns, and terminated a long-term supply agreement with at least one independent door manufacturer. Therefore, Jeld-Wen's unlawful acquisition and conduct violated Section 7 of the Clayton Act, 15 U.S.C. § 18.

135.    By reason of the antitrust violations of Defendant Jeld-Wen alleged herein, the prices of interior molded doors purchased by Plaintiff and the other members of Sub-Class 2 were higher than they would have been but for Jeld-Wen's violation of antitrust laws.

136.    Jeld-Wen's acquisition and holding of CMI violated Section 7 of the Clayton Act.

137.    As a direct and proximate result of Jeld-Wen's acquisition of CMI, a direct competitor, Plaintiff and members of Sub-Class 2 were injured in their business or property by the

substantial lessening of competition in the United States interior molded doors market. Without limiting the generality of the foregoing, Plaintiff and members of Sub-Class 2 have been forced to pay higher prices for interior molded doors than they would have paid in the absence of Jeld-Wen's unlawful conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Jeld-Wen's conduct unlawful.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands judgment against Defendants as follows:

a. Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the two Sub-Classes as defined herein;

b. That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants, be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

c. That certain acts alleged herein by Defendant Jeld-Wen be adjudged and decreed unlawful acts in violation of Section 7 of the Clayton Act;

d. That judgment be entered for Plaintiff and the Sub-Classes against Defendants for three times the amount of damages sustained by Plaintiff and the Sub-Classes as allowed by law;

e. That Plaintiff and the Sub-Classes recover pre-judgment and post-judgment interest as permitted by law;

f. That Plaintiff and the Sub-Classes recover their costs of the suit, including attorneys' fees, as provided by law; and

g.     For such other and further relief as is just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  October 19, 2018                     Respectfully submitted,

**GRUBB LUMBER COMPANY, INC.,**

  */s/  Wyatt B. Durrette, Jr.*
Wyatt B. Durrette, Jr., Esq. (VSB No. 04719)
Christine A. Williams, Esq. (VSB No. 47074)
Kevin J. Funk, Esq. (VSB No. 65465
DURRETTE, ARKEMA, GERSON & GILL PC
Bank of America Center
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Tel:  804-775-6900
Fax:  804-775-6911
Email:  wdurrette@dagglaw.com
            cwilliams@dagglaw.com
            kfunk@dagglaw.com


Michael J. Boni*
Joshua D. Snyder*
John E. Sindoni*
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, Pennsylvania  19004
Tel:  610-822-0200
Fax:  610-822-0206
Email:  mboni@bonizack.com
            jsnyder@bonizack.com
            jsindoni@bonizack.com

Jeffrey J. Corrigan*
Jeffrey L. Spector*
Len A. Fisher*
SPECTOR ROSEMAN & KODROFF P.C.
1818 Market Street, Suite 2500
Philadelphia, Pennsylvania  19103
Tel:  215-496-0300
Fax:  215-496-6611
Email:  jcorrigan@srkattorneys.com
          jspector@srkattorneys.com
          lfisher@srkattorneys.com


W. Joseph Bruckner*
Elizabeth R. Odette*
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota  55401
Tel:  612-339-6900
Fax:  612-339-0981
Email:  wjbruckner@locklaw.com
          erodette@locklaw.com


Roberta D. Liebenberg*
Jeffrey S. Istvan*
Gerard A. Dever*
FINE, KAPLAN & BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, Pennsylvania  19107
Tel:  215-567-6565
Fax:  215-568-5872
Email:  rliebenberg@finekaplan.com
          jistvan@finekaplan.com
          gdever@finekaplan.com

Howard Langer*
Edward Diver*
Peter Leckman*
LANGER, GROGAN & DIVER P.C.
1717 Arch Street, Suite 4020
Philadelphia, Pennsylvania  19103
Tel:  215-320-5660
Fax:  215-320-5703
Email:  hlanger@langergrogan.com
            ndiver@langergrogan.com
            pleckman@langergrogan.com


Jeffrey Gittleman*
BARRACK, RODOS & BACINE
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, Pennsylvania  19103
Tel:  215-963–0600
Fax:  215-963–0838
Email:  jgittleman@barrack.com


*Counsel for Plaintiff and the Proposed Sub-Classes*

*Applications for Admission Pro Hac Vice* Forthcoming