**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **IN RE: INTERIOR MOLDED DOORS ANTITRUST LITIGATION** | **Lead Civil Action No. 3:18-cv-00718-JAG** |

## SECOND AMENDED CONSOLIDATED COMPLAINT

Plaintiffs Grubb Lumber Company, Inc. ("Grubb Lumber"), Len-Co Lumber Corp. ("Len-Co") and Philadelphia Reserve Supply Company ("PRSCO") (collectively, "Plaintiffs") bring this action on their own behalf and on behalf of all others similarly situated, to recover treble damages and other appropriate relief based on Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. In support of this Second Amended Consolidated Complaint ("Complaint"), Plaintiffs allege, with knowledge as to their own acts and those taking place in their presence and upon information and belief as to all other matters, as follows:

### I. NATURE OF ACTION

1.      This case challenges Defendants' collusive pricing and illegal scheme for "interior molded doors" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Interior molded doors are a type of interior door made by sandwiching a wood frame and a hollow or solid core between two doorskins composed of a high-density fibrous mat and formed into a raised panel design. Interior molded doors attempt to simulate the aesthetics of solid wood doors at lower prices, and are the most popular type of interior door in North America.

2.      Doorskins constitute the largest input cost of an interior molded door, comprising up to 70% of the cost of manufacturing a molded door. Defendants Masonite Corporation ("Masonite"), JELD-WEN, Inc. and JELD-WEN Holding, Inc. (collectively "Jeld-Wen") are

vertically-integrated manufacturers, *i.e.*, they manufacture both doorskins as well as interior molded doors. Defendants control approximately 85% of the market for interior molded doors, and are the only manufacturers of doorskins, the primary component of interior molded doors, in North America. Being the only two vertically-integrated interior molded door manufacturers in the U.S., Jeld-Wen and Masonite have dominant power in that market.

3.      Historically, the market contained at least one significant non-integrated manufacturer of doorskins, Masonite, at least one significant non-integrated manufacturer of interior molded doors, Premdor, Inc., and numerous other non-integrated interior molded door manufacturers.

4.      Recognizing there was a strong incentive by door manufacturers to collude to increase the price of interior molded doors, in 2001 the U.S. Department of Justice ("DOJ") permitted Premdor, Inc. to acquire Masonite (and form a newly-integrated manufacturer of both doorskins and interior molded doors) only on the condition that Premdor/Masonite divest a doorskin manufacturing plant in Towanda, Pennsylvania to a new entity, CraftMaster, Inc. ("CMI").

5.      In 2012, however, Jeld-Wen acquired CMI, thereby eliminating the check on competition established when the DOJ required Masonite to divest CMI more than a decade earlier.

6.      In the wake of that merger and in furtherance of the conspiracy alleged herein, Defendants jointly sought to eliminate competition by stopping their longstanding practice of supplying doorskins to smaller interior molded door manufacturers. Because doorskins are a necessary component of interior molded doors, any lessening of competition in the doorskins

market necessarily results in a lessening of competition in the interior molded doors market, thereby injuring Plaintiffs and Class members.

7.     In furtherance of the conspiracy, Masonite announced in 2014 it would no longer sell doorskins to other door manufacturers. This unprecedented shift in business practice was plainly against Masonite's own economic interests, as it handed over that entire market to Jeld-Wen. Further evidence that Masonite acted against its economic interests when it stopped selling doorskins is that it did so at a time when Jeld-Wen's doorskins were of poor quality.

8.     Around the same time, Jeld-Wen began taking adverse actions against third-party door manufacturers with which it had long-term supply agreements for doorskins by, among other things, raising prices notwithstanding its own declining costs. It also notified at least one third-party manufacturer that it would prematurely terminate its supply agreement, contrary to the terms of the agreement. Jeld-Wen's conduct undermined the ability of independent manufacturers to compete with Defendants in the sale of interior molded doors.

9.     This market structure, established through consolidation and Defendants' coordinated conduct as alleged herein, has enabled Defendants to repeatedly impose uniform price increases in the interior molded door market without any competitive constraints.

10.    Defendants communicated regularly regarding their pricing intentions. Numerous high-ranking executives from Masonite and Jeld-Wen had worked at the other company at one point and had close relationships dating back to the 1980s. In fact, decisions on pricing at Masonite were made after one of its vice presidents, who had significant influence with upper management and participated in the company's pricing discussions, went on business trips and returned with knowledge of Jeld-Wen's planned price increases. On his return from such trips, the vice president always knew what Jeld-Wen's price increases would be before the price

increases were publicly announced. Also, at least from 2012 to the vice president's departure from Masonite in 2014, Masonite never undercut Jeld-Wen's prices for interior molded doors. This was the case even when Masonite's profit margin could have withstood a lower sale price to earn more market share.

11.     As it discussed in its annual reports, during this time Jeld-Wen shifted from a strategy that focused on increasing market share, which often led to price competition, to a new strategy Jeld-Wen characterized as pricing optimization. When sales forces have incentives to pursue increases in market share, such incentives can run counter to cartel activity. For this reason, a shift away from a pricing policy focused on increasing market share can be indicative of a conspiracy.

12.     Defendants' price increases cannot rationally be explained by normal market forces, such as rising key input costs or supply and demand factors. Key input costs for raw materials, such as wood, resin, wax, oil, sealer, paint, and packaging, and for energy, such as electric power prices, natural gas prices, and boiler fuel, decreased while Defendants increased their prices. Masonite employees analyzed data and ran pricing scenarios based on market factors, such as the price of raw materials, transportation costs, and expected demand, and were often surprised to learn that the company's top executives intended to impose price increases that were substantially in excess of what they believed the market would accept.

13.     The interior molded door market possesses characteristics that are well recognized to enable and facilitate collusion in such a way that would inflict widespread harm on Class members (defined below), including the fact that (a) it is highly concentrated, with Defendants controlling 85% of the market, (b) there are significant barriers to entry, (c) there are no economic substitutes for interior molded doors, (d) interior molded doors are standardized

products with a high degree of interchangeability, and (e) there are ample opportunities to conspire through trade associations and other meetings. In addition, there is a history of collusion in the residential door industry generally – with Defendants or their predecessors having pled guilty to antitrust violations in the 1990s – and as to Defendants specifically, as alleged herein at ¶ 81.

14.     These collusive pricing practices have harmed Plaintiffs and Class members, which paid more for interior molded doors than they would have paid absent Defendants' unlawful collusive conduct.

## II.     THE PARTIES

15.     Plaintiff Grubb Lumber is a Delaware corporation with its principal place of business in Wilmington, Delaware. Grubb Lumber purchased interior molded doors directly from Defendants during the Class Period (defined below).

16.     Plaintiff Len-Co Lumber Corp. is a New York corporation with its principal place of business in Buffalo, New York. Len-Co purchased interior molded doors directly from a subsidiary of Defendant JELD-WEN Holding, Inc. during the Class Period (defined below).

16(a). Plaintiff Philadelphia Reserve Supply Company ("PRSCO") is a Pennsylvania corporation with its principle place of business in Croydon, Pennsylvania. PRSCO purchased interior molded doors directly from Defendants during the Class Period (defined below).

17.     Defendant Masonite is a corporation organized under the laws of Delaware. Masonite's principal place of business is One Tampa City Center, 201 North Franklin Street, Suite 300, Tampa, Florida 33602. Masonite is a wholly owned subsidiary of Masonite International Corporation. Masonite is registered with the Virginia State Corporation Commission as a foreign corporation and maintains a registered agent in Virginia.

18.     Defendant JELD-WEN, Inc. is a corporation organized under the laws of Delaware. JELD-WEN, Inc.'s principal place of business is 2645 Silver Crescent Drive, Charlotte, North Carolina 28273. JELD-WEN, Inc. is a wholly-owned subsidiary of Defendant JELD-WEN Holding, Inc. JELD-WEN, Inc. is registered with the Virginia State Corporation Commission as a foreign corporation and maintains a registered agent in Virginia.

19.     Defendant JELD-WEN Holding, Inc. is a corporation organized under the laws of Delaware. JELD-WEN Holding, Inc.'s principal place of business is 2645 Silver Crescent Drive, Charlotte, North Carolina 28273. JELD-WEN Holding, Inc. is the direct parent company of Defendant JELD-WEN, Inc. JELD-WEN Holding, Inc. is liable for the conspiracy alleged herein by virtue of its direct participation in the conspiracy, and by and through JELD-WEN, Inc., which acted as JELD-WEN Holding, Inc.'s alter ego or agent. *See infra* § VI.D.

### III.     JURISDICTION AND VENUE

20.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries Plaintiffs and the other Class members have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

22.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

23.     This Court has personal jurisdiction over each Defendant because, among other

things, each Defendant: (a) transacted business throughout the United States, including in this

District; (b) sold interior molded doors throughout the United States, including in this District;

(c) had substantial contacts with the United States, including in this District; (d) was engaged in

an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended

effect of causing injury to, and did cause injury to persons residing in, located in, or doing

business throughout the United States, including in this District; and/or (e) took overt action in

furtherance of the conspiracy in this District or conspired with someone who did, and by doing

so could reasonably have expected to be sued in this District.

## IV.     CLASS ALLEGATIONS

24.     Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal

Rules of Civil Procedure on behalf of a class consisting of:

> All persons or entities that purchased interior molded doors in the
> United States from at least as early as October 24, 2012 through
> the present (the "Class Period") directly from any of the
> Defendants, their subsidiaries, affiliates or joint-ventures (the
> "Class").

Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any

co-conspirators, federal governmental entities and instrumentalities of the federal government.

25.     The Class is so numerous that joinder of all members is impracticable. On

information and belief, hundreds or thousands of individuals and entities geographically

dispersed around the country purchased interior molded doors from Defendants during the Class

Period.

26.     There are questions of law or fact common to the Class, which predominate over

any questions that may affect individual members of the Class, including:

a.    Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain and/or stabilize the prices of interior molded doors in the United States;

b.    The identity of other participants of the alleged combination or conspiracy, if any;

c.    The duration of the alleged combination or conspiracy and the acts carried out by Defendants and their co-conspirators, if any, in furtherance of the combination or conspiracy;

d.    Whether the alleged combination or conspiracy violated the Sherman Act;

e.    Whether the alleged combination or conspiracy had the effect of artificially inflating the price of interior molded doors sold in the United States during the Class Period;

f.    Whether Defendants' conduct caused injury to Class members;

g.    Whether Defendants undertook actions to conceal their unlawful conspiracy; and

h.    The measure and amount of damages incurred by the Class.

27.    Plaintiffs are members of the Class and their claims are typical of the claims or defenses of the Class. Plaintiffs and all Class members were damaged by Defendants' actions, which caused them to pay artificially inflated prices for interior molded doors. There are no defenses that are unique to Plaintiffs.

28.    Plaintiffs will fairly and adequately protect the interests of the Class because Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class members.

29.     Plaintiffs are represented by counsel who are capable and experienced in the prosecution of class action and antitrust litigation.

30.     Adjudicating the claims of the Class members as a class action is superior to the alternative, because it promotes the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

31.     The Class members are ascertainable either from Defendants' records or through self- identification in the claims process.

## V.     INTERSTATE TRADE AND COMMERCE

32.     Defendants' conduct as described in this Complaint was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

33.     During the Class Period, Defendants manufactured, sold and/or shipped interior molded doors in a continuous and uninterrupted flow of interstate commerce. The price-fixing combination or conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## VI.     FACTUAL ALLEGATIONS

### A.     The Interior Molded Doors Market

34.      "Interior molded doors" are a type of composite wood door used primarily in residential construction and remodeling, including the construction and remodeling of multi-

family and apartment housing, for closets, rooms, and hallways. An interior composite wood door is made by sandwiching a wood frame and a hollow or solid core between two doorskins. The doorskins used to manufacture an interior composite wood door generally come in three types: hardboard, veneered and molded. While some interior doors are made of solid wood, the vast majority use composite wood materials to create their hollow or solid cores and doorskin components.

35.     Interior molded doors, which are the most popular type of interior door in North America, have two doorskins that are made from a high-density fibrous mat formed into a raised panel design. Interior molded doors attempt to simulate the aesthetics of solid wood doors at lower prices. (Unlike interior molded doors, hardboard or veneered doors have a flat surface. The doorskin of an interior hardboard door is typically a multi-ply facing of wood such as pine, and the doorskin of an interior veneered door is typically plywood with a thin veneered overlay of a wood such as birch or oak.)

36.     Interior molded door manufacturers sell to distributors, building supply outlets, home centers and lumber yards. Consumers purchasing doors to repair, renovate or remodel an existing home typically purchase doors from retail building supply outlets. Builders and contractors purchase doors primarily from distributors, lumber yards, home centers and building supply outlets.

37.     The market for interior molded doors is closely connected to the upstream market for interior molded doorskins. Two doorskins are required for each composite wood door. Doorskins constitute the largest input cost of an interior molded door, comprising up to 70% of the cost of manufacturing such a door.

38.     Masonite and Jeld-Wen are the only two manufacturers of interior molded doorskins in the western hemisphere and operate eight of the nine largest doorskin facilities in the world. Smaller foreign doorskin manufacturers in Turkey, Romania and China, such as Teverpan, Kastamonu and Yildiz, respectively, are unable to supply doorskins of a sufficient quantity, quality, and range of product lines necessary to satisfy the needs of U.S. door manufacturers. As such, Defendants are the only viable source of interior molded doorskins in the United States.

39.     Jeld-Wen began manufacturing interior molded doorskins in the early 1970s, and it has owned and operated nine doorskin manufacturing plants, six of which Jeld-Wen built itself. In the early 1980s, Jeld-Wen acquired the doorskins division of Weyerhaeuser. From that time until the 1990s, Jeld-Wen supplied doorskins to domestic manufacturers of interior molded doors but did not manufacture interior molded doors.

40.     In or around the 1990s, Jeld-Wen decided to manufacture and sell interior molded doors as well as doorskins for those doors, making Jeld-Wen vertically integrated.

41.     Shortly after Jeld-Wen became vertically integrated, it went on a buying spree of independent interior molded door manufacturers. Among its acquisitions, Jeld-Wen acquired Michigan Birch Door of Chesterfield, Michigan along with its Doorcraft of Vermont division based in Ludlow, Vermont. Jeld-Wen also acquired an interior door manufacturing plant in Hartselle, Alabama from Young Door in 1990, and another from Morgan Door Co. in Oshkosh, Wisconsin in 1998.

42.     The other major manufacturer of doorskins was Masonite, which began producing doorskins in the 1970s. Prior to 2001, Masonite was a subsidiary of International Paper. During that time, Masonite manufactured doorskins for interior molded doors at plants in Laurel,

11

Mississippi and Towanda, Pennsylvania, and sold those doorskins to non-vertically integrated door manufacturers.

43.     In September 2000, International Paper sold Masonite to Premdor, Inc. and Premdor U.S. Holding, Inc. (collectively, "Premdor"), then the largest manufacturer and merchandiser of interior molded doors in the world. Premdor's market position was also the product of an aggressive series of mergers and acquisitions in the late 1980s and 1990s, including a merger in 1989 with Century Wood Door, a Canadian company that itself had experienced significant growth, including the acquisition of Crown Door Corp., making it one of the largest door manufacturers in the United States at the time. Other Premdor acquisitions included the purchase of The Walled Lake Door Co. of Cameron, Texas in 1992, and the door fabrication operations of Georgia-Pacific in 1998.

44.     Thus, by 2000, Masonite and Jeld-Wen dominated the market for the manufacture of interior molded doorskins, with Masonite alone accounting for more than 50% of the market. A third entity, Fibramold, a Chilean joint venture in which Premdor had an equity interest, accounted for less than 10% of the interior molded doorskins used for the manufacture of interior molded doors in the United States. These were the only three firms with significant sales of interior molded doorskins in the United States at that time; a small number of other interior molded doorskins manufacturers each sold less than one percent of the interior molded doorskins in the United States.

45.     In 2000, Premdor was the dominant domestic manufacturer of interior molded doors, with more than a 40% share of that market. Jeld-Wen was the only other large domestic producer of interior molded doors. Nine other non-vertically integrated molded door manufacturers each had a market share of less than 5%.

46. In 2001, the DOJ filed a civil antitrust action seeking to block the acquisition of Masonite by Premdor. As the DOJ explained, allowing Premdor to acquire Masonite's doorskins business and create a new vertically-integrated manufacturer would harm competition in the downstream market for interior molded doors:

> . . . Masonite acts as a significant competitive constraint in the interior molded door market. Premdor and the non-party firm [Jeld-Wen] have an incentive to attempt to coordinate pricing by reducing output. Coordination would reduce the output of interior molded doors, and lead to higher door prices. However, such an output reduction would also reduce the output of interior molded doorskins sold in the United States, harming Masonite. Thus, Masonite would have an incentive to disrupt such coordination through increased sales to the other non-vertically integrated door manufacturers. After the proposed transaction, a vertically integrated Premdor/Masonite combination will not have the same incentive to defeat coordination in the interior molded door market by increasing sales to the non-integrated door manufacturers since the combined company would be competing against those door manufacturers, and would benefit from an increase in the prices of interior molded doors.

47. The DOJ further explained that a vertically-integrated Masonite/Premdor would have an incentive to coordinate with the already vertically-integrated Jeld-Wen:

> Documentary evidence obtained from the defendants suggests that the non-party firm, as a fully vertically integrated manufacturer, has certain cost advantages over Masonite and Premdor that it has used to lower prices to build market share. This differing cost structure among the dominant firms is an impediment to coordination. The evidence from the defendants suggests that post-acquisition, the cost structures of the two vertically integrated firms would be more closely aligned, decreasing the opportunity for the non-party firm to increase its market share profitably through lower prices, and thus increasing the non-party firm's incentive to coordinate with the combined Premdor/Masonite. In fact, Masonite recognized that the non-party firm's incentive to gain market share by lowering price would diminish if it faced a strong, integrated competitor.

48. In order to address these competitive concerns, as a condition for allowing Premdor to acquire Masonite, the DOJ required Premdor to divest assets related to the

production of interior molded doorskins at a plant in Towanda, Pennsylvania, as well as an exclusive right to the "CraftMaster" name and molded doorskin design names, intellectual property related to the manufacture and sale of interior molded doorskins, a customer list, and the right to hire Masonite employees.

49.     This divestiture resulted in the creation of CMI as a stand-alone competitive force. It was intended to allow CMI to manufacture and sell all the designs and sizes of interior molded doorskins that Masonite sold at the time in the United States, with the stated aim of maintaining competition in the domestic interior molded doors market. (As alleged below, however, this salutary aim was undone by Jeld-Wen's acquisition of CMI in 2012.)

50.     After completing the acquisition of Masonite, Premdor changed its name to Masonite International Corp.

**B.      Market Characteristics Conducive to Collusion**

**1.       The United States Market for Interior Molded Doors is Conducive to Collusion Because it is Controlled by Just Two Producers.**

51.     There has been substantial consolidation among the manufacturers of interior molded doors.

52.     After Premdor's acquisition of Masonite, there was substantial additional consolidation that eliminated competing doorskin manufacturers. In 2002, Masonite acquired the remaining interests in Fibramold, which became a wholly-owned subsidiary of Masonite, renamed Masonite Chile S.A. Fibramold, the joint venture in which Premdor held an equity interest, was the only other doorskin manufacturer besides Jeld-Wen and Masonite that the DOJ considered to be significant when evaluating Premdor's acquisition of Masonite.

53.     In 2002, Masonite also acquired a majority ownership interest in Sacopan Inc., a Canadian company that just prior to that time had begun to manufacture wood composite molded

door facings at a new state-of-the art facility in Sacré-Coeur, Québec. From that time, Sacopan operated as a subsidiary of Masonite. In 2008, Masonite acquired the remaining interest in Sacopan.

54.     Both Premdor (now Masonite) and Jeld-Wen had undergone significant growth by acquisition in the late 1980s and 1990s. *See* ¶¶ 41-49, *supra*. This pattern continued after Premdor acquired Masonite, with Jeld-Wen, Masonite and the newly formed CMI continuing to acquire door manufacturers. For example:

- In 2005, CMI acquired C&S Door, a door manufacturer founded in 1976 with plants in Christiansburg, Virginia, and Ozark, Alabama. As a result of this acquisition, CMI became a vertically-integrated manufacturer.

- In February 2010, CMI acquired Illinois Flush Door Co. in Plainfield, Illinois, a manufacturer and distributer of a full line of interior doors, which had been in business since 1944.

- In March 2010, Masonite acquired Ledco, Inc. (previously known as Lake Erie Door Company), a premier interior door manufacturer that had been selling door products since 1964, and which had a strong wholesale customer base east of the Rockies.

- In October 2010, Masonite acquired Lifetime Doors, Inc., an interior door manufacturer specializing in molded, veneer, prefinished, and bifold doors that had been manufacturing and selling high quality door products since 1947.

- In October 2012, JELD-WEN, Inc. acquired CMI, the manufacturer and marketer of interior molded doors and doorskins that operated a

manufacturing plant in Towanda, Pennsylvania, which the DOJ required

Premdor to divest in 2001 to alleviate competitive concerns arising out of

Premdor's acquisition of Masonite from International Paper.

- In August 2017, JELD-WEN Holding, Inc., acquired Milliken Millwork, Inc., a leading provider of doors and related value-added services in the Midwest region of the United States, which was founded in 1953.

- In April 2018, JELD-WEN Holding, Inc. acquired American Building Supply, Inc., a provider of doors, millwork, and related value-added services based in Sacramento, California, which was founded in 1985.

55.     This industry consolidation has resulted in Jeld-Wen and Masonite controlling 85% of the interior molded door market, with the rest controlled by a handful of small, regional interior molded door manufacturers, as demonstrated by this excerpt from a Masonite investor presentation:



56.     Historically, the market for interior molded doors was viewed as regional due to the presence of locally-focused door manufacturers and variations in shipping costs.

57.     The consolidation in the industry has eliminated most of those regional manufacturers and has given Defendants a nationwide footprint, *i.e.*, factories from which to ship interior molded doors, removing regional variations in pricing.

58.     The competitive landscape that emerged in the wake of Jeld-Wen's 2012 acquisition of CMI consisted of two dominant, vertically-integrated door manufacturers with incentives to collude, which is exactly what the DOJ had warned of when it required Premdor to divest the assets represented by CMI in the first place.

59.     A high degree of concentration facilitates the successful operation of a price-fixing conspiracy, because it gives competitors transparency into one another's production

capabilities and capacity, and makes it easier for competing producers to coordinate their behavior.

60.     Because of their high collective market share for interior molded doors and the fact that they are the only two manufacturers of doorskins in North America, Defendants collectively are able to and did exercise dominant market power in the interior molded doors market, including the ability to erect barriers to entry and raise prices.

**2.      The United States Market for Interior Molded Doors is Conducive to Collusion Because of the Existence of High Barriers to Entry.**

61.     A collusive arrangement that raises prices above competitive levels would, under normal circumstances, attract entrants to the market. Where there are significant barriers to entry, however, entrants are less likely. With regard to interior molded door sales in the United States, high barriers to entry, especially those artificially erected by Defendants, serve as barriers to potential entrants into the market.

62.     As Masonite itself acknowledged in a 2014 investor presentation (excerpted below), the production of interior molded doors is not easy to replicate and would take a capital investment of more than $200 million.



63.     As another Masonite investor presentation demonstrates, it would take approximately four years before even a new doorskins ("facings" in the presentation) manufacturer could enter the market:



64.    These high barriers to entry helped facilitate Defendants' conspiracy, as they ensured that no new competitors would be able to enter the market to undermine their collusive prices.

### 3.    Price Inelasticity for Interior Molded Doors Makes the Industry Susceptible to Collusion.

65.    When a seller of goods or services can increase prices without suffering a substantial reduction in demand, pricing is considered inelastic. Price inelasticity facilitates collusion, allowing producers to raise their prices collectively without triggering customer substitution and lost sales revenue.

66.    Pricing for interior molded doors is highly inelastic, in large part because no close substitutes exist for interior molded doors. Interior doors are a necessity for residential and commercial buildings, and if an interior door is broken, it must be replaced. Solid wood doors are not close substitutes for interior molded doors because they are significantly more expensive

and are typically used only in the most expensive homes. Flat-faced flush doors with hardboard or veneered facings are not close substitutes for interior molded doors because they are lower in quality and lack aesthetically pleasing designs, and are therefore less attractive to consumers and are typically used only in entry-level homes or in utility rooms and garages.

67.     A hypothetical small but significant increase in the price of interior molded doors by a cartel would not cause a significant number of purchasers to utilize other materials in lieu of interior molded doors, nor would such a hypothetical price increase cause so much switching to other products that the increase would be unprofitable. Historically, changes in the price of interior molded doors have not had a significant impact on the demand for hardboard or veneered flush doors.

68.     Because the price for interior molded doors is highly inelastic, Defendants were able to and did collectively raise prices to supra-competitive levels without losing revenues.

**4.     Interior Molded Doors Have a High Degree of Interchangeability.**

69.     Both Masonite and Jeld-Wen make very similar versions of many of the interior molded door models, including the more popular ones, and those interior molded doors do not differ significantly in quality, appearance or use. As a result, those interior molded door models are functionally interchangeable.

70.     When products are interchangeable, the primary way companies can win business is by competing on price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products.

71.     Interior molded doors are produced and sold in standard dimensions.

72.     Here, although one Defendant may have offered a style of interior molded door that was not offered by the other, during the Class Period the majority of interior molded door

sales were of interior molded door models offered by both Defendants. Because there is little difference between one manufacturer's interior molded door and another manufacturer's, any difference in price significantly impacts the market.

73.     Where a product like an interior molded door is interchangeable, economics suggests that cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price-fixing agreement.

**5.     Defendants Have Had Many Opportunities to Collude.**

74.     At least throughout the Class Period, the interior molded door industry has provided ample opportunities for Defendants to collude and fix the prices of interior molded doors, through trade association meetings and analyst phone calls.

75.     Defendants are members of the Window & Door Manufacturers Association (the "WDMA"), a trade association that has been in existence since 1927, originally known as the National Door Manufacturers Association. Senior executives from both Jeld-Wen and Masonite currently serve on the Board of Directors of the WDMA. The WDMA holds a number of annual meetings that have been attended by Defendants' representatives, including the Spring Meeting & Legislative Conference jointly sponsored by the National Lumber & Building Material Dealers Association, the Executive Management Conference, the National Architectural Door Conference, and the Technical & Manufacturing Conference.

76.     Defendants are members of and/or attended meetings organized by other trade associations as well, including the World Millwork Alliance and the Northeastern Retail Lumber Association.

77.     Defendants also attended other trade shows and conventions, such as The International Builders' Show, which is organized by the National Association of Home Builders, which takes place in January or February each year in Orlando or Las Vegas.

78.     Masonite and Jeld-Wen are covered by several of the same financial analysts and executives from both companies attend and make presentations at some of the same annual investor conferences, such as the J.P. Morgan Homebuilding & Building Products Conference, the Baird Global Industrial Conference, and the Deutsche Bank Global Industrials and Materials Summit.

79.     The opportunities for collusion were enhanced because a number of senior executives have worked for both Masonite and Jeld-Wen and have close professional relationships with their former colleagues. The interior molded door industry is a highly inbred, "good old boy" network that is comprised of the same players who have been working together since the 1980s. For example, Philip Orsino, who served as Chief Executive Officer and President of Jeld-Wen from August 2011 to March 2014, previously served as the chief executive at Masonite and its predecessor entities from 1984 to 2005. After Orsino became CEO at Jeld-Wen, he brought other former Masonite employees to work at Jeld-Wen. For example, Matt Maughon, a Vice President of Sales at Masonite under Orsino's leadership from 1981 to 2007, became a Vice President of Sales at Jeld-Wen in 2011 after he left Masonite. Also, Robert Merrill, who until recently served as Executive Vice President of Sales & Marketing at Jeld-Wen, was CEO of CMI when it was acquired by Jeld-Wen and is also a former Masonite executive.

80.     Other former Jeld-Wen employees are now employed at Masonite. For example, Daryl Breymeyer, who was a Regional Sales Manager at Jeld-Wen from 2004 to March 2009 and a Regional Manager at CMI from August 2009 to September 2012, when it was acquired by Jeld-Wen, is now a Product Sales Manager at Masonite.

81.      Through communications with colleagues whom they had known and worked with for years at competing companies, Masonite and Jeld-Wen shared information about their intentions to raise prices and the amount of those price increases before they were known to the public.

**6.      The Residential Door Industry's History of Collusive Behavior**

82.      The residential door industry for years has been highly concentrated, and there is a history of antitrust violations by door manufacturers. In the 1990s, the DOJ investigated collusion in the residential door industry and several door manufacturers, including Defendants' predecessors and subsidiaries, pled guilty to conspiring to fix the prices of residential doors and paid substantial fines:

- Premdor, the predecessor to Masonite, *see* ¶¶ 43-50, above, pled guilty and paid a $6 million fine.

- Michigan Birch Door Manufacturers Inc., a subsidiary of Jeld-Wen, pled guilty and agreed to pay a $1.55 million criminal fine.

- Illinois Flush Door Inc., which was subsequently acquired by CMI and in turn acquired by Jeld-Wen, pled guilty and agreed to pay a $160,000 criminal fine.

- LEDCO, Inc., which was subsequently acquired by Masonite, pled guilty and agreed to pay a $250,000 criminal fine.

- Steves & Sons, Inc. ("Steves"), one of the few residential door manufacturers not yet acquired by Jeld-Wen or Masonite, pled guilty and was fined $650,000.

- Southwood Door Company of Quitman, Mississippi, pled guilty and was fined $25,000.

C.      **The Conspiracy**

83.      Starting at least as early as 2012, Defendants engaged in a conspiracy to raise, fix, maintain and or stabilize the prices of interior molded doors.

84.      Since 2012, Jeld-Wen and Masonite have adopted numerous uniform price increases on interior molded doors. In some instances, Jeld-Weld was the first to announce price increases for interior molded doors and in some instances, Masonite first announced the price increase. In all instances, the price increases were quickly followed by an announcement from the other manufacturer matching the price increase.

85.      These price increases were larger and in a different form than prior price increases. Historically, price increases would be in amounts such as 25 cents or $1 per door. Beginning around 2012, Defendants started increasing prices by percentages.

| Price Increase | Company | Notice Date | Effective Date | Increase Amount |
|---|---|---|---|---|
| Early 2013 | Jeld-Wen | 11/15/2012 | 2/4/2013 | 3-5% |
|  | Masonite | 12/6/2012 | 3/18/2013 | 3-6% |
| Late 2013 | Jeld-Wen | 8/6/2013 | 10/7/2013 | 4% |
|  | Masonite | 8/13/2013 | 9/30/2013 | 5% |
| Early 2014 | Masonite | 10/31/2013 | 2/3/2014 | 5% |
|  | Jeld-Wen | 11/18/2013 | 1/27/2014 | 5% |
| Late 2014 | Jeld-Wen | 6/9/2014 | 8/11/2014 | 9.5% |
|  | Masonite | 6/17/2014 | 8/18/2014 | 8% |
| Early 2015 | Masonite | 12/1/2014 | 3/2/2015 | 5-7% |
|  | Jeld-Wen | 12/3/2014 | 3/2/2015 | 5-6% |
| Early 2016 | Masonite | 10/26/2015 | 2/1/2016 | 3-5% |
|  | Jeld-Wen | 10/28/2015 | 2/1/2016 | 3-5% |
| Early 2017 | Masonite | 10/4/2016 | 1/1/2017 | 5-7% |
|  | Jeld-Wen | 10/18/2016 | 1/3/2017 | 5% |
| Mid 2018 | Jeld-Wen | 3/6/2018 | 5/7/2018 | 6% |
|  | Masonite | 3/2018 | 6/1/2018 | 6% |
| Late 2018 | Jeld-Wen | 10/8/2018 | 12/17/2018 | 7% |
|  | Masonite | 10/8/2018 | 12/15/2018 | 7-9% |

86.     In a 2016 annual report, Jeld-Wen discussed a new pricing strategy that it began to implement in 2014, shifting from an old strategy that often led to competing on price to a new strategy emphasizing pricing optimization. A shift in pricing policy from increasing market share to increasing unit profits is consistent with conspiratorial pricing behavior.

87.     Defendants' price increases alleged herein cannot rationally be explained by normal market forces, such as key input costs or supply and demand factors. Those price increases have outpaced any increase to Defendants' raw material and other costs. Further, at least from 2012 to 2015, the capacity utilization rate for manufacturing doorskins, the largest input cost (up to 70%) of manufacturing an interior molded door, was in the range of 60% to 70%.

88.     Prior to the Class Period, Masonite did not have a centralized pricing department, as its sales representatives made most of the pricing decisions. In 2011 or 2012, pricing decisions at Masonite became centralized, with price increases set at the corporate level on a nationwide basis. Around the same time, Masonite started to enjoy a noticeable increase in its profit margins.

89.     A Masonite sales director was tasked with using internal software to run pricing scenarios based on market factors, such as the price of raw materials, transportation costs, and expected demand. When the sales director presented price increases based on market data, he suggested hikes that his analyses indicated the market could sustain. His proposed price increases were presented to senior executives and the Board of Directors, who made the ultimate decision as to the amount of the increase. Instead of relying on the sales director's analyses, the ultimate price increases implemented were at times substantially higher than what the sales director believed a competitive market would support based on the data he analyzed.

90.     Pricing decisions at Masonite were often made after a Vice President of Strategic Initiatives, who had significant influence with upper management and participated in the company's pricing discussions, returned from days or weeks of travel and had obtained information about Jeld-Wen's intended price increases. Masonite employees knew Jeld-Wen's price increases before they were publicly announced.

91.     During the relevant time period, Masonite never undercut Jeld-Wen's pricing for interior molded doors, even if Masonite's profit margin could have withstood a lower sale price to take more market share.

92.     Defendants' ability to raise prices has been facilitated by their refusal to provide doorskins to third-party manufacturers, as evidenced by the fact that Defendants imposed the largest of these increases in 2014, after Masonite abruptly stopped selling doorskins to third-party, independent interior molded door manufacturers.

93.     Prior to Jeld-Wen's acquisition of CMI in 2012, Masonite, CMI, and Jeld-Wen each aggressively competed in the sale of doorskins to smaller, independent, non-integrated door manufacturers, such as Steves (the entity that sued Jeld-Wen, *see* ¶¶ 103-108, *infra*), Lynden Door Inc., Haley Bros., Unidoor Corporation, Excel Interior Door, and ABS.

94.     In seeking regulatory approval of the CMI acquisition, Jeld-Wen tried to assuage concerns held by these independent door manufacturers and the DOJ that the acquisition would hurt competition in the doorskin market. It did so by entering into long-term supply agreements with several of these independent door manufacturers. As a result of these supply agreements and Jeld-Wen's representations concerning the continued supply of doorskins, the DOJ did not challenge Jeld-Wen's acquisition of CMI.

95.     The marketplace began to change in 2014 when, in furtherance of the conspiracy, Masonite announced during an investor presentation on June 25, 2014 that it would no longer supply doorskins to third parties:

> Only Masonite and JELD-WEN service the entire North American market. And other door assembly companies are smaller and much more regionally focused. And importantly, the other smaller. . . door assembly manufacturers have to get their facing [i.e., doorskins] from somebody else. They're not vertically integrated in their facings. And we, at Masonite, have determined that we will not sell our facings into—to competition. ***So, that only leaves one other outlet for them to get their facings from in North America.*** (emphasis added).

96.     In its statement, Masonite offered no explanation for why it was exiting the doorskins market. But Masonite's statement that its exit would leave only one other outlet, Jeld-Wen, from which independent door manufacturers could purchase doorskins in North America makes no sense unless viewed as an explicit acknowledgment to its co-conspirator Jeld-Wen that Masonite was ceding the entire doorskins market to Jeld-Wen.

97.     Jeld-Wen clearly understood Masonite's acknowledgment, as indicated by Jeld-Wen's Kirk Hachigian sending the Masonite announcement to Steves, a smaller, independent door manufacturer that purchased doorskins from Jeld-Wen. At the time, Mr. Hachigian simultaneously served as CEO and Chairman of the Board of both JELD-WEN Holding, Inc. and JELD-WEN, Inc. The announcement was sent in connection with an effort to force Steves to pay more for doorskins than the price set out in Steves' supply contract with Jeld-Wen. When Steves refused, Jeld-Wen notified Steves it would terminate that contract.

98.     Masonite's refusal to sell doorskins to other door manufacturers is against Masonite's economic self-interest, absent a conspiracy with Jeld-Wen. Since doorskins are the primary component of interior molded doors, a manufacturer's ability to control the doorskin market directly impacts the interior molded door market. By exiting the doorskin market,

Masonite gave Jeld-Wen monopoly power within the (non-captive use) doorskin market. Jeld-Wen was then able to use this power in the doorskin market to entirely control a major cost input for the non-vertically integrated, *i.e.*, independent, door manufacturers.

99.      In effect, without competition from Masonite, Jeld-Wen has had the ability to price doorskins to door manufacturers at a level whereby Jeld-Wen can extract all the profits for the sale of the door. It was not in Masonite's economic self-interest to simply gift Jeld-Wen the entire non-captive use doorskin market, foregoing the doorskin revenue that Masonite would have earned from the non-vertically integrated door manufacturers that make up around 15% of the interior molded door market. Masonite has excess capacity in its doorskin production facilities, and, due to the significant upfront and fixed costs of doorskin manufacturing plants, would be incentivized to increase sales in order to maximize production and revenue from doorskins.

100.      Masonite's exit from the doorskins market is even more suspicious given that Jeld-Wen, its only real competitor, was experiencing pronounced and protracted quality control issues with its doorskins. It is implausible that, absent an anti-competitive agreement with Jeld-Wen, Masonite would exit a market it would have been poised to dominate given its largest (and only) competitor's quality control issues.

101.      Jeld-Wen has, in fact, utilized its dominant position in the doorskin market, facilitated by its acquisition of CMI and its agreement with Masonite, to harm independent door manufacturers. Contrary to its representations to the DOJ as to the competitive significance of its long-term supply relationships with third-party door manufacturers, Jeld-Wen's relationship with those independent manufacturers has been extremely contentious, particularly after Masonite's departure from the doorskin market.

102.   Notwithstanding that its key input costs for raw materials (wood, resin, wax, oil, and sealer; paint; and packaging) and for energy (electric power prices, natural gas prices, and boiler fuel) decreased every year, Jeld-Wen substantially increased the prices it charged independent door manufacturers for doorskins. Jeld-Wen also changed the way it dealt with doorskin defects and limited reimbursements for those defects.

103.   Faced with these difficulties in sourcing doorskins, thereby undermining its ability to compete in the interior molded door market, in 2016, Steves, a smaller, independent door manufacturer that purchased doorskins from Jeld-Wen, filed a complaint against Jeld-Wen alleging that Jeld-Wen's 2012 acquisition of CMI harmed competition, violating section 7 of the Clayton Act. Steves and Jeld-Wen had a long-term supply agreement, but Jeld-Wen sent a notice of termination in September 2014, effective September 2021. In 2018, a jury found in favor of Steves and awarded more than $58 million in antitrust damages (more than $175 million after trebling under the Clayton Act), as well as $12 million for breach of contract. *See Steves & Sons, Inc. v. JELD-WEN, Inc.,* Civ. No. 3:16-cv-545 (E.D. Va.).

104.   Steves' complaint alleged details regarding Mr. Hachigian's active role in Jeld-Wen's anticompetitive conduct, during the period in which he simultaneously served as CEO and Chairman of the Board of both JELD-WEN Holding, Inc. and JELD-WEN, Inc.:

> On April 21, 2014, one month after Hachigian became JELD-WEN's President and CEO, the parties met to discuss certain issues that had arisen in connection with their business dealings. At that meeting, and in a letter the next day, JELD-WEN demanded "better defined pricing mechanics," even though the pricing had been fixed by [REDACTED] the Supply Agreement. Compl. (ECF 1) ¶ 159.

Steve's subsequently alleged that discovery it took in that case revealed that Mr. Hachigian repeatedly showed contempt for Jeld-Wen's customers, including instances in which he was communicating directly with their representatives.

105.     In an October 5, 2018 post-trial opinion ordering Jeld-Wen to divest CMI, Judge

Payne stated the following:

> Here, as the jury found, and the record shows, ***the merger substantially reduced competition in the doorskin industry***. Less than two years after the merger reduced the number of suppliers from three to two, one of those suppliers essentially withdrew from the market, ***thereby depriving the Independents* [non-vertically integrated door manufacturers] *of that key component of a reliable supply source***.
>
> . . . Although the Court could solve Steves' supply problem by ordering JELD-WEN to supply Steves' requirements for a long term, ***that alternate remedy would not restore competition in the industry as a whole***. And, ***the record proves that the lessened competition has adversely affected the Independents* [non-vertically integrated door manufacturers] *other than Steves***. So simply securing a long-term supply for Steves ***would not aid those manufacturers***.

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, Civ. No. 3:16-cv-545, 2018 WL 4855459, at *38 (E.D.

Va. Oct. 5, 2018) (emphasis added).

106.     Jeld-Wen was able to engage in such conduct because of the lack of any

alternative supply for doorskins in the U.S. market.

107.     When threatened with the loss of doorskins from Jeld-Wen, Steves sought but was

unable to find any alternative source of supply. It approached Masonite, but Masonite refused to

enter into a long-term supply agreement and would only sell to Steves on a spot basis. Worse,

Masonite would only do so at prices ***37% higher*** than the prices Jeld-Wen charged under its

supply agreement with Steves. This was a shift from Masonite's prior willingness to sell

doorskins to Steves, before its 2014 announcement that it would stop selling doorskins to

independent door manufacturers. Previously, Steves was able to purchase millions of doorskins

from Masonite from 2006 until 2012, when Steves entered into its supply relationships with Jeld-

Wen. Also in 2012, Masonite had offered to enter into a long-term supply relationship with

Steves prior to Steves entering into such a relationship with Jeld-Wen.

108.     Steves also explored sourcing its doorskins from foreign suppliers but was unable to fulfill its doorskin requirements from those suppliers. Those foreign suppliers only offered a limited number of doorskin designs and sizes and also had serious quality deficiencies.

109.     This conduct has undermined the ability of independent door manufacturers to compete with Defendants in the sale of interior molded doors, enabling Defendants to impose numerous matching anticompetitive price increases on the Class members.

**D.     JELD-WEN, Inc. is the Alter Ego of JELD-WEN Holding, Inc.**

110.     During the time period relevant to Plaintiffs' claims, JELD-WEN Holding, Inc. participated in the conspiracy by and through JELD-WEN, Inc., which acted as JELD-WEN Holding, Inc.'s alter ego or agent. JELD-WEN Holding, Inc. dominated or controlled JELD-WEN, Inc.'s business as reflected by, among other things: (1) the two companies' virtually complete overlap of senior officers; (2) the companies' maintenance of the same principal office address (*see supra* ¶¶ 18-19); (3) repeated instances in which Jeld-Wen officers have publicly treated the two companies as one and the same; and (4) JELD-WEN, Inc.'s conduct of JELD-WEN Holding, Inc.'s business.

111.     On February 28, 2017, JELD-WEN Holding, Inc. applied to the North Carolina Secretary of State for a certificate of authority ("JWHI Application"). Ten days later, on March 10, 2017, JELD-WEN, Inc. filed its 2016 annual report with the same authority ("JWI 2016 Report"). The two submissions identified certain officers of the respective companies as follows:

| Officers | JWI 2016 Report | JWHI Application |
|---|---|---|
| Kirk Hachigian | Chairman | Director and Chairman of the Board |
| L. Brooks Mallard | CFO | Executive VP and CFO |
| Brian Luke | Treasurer | Treasurer |
| Rebekah Toton | Secretary | Corporate Secretary |
| Scott Vining | Chief Accounting Officer | Senior VP and Chief Accounting Officer |
| Laura Doerre | General Counsel | Executive VP, and Chief Compliance Officer |
| Timothy Craven | VP | Executive VP |
| John Linker | VP | Senior VP and Assistant Secretary |
| Mark Beck | President | Director, President, and CEO |
| John Dinger | VP | Executive VP |
| Peter Farmakis | VP | Executive VP |
| Peter Maxwell | VP | Executive VP |
| Robert Merrill | VP | Executive VP |

112.    In a subsequent submission to the North Carolina Secretary of State, JELD-WEN
Holding, Inc. stated that "the majority of our operating income is derived from [JELD-WEN,
Inc.]." A JELD-WEN Holding, Inc. submission to the Securities and Exchange Commission
refers to JELD-WEN, Inc.'s website as its own.

113.    In its 2017 Annual Report, JELD-WEN Holding, Inc. reported the following:

JELD-WEN Holding, Inc., (the "Parent Company") (a Delaware corporation) was
formed by Onex Partners III LP to effect the acquisition of JELD-WEN, Inc. and
had no activities prior to the acquisition of JELD-WEN, Inc. on October 3, 2011.
The Parent Company is a holding company with no material operations of its own
that conducts substantially all of its activities through its direct subsidiary, JELD-
WEN, Inc. and its subsidiaries.

33

114.     An October 3, 2011 Jeld-Wen press release detailed Onex Group's acquisition of "*JELD-WEN Holding, Inc., one of the world's largest residential door and window manufacturers*." (emphasis added). It also referred readers to Teri Cline, the Communications Director for JELD-WEN, Inc. More recently, during JELD-WEN Holding, Inc.'s earnings call for the third quarter of 2018, its CEO Gary Michel referred to "our history, back to 1960." An earlier SEC submission by JELD-WEN Holding, Inc. reflects that "JELD-WEN, Inc. was initially incorporated as an Oregon corporation in 1960 and JELD-WEN Holding, Inc. was initially incorporated as an Oregon corporation in 1999."

115.     JELD-WEN Holding, Inc. attached to another SEC submission a Management Employment Agreement between only JELD-WEN, Inc. and Mr. Hachigian. That agreement required JELD-WEN Holding, Inc. to grant Mr. Hachigian 78,000 options. A subsequent agreement between only JELD-WEN, Inc. and L. Brooks Mallard (the CFO of both companies) likewise required JELD-WEN Holding, Inc. to grant Mr. Mallard a certain number of options.

## VII.     VIOLATIONS OF THE ANTITRUST LAWS

116.     Beginning in at least 2012 and continuing through the present, Defendants have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of interior molded doors in the United States.

117.     Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of interior molded doors sold in the United States. These activities included:

(a)     participation in meetings, conversations, and communications to discuss

the price and pricing terms for the sale of interior molded doors in the United

States;

(b)     agreement during those meetings, conversations, and communications to

raise prices and to otherwise fix, raise, maintain, or stabilize prices for interior

molded doors sold in the United States; and

(c)     taking numerous steps, as set forth above, to implement and maintain the

conspiracy.

118.    Defendants and their co-conspirators engaged in the activities described above for

the purpose of effectuating the unlawful agreements described in this Complaint.

119.    Throughout the Class Period, Plaintiffs and the other Class members purchased

interior molded doors from Defendants (or their subsidiaries or controlled affiliates) at supra-

competitive prices.

120.    Defendants' contract, combination or conspiracy constitutes an unreasonable

restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1.

## VIII.   FRAUDULENT CONCEALMENT
## TOLLED THE STATUTE OF LIMITATIONS

121.    Plaintiffs and Class members had neither actual nor constructive knowledge of the

facts constituting their claims for relief. Plaintiffs and Class members were unaware of

Defendants' conspiracy, or of facts sufficient to place them on notice of the conspiracy or the

claims set forth herein.

122.    In fact, Defendants have publicly stated that they have policies in place to ensure

compliance with federal and state laws.

123.     Masonite's publicly available antitrust compliance policy provides:

Fair trade and competition laws – often referred to as "antitrust laws" – vary from country to country and, in some cases, even within a single country depending on the jurisdiction.

As a general rule, these laws:

- Prohibit agreements or understandings between competitors that undermine competition;

- Regulate the behavior of dominant companies; and

- Require prior review and in some instances clearance for mergers, acquisitions and certain other transactions, in order to prevent transactions that would substantially reduce competition.

Every country where Masonite does business has some form of fair trade, competition, or antitrust law. Thus, you should be fully familiar with Masonite's Antitrust Policy as it applies to where you do business. If you have any doubt about whether a practice is legal or permitted under Masonite's policies, you should contact the Legal Department immediately.

**II. OUR POLICY**

- **Never** enter into an agreement or an understanding with a competitor, or a group of competitors, about any aspect of Masonite's business without the approval of the Legal Department. Many, if not most, agreements with a competitor are criminal offenses that can result in large fines and prison terms.

- **Do not ever agree** with a competitor about: (1) Masonite's prices or terms and conditions of sale; (2) which customers Masonite will or will not sell to, or in what geographic areas it will sell or not sell; or (3) the price that Masonite will bid or offer to a customer or class of customers. These agreements are always illegal, and will result in your **immediate** dismissal. . . .

Masonite Values Operating Guide.

124.     Jeld-Wen's publicly available antitrust compliance policy states:

Business activities must be conducted in accordance with applicable antitrust and competition laws. Some of the most

serious antitrust offenses are agreements between competitors that limit independent judgment and restrain trade, such as agreements to fix pricing, or to divide a market for customers, territories, products or purchases. Any communication with a competitor's representative, no matter how innocent it may seem at the time, may later be subject to legal scrutiny and form the basis for accusations of improper or illegal conduct. Directors, officers and employees should avoid situations from which an unlawful agreement could be inferred. By bringing competitors together, trade associations can raise antitrust concerns, even though such groups serve many legitimate goals. The exchange of sensitive information with competitors regarding topics such as pricing or billing practices can potentially violate antitrust and competition laws and should be avoided.

Jeld-Wen Code of Business Conduct and Ethics (2017).

125.    Defendants and their co-conspirators affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Class from at least October 24, 2012 through at least June 29, 2016, when residential door manufacturer Steves filed its Complaint for Injunctive and Declaratory Relief, Damages, and Specific Performance against Jeld-Wen, for the first time publicly disclosing facts pertaining to Defendants' alleged anticompetitive conduct and illegal scheme, particularly Jeld-Wen's use of Masonite's announcement that it was leaving the doorskins market, which was against Masonite's own interests, as leverage to get Steves to pay more for doorskins (*see* ¶¶ 95-100, *supra*). Before Steves' June 29, 2016 complaint, Plaintiffs and the Class did not learn or discover the operative facts giving rise to their claims, despite due diligence. Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least June 29, 2016.

## A.    Active Concealment of the Conspiracy

126.    Defendants engaged in an illegal scheme to fix prices in violation of the federal antitrust laws. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

127.    Defendants provided their customers for interior molded doors with pretextual justifications for price increases in the letters they sent announcing those price increases. For example, Defendants attributed the need for price increases on rising input costs, when in fact the cost of raw materials and energy was decreasing. Plaintiffs and the Class had no knowledge that these justifications were pretextual, at least until it was disclosed in the litigation between Jeld-Wen and Steves that Jeld-Wen's input costs were actually decreasing.

128.    Through their misleading, deceptive, false and fraudulent statements and material omissions, Defendants effectively concealed their conspiracy from Plaintiffs and the Class. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Class into accepting the price hikes as a normal result of competitive and economic market trends, rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Class into paying unjustifiably higher prices for interior molded doors.

129.    These false statements and others made by Defendants helped conceal Defendants' illegal conspiracy to fix, stabilize, maintain and raise the price of interior molded doors to artificially inflated levels.

**B.      Plaintiffs Exercised Reasonable Diligence.**

130.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Plaintiffs and members of the Class received pricing information from Defendants, and Plaintiffs reasonably considered the market for interior molded doors to be competitive. Jeld-Wen's October 24, 2012 acquisition of CMI consolidated the doorskins market, thereby contributing to further consolidation in the interior molded doors market. Price increases following industry consolidation are not unexpected due to limited competition, and thus, Plaintiffs and the Class had no reason to suspect anything other than that Defendants' price increases on interior molded

doors were merely a consequence of further consolidation in the doorskins and the interior molded doors markets. While interdependent price increases are not unlawful, coordination of pricing and price increases among competitors is. Plaintiffs and the Class had no reason to investigate, and no way to know that these prices were higher than they should have been due to the conspiracy and the unlawful anticompetitive conduct alleged herein before June 29, 2016.

131.     A reasonable person under the circumstances could also not have been alerted to the harm stemming from Jeld-Wen's acquisition of CMI until Steves' June 29, 2016 complaint. Accordingly, Plaintiffs and Class members under the circumstances would not have been alerted to investigate the legitimacy of Defendants' pricing and price increases before Steves' June 29, 2016 complaint, particularly in light of the DOJ's approval of the acquisition.

132.     Because of Defendants' concealment of their illicit conduct, Plaintiffs and the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

133.     Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Class as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and the other members of the Class were unaware of Defendants' unlawful conduct and did not know they were paying supra-competitive prices for interior molded doors throughout the United States during the Class Period.

134.     For these reasons, Plaintiffs claims are timely under the federal laws identified herein.

## IX.    ANTI-COMPETITIVE EFFECTS

135.    As a result of Defendants' unlawful conduct, Plaintiffs and the other Class members have been injured in their business and property because they have paid more for interior molded doors than they would have paid absent the collusion and unlawful acquisition.

136.    Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

(a)    price competition in the interior molded doors market has been artificially restrained;

(b)    prices for interior molded doors sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

(c)    purchasers of interior molded doors from Defendants have been deprived of the benefit of free and open competition in the interior molded doors market.

## X.    PLAINTIFFS AND THE CLASS AGAINST DEFENDANTS
### Violations of The Sherman Act, 15 U.S.C. § 1

137.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

138.    Beginning in at least 2012, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of interior molded doors in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

139.    Plaintiffs and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and Class members have paid more for interior molded doors than they otherwise

would have paid in the absence of Defendants' conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

140.     Accordingly, Plaintiffs and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs demand judgment against Defendants as follows:

a.     Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein;

b.     That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants, be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.     That judgment be entered for Plaintiffs and the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the Class as allowed by law;

d.     That Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law;

e.     That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

f.     For such other and further relief as is just and proper under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: April 10, 2019
            /s/ *Wyatt B. Durrette, Jr.*
            Wyatt B. Durrette, Jr., Esq. (VSB No. 04719)
            Christine A. Williams, Esq. (VSB No. 47074)
            Kevin J. Funk, Esq. (VSB No. 65465)
            DURRETTE, ARKEMA, GERSON & GILL PC
            1111 East Main Street, 16th Floor
            Richmond, Virginia  23219
            Tel:  (804) 775-6900
            Fax:  (804) 775-6911
            Email:  wdurrette@dagglaw.com
                    cwilliams@dagglaw.com
                    kfunk@dagglaw.com

            *Interim Liaison Counsel for Plaintiffs and the Proposed Class*

| | |
|---|---|
| Michael J. Boni (*pro hac vice*) | Jeffrey J. Corrigan (*pro hac vice*) |
| Joshua D. Snyder (*pro hac vice*) | Jeffrey L. Spector (*pro hac vice*) |
| John E. Sindoni (*pro hac vice*) | Len A. Fisher (*pro hac vice*) |
| BONI, ZACK & SNYDER LLC | SPECTOR ROSEMAN & KODROFF PC |
| 15 St. Asaphs Road | 1818 Market Street, Suite 2500 |
| Bala Cynwyd, PA 19004 | Philadelphia, PA 19103 |
| Tel: 610-822-0200 | Tel: 215-496-0300 |
| Fax: 610-822-0206 | Fax: 215-496-6611 |
| Email: mboni@bonizack.com | Email: jcorrigan@srkattorneys.com |
|       jsnyder@bonizack.com |       jspector@srkattorneys.com |
|       jsindoni@bonizack.com |       lfisher@srkattorneys.com |

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

Jeffrey B. Gittleman (*pro hac vice*)
Lisa M. Port*
BARRACK, RODOS & BACINE
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Tel: 215-963-0600
Fax: 215-963-0838
Email: jgittleman@barrack.com
      lport@barrack.com

Howard I. Langer (*pro hac vice*)
Edward A. Diver (*pro hac vice*)
Peter E. Leckman (*pro hac vice*)
LANGER, GROGAN & DIVER P.C.
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: 215-320-5660
Fax: 215-320-5703
Email: hlanger@langergrogan.com
      ndiver@langergrogan.com
      pleckman@langergrogan.com

Eric L. Cramer (*pro hac vice*)
Ruthanne Gordon (*pro hac vice*)
Michael J. Kane (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-496-6611
Email: ecramer@bm.net
      rgordon@bm.net
      mkane@bm.net

Roberta D. Liebenberg (*pro hac vice*)
Jeffrey S. Istvan (*pro hac vice*)
Gerard A. Dever (*pro hac vice*)
FINE, KAPLAN & BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA 19107
Tel: 215-567-6565
Fax: 215-568-5872
Email: rliebenberg@finekaplan.com
      jistvan@finekaplan.com
      gdever@finekaplan.com

W. Joseph Bruckner (*pro hac vice*)
Elizabeth R. Odette (*pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900
Fax: 612-339-0981
Email: wjbruckner@locklaw.com
      erodette@locklaw.com

Joseph J. Tabacco, Jr.*
Todd A. Seaver (*pro hac vice*)
Carl Hammarskjold (*pro hac vice*)
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel: 415-433-3200
Fax: 415-433-6382
Email: jtabacco@bermantabacco.com
      tseaver@bermantabacco.com
      chammarskjold@bermantabacco.com

Sharon K. Robertson*
COHEN MILSTEIN SELLERS & TOLL
PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Tel: 212-838-7797
Fax: 212-838-7745
Email: srobertson@cohenmilstein.com


Oren S. Giskan (*pro hac vice*)
GISKAN SOLOTAROFF &
ANDERSON LLP
217 Centre Street, 6th Floor
New York, NY 10013
Tel: 212-847-8315
Email: ogiskan@gslawny.com


Jeffrey S. Goldenberg (*pro hac vice*)
Todd B. Naylor (*pro hac vice*)
GOLDENBERG SCHNEIDER, LPA
One West Fourth Street, 18th Floor
Cincinnati, OH 45202-3604
Tel: 513-345-8291
Fax: 513-345-8294
Email: jgoldenberg@gs-legal.com
        tnaylor@gs.legal.com


Garrett D. Blanchfield (*pro hac vice*)
Roberta A. Yard*
REINHARDT WENDORF &
BLANCHFIELD
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Tel: 651-287-2100
Fax: 651-287-2103
Email: g.blanchfield@rwblawfirm.com
        r.yard@rwblawfirm.com

Steven A. Kanner*
William H. London*
Douglas A. Millen*
FREED KANNER LONDON & MILLEN, LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: 224-632-4500
Fax: 224-632-4521
Email: skanner@fklmlaw.com
        wlondon@fklmlaw.com
        dmillen@fklmlaw.com


Lee Albert (*pro hac vice*)
Brian Murray (*pro hac vice*)
GLANCY PRONGAY & MURRAY LLP
230 Park Avenue, Suite 530
New York, NY 10169
Tel: 212-682-5340
Fax: 212-884-0988
Email: lalbert@glancylaw.com
        bmurray@glancylaw.com


Walter D. Kelley, Jr. (VSB No. 21622)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel: 202-540-7200
Fax: 202-540-7201
Email: wkelley@hausfeld.com


Brent W. Landau (*pro hac vice*)
HAUSFELD LLP
325 Chestnut Street, #900
Philadelphia, PA 19106
Tel: 215-985-3270
Fax: 215-985-3271
Email: blandau@hausfeld.com

Christopher M. Burke (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW
LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: 619-233-4565
Fax: 619-233-0508
cburke@scott-scott.com

Robert S. Kitchenoff (*pro hac vice*)
WEINSTEIN KITCHENOFF & ASHER
LLC
100 S. Broad Street, Suite 705
Philadelphia, PA 19110
Tel: 215-545-7200
Fax: 215-545-6535
Email: kitchenoff@wka-law.com

Michael G. Phelan (VSB No. 29725)
PHELAN PETTY PLC
6641 W. Broad Street, Suite 406
Richmond, VA 23230
Tel: 804-980-7100
Fax: 804-767-4601
Email: mphelan@phelanpetty.com

Kristen M. Anderson (*pro hac vice*)
Michelle E. Conston (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel: 212-223-6444
Fax: 212-223-6334
kanderson@scott-scott.com
mconston@scott-scott.com

Linda P. Nussbaum (*pro hac vice*)
Bart D. Cohen (*pro hac vice*)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
Tel: 917-438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

Arthur N. Bailey*
Marco Cercone*
RUPP BAASE PFALZGRAF CUNNINGHAM,
LLC
1600 Liberty Building
424 Main Street
Buffalo, NY 14202
(716) 664-2967
Email:    bailey@ruppbaase.com
          cercone@ruppbaase.com

*Counsel for Plaintiffs and the Proposed Class*

*Application for Admission *Pro Hac Vice*
Forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically e-mail notification of such filing to all counsel of record.

To the best of my knowledge, there are no other attorneys or parties who require service by U.S. Mail.

 */s/ Wyatt B. Durrette, Jr.*
Wyatt B. Durrette, Jr., Esq. (VSB No. 04719)
DURRETTE, ARKEMA, GERSON & GILL PC
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Tel:  (804) 775-6900
Fax:  (804) 775-6911
Email:  wdurrette@dagglaw.com

*Interim Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Class*