IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN RE: INTERIOR MOLDED DOORS ANTITRUST LITIGATION | Lead Civil Action No. 3:18-cv-00718-JAG |
| IN RE: INTERIOR MOLDED DOORS INDIRECT PURCHASER ANTITRUST LITIGATION | Lead Civil Action No. 3:18-cv-00850-JAG |

## OPINION

In these consolidated class actions, two groups of plaintiffs contend that America's leading manufacturers of interior molded doors unlawfully conspired to fix prices. The first group of plaintiffs—the direct purchaser plaintiffs—bought interior molded doors directly from the defendants, Masonite Corporation and JELD-WEN, Inc. The direct purchaser plaintiffs seek damages under the Sherman Act for the defendants' alleged anticompetitive conduct. The second group of plaintiffs—the indirect purchaser plaintiffs—bought interior molded doors indirectly from the defendants through distributors. The indirect purchaser plaintiffs seek injunctive relief under the Sherman Act and damages under the laws of thirty-nine states. The defendants have moved to dismiss both complaints[1] for failure to state a claim.

Because the direct and indirect purchaser plaintiffs sufficiently allege that the defendants conspired to fix prices, the Court will deny the motion to dismiss for failure to state a claim as to

---

[1] The operative complaint in the 3:18-cv-718 action is the Second Amended Consolidated Complaint. (Dk. No. 119, No. 3:18-cv-718.) The operative complaint in the 3:18-cv-850 action is the Consolidated Class Action Complaint. (Dk. No. 56, No. 3:18-cv-850.) The Court will refer to both operative complaints collectively as "the complaints."

the Sherman Act. Some of the indirect purchaser plaintiffs' claims arising under state law, however, fall short in various respects. Accordingly, the Court will grant in part the motions to dismiss. In this Opinion, the Court will address each claim in turn.

## I. FACTS ALLEGED IN THE COMPLAINTS

Most American homes contain interior molded doors ("IMDs"), which separate interior rooms, hallways, and closets. Manufacturers produce IMDs "by sandwiching a wood frame and a hollow or solid core between two doorskins composed of a high-density fibrous mat and formed into a raised panel design." (Dk. No. 119, 3:18-cv-718, at ¶ 1.) Doorskins comprise the most important part of IMDs, representing up to 70 percent of the overall cost of IMDs.

JELD-WEN and Masonite are the two largest manufacturers of IMDs in the United States. In 2012, JELD-WEN acquired another manufacturer of IMDs and doorskins, CraftMaster International, Inc. ("CMI"). After the acquisition, JELD-WEN and Masonite became the only two manufacturers of doorskins in the United States and controlled 85 percent of the national IMD market. Because the manufacturers comprising the other 15 percent of the IMD market did not make doorskins, they had to buy doorskins from the defendants, who had aggressively competed for the business of those manufacturers in the past. In 2014, Masonite abruptly stopped selling doorskins to third parties, making JELD-WEN the sole supplier of the largest component of IMDs.

To plausibly plead a conspiracy to fix prices, the plaintiffs must plead facts showing that the defendants (1) increased prices in a parallel fashion, and (2) entered into an illegal agreement to fix prices. The Court sets forth the plaintiffs' allegations in that order.

### A. Parallel Price Increases

After JELD-WEN acquired CMI, JELD-WEN and Masonite began to increase their prices of IMDs in near synchronization—either simultaneously or in brief succession of each other—

2

beginning in late 2012. Nine different times between 2012 and 2018, the defendants increased the price of IMDs in similar percentage increments. For example, in late 2013, Masonite increased its prices by 5 percent. Seven days later, Jeld-Wen increased its prices by 4 percent. The last alleged price increase came from both companies on the same day: October 8, 2018. Both JELD-WEN and Masonite announced that the prices would take effect later in the year within two days of each other.

### B. Facts Showing an Agreement

The plaintiffs set forth the following allegations to show that the defendants entered into an illegal agreement to fix prices.

#### 1. Trade Association Meetings and Revolving Door

Executives from JELD-WEN and Masonite regularly attend the same trade association meetings, trade shows, and investor conferences. Representatives from the two companies have both attended at least five separate annual trade shows and made presentations at three investor conferences. Additionally, executives from JELD-WEN and Masonite alternate between working for each company, resulting in a "revolving door" between the two competitors. The industry is a "highly inbred, 'good old boy' network that is comprised of the same players who have been working together since the 1980s." (*Id.* at ¶ 79.)

#### 2. Features of the IMD Market

Various features of the IMD market make it ripe for price fixing. Because the IMD market has only two large producers, each player knows the capabilities and capacity of the rest of the market. The IMD market has high barriers to entry: any new company wishing to enter the market must not only capture customers currently purchasing IMDs from established suppliers, but also

3

must invest tens of millions of dollars to construct an IMD plant. Those barriers allow the current players to ignore the threat of emerging competitors.

Because home builders, renovators, and other buyers all need IMDs and will keep buying them regardless of the price, demand for IMDs is "inelastic." Manufacturers are thus able to continue increasing prices without decreasing demand.

Buyers can easily replace one model of IMD with another. Because IMDs are interchangeable products, manufacturers must aggressively compete over price as the only differentiating feature. Manufacturers, therefore, have a greater incentive to fix prices.

### 3. *History of Antitrust Violations*

The interior door industry has a history of violating antitrust laws. In the 1990s, several predecessors of the defendants and their subsidiaries pled guilty to multiple allegations of price fixing and paid substantial fines to the government.

### 4. *Price Increases Despite Falling Input Costs*

In letters to customers, Masonite and JELD-WEN often blamed their price increases on rising input costs. Those representations were materially false, as input costs were decreasing and inflation rates were low.

### 5. *Knowledge of JELD-WEN's Pricing Decisions*

A Masonite vice president often returned to Masonite from days or weeks of travel having obtained knowledge of JELD-WEN's intended price increases. Decisions to raise prices at Masonite occurred shortly after that vice president returned.[2]

---

[2] Only the direct purchaser plaintiffs make this allegation. (*See* Dk. No. 119, 3:18-cv-718, at ¶ 90.) At oral argument, counsel for the plaintiffs said that Dale Mayfield is the vice president and has worked for Masonite since 2012. (Hr'g Tr. 23:21-25, June 11, 2019; Dk. No. 138, 3:18-cv-718.)

### 6. *Masonite's Pricing Activity*

Masonite executives set prices well above the levels that internal analyses showed a competitive market could support. Masonite never undercut JELD-WEN's pricing, despite having the necessary profit margins to lower prices and capture a larger market share.

### 7. *Masonite's Decision to Stop Selling Doorskins*

In 2014, Masonite stopped selling doorskins to independent IMD manufacturers despite its continued capacity to sell and its previous aggressive marketing of doorskins. Masonite's actions were against its economic interests and helped JELD-WEN corner the doorskins market. Around that same time, JELD-WEN implemented a new strategy emphasizing price optimization.

After Masonite announced that it would stop selling doorskins to independent IMD manufacturers, JELD-WEN—the only remaining doorskins seller—began raising its prices for doorskins.

## II. **THESE PROCEEDINGS AND RELATED LITIGATION**

In response to JELD-WEN's price hikes, an IMD manufacturer, Steves & Sons, Inc., sued JELD-WEN, alleging that the company's 2012 acquisition of CMI violated § 7 of the Clayton Act because it substantially decreased competition in the doorskins market.[3] In February, 2018, a jury returned a verdict in Steves' favor.

Following the *Steves* verdict, the direct and indirect purchaser plaintiffs followed suit with these claims. First, the direct purchaser plaintiffs[4] allege that Masonite and JELD-WEN conspired to adopt uniform price increases for IMDs in violation of § 1 of the Sherman Act and fraudulently

---

[3] *Steves & Sons, Inc. v. JELD-WEN, Inc.*, Civil Action No. 3:16-cv-00545-REP. Section 7 of the Clayton Act prohibits companies from acquiring assets that would create a monopoly and thus would harm competition. *See* 15 U.S.C. § 18.

[4] The remaining named direct purchaser plaintiffs are Grubb Lumber Company, Inc. ("Grubb"), and Philadelphia Reserve Supply Company ("PRSCO").

concealed their conspiracy from the plaintiffs. Soon thereafter, the indirect purchaser plaintiffs

sued the defendants. The indirect purchaser plaintiffs also allege that the defendants violated § 1

of the Sherman Act, but only request injunctive relief. The indirect purchaser plaintiffs seek

damages based on alleged violations of state antitrust, consumer protection, and unjust enrichment

laws.

The defendants have moved to dismiss both complaints for failure to state a claim, arguing

that the plaintiffs have failed to plead sufficient facts showing that the defendants conspired to fix

prices in the IMD market. The defendants also lodge numerous challenges to the plaintiffs' state

law claims, which the Court will address in turn.

## III. <u>DISCUSSION</u>[5]

Because virtually all the plaintiffs' claims rise and fall on the sufficiency of their federal

antitrust allegations, the Court first addresses the federal antitrust claim. The Court then considers

the defendants' sundry challenges to the plaintiffs' state law claims.

### A. Federal Antitrust Claim

First, the defendants argue that the plaintiffs do not plead a plausible conspiracy claim

under the Sherman Act. The defendants also say that the plaintiffs cannot invoke the doctrine of

---

[5] A Rule 12(b)(6) motion gauges the sufficiency of a complaint without resolving any factual discrepancies or testing the merits of the claims. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering the motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). The principle that a court must accept all allegations as true, however, does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion to dismiss, a complaint must state facts that, when accepted as true, state a claim to relief that is plausible on its face. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

fraudulent concealment to toll the statute of limitations. Finally, the defendants contend that the indirect purchaser plaintiffs lack antitrust standing to seek injunctive relief under the Sherman Act.

### 1. *Plausibility Under § 1 of the Sherman Act*

To state a claim under § 1 of the Sherman Act, "a plaintiff must [show] (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint on trade." *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013). The parties dispute whether the plaintiffs sufficiently allege a "contract, combination, or conspiracy." *Id.*

To show that the defendants conspired to fix prices, the plaintiffs must allege facts suggesting that the defendants "specifically made 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Here, the plaintiffs do not allege any direct evidence of a conspiracy or agreement. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (noting that direct evidence of conspiracy, such as a "smoking gun," is "extremely rare in antitrust cases").

Instead, the plaintiffs contend that the defendants engaged in parallel conduct that suggests an agreement. But to proceed on charges of parallel conduct, antitrust plaintiffs must allege enough additional facts "to raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *Twombly*, 550 U.S. at 557. Put another way, "[f]or a § 1 claim to survive, . . . a plaintiff must plead parallel conduct *and* something 'more.'" *SD3*, 801 F.3d at 424 (quoting *Twombly*, 550 U.S. at 557) ("[P]arallel conduct, standing alone, does not establish the required agreement because it is equally consistent with lawful conduct."). Courts refer to the "more" required in the pleadings as "plus factors." *Id.* Courts evaluate plus factors holistically and weigh them together with the allegations of parallel conduct. *See id.* at 424-25 (declining "to parse each

'plus factor' individually"). Allegations that alone seem neutral "can take on a different shape when considered in conjunction with other surrounding circumstances." *Id.*

Plus factors consist of circumstantial or contextual evidence that substantiates an otherwise speculative conspiracy claim. *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289 (4th Cir. 2012) (citing *Twombly*, 550 U.S. at 557). The circumstantial evidence need not "compel an inference of conspiracy," but need only render the allegations plausible. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (Posner, J.).

In *Twombly*, the plaintiffs set forth extensive allegations of parallel behavior among the nation's phone service providers, but made only cursory allegations regarding the nature of the market, the history of the defendants' attendance at trade conventions, and suspicious statements made by company executives. 550 U.S. at 564-65. The plaintiffs in *Twombly* "rest[ed] their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement." *Id.* at 564. The complaint lacked enough plus factors tending to show an illegal agreement, so the plaintiffs failed to "nudge" their conspiracy allegation "from conceivable to plausible." *Id.* at 570.

In contrast, the plaintiff in *SD3* alleged specific facts about the defendants' agreement and conspiracy. 801 F.3d at 429. The plaintiff, an emerging table-saw manufacturer, sued a group of established table-saw manufacturers for conspiring to keep it out of the market. The plaintiff identified the exact time, place, and manner of the agreement, most of the individuals directly involved, and the procedures used to seal the agreement. Because the complaint set forth "parallel conduct in conjunction with 'circumstance[s] pointing toward a meeting of the minds,'" the Fourth Circuit held that the plaintiff plausibly alleged a conspiracy claim under the Sherman Act. *Id.* at 434 (quoting *Twombly*, 801 F.3d at 557).

8

In *Text Messaging*, the Seventh Circuit confronted a set of plus factors similar to those in our cases. 630 F.3d at 628. The plaintiffs in *Text Messaging* alleged that a group of cell phone companies met at trade shows to fix prices in the market for text messaging. The plaintiffs made allegations about the concentrated nature of the text messaging market as highly concentrated and asserted that the defendants increased prices despite falling input costs. The Seventh Circuit noted that "[w]hat is missing . . . is the smoking gun," direct evidence of conspiracy typically rare in antitrust cases. *Id.* at 629. The court, however, explained that it "need not decide whether the circumstantial evidence . . . is sufficient to *compel* an inference of conspiracy." *Id.* The court thus held that the complaint plausibly alleged a Sherman Act conspiracy claim, noting that "[d]iscovery may reveal the smoking gun or bring to light additional circumstantial evidence that further tilts the balance in favor of liability." *Id.*

In these cases, the plaintiffs rely on seven plus factors: (1) Masonite and JELD-WEN attended the same trade group meetings and investor conventions and often swapped executives; (2) the market for IMDs is highly concentrated, contains high barriers to entry, and deals with an inelastic, interchangeable good; (3) IMD manufacturers have violated antitrust laws in the past; (4) Masonite and JELD-WEN increased prices despite falling input costs; (5) Masonite made pricing decisions after a certain vice president learned of JELD-WEN's prices before they were public; (6) Masonite engaged in irrational pricing activity; and (7) Masonite stopped selling standalone doorskins to outside IMD manufacturers to yield the market to JELD-WEN.

First, the plaintiffs allege that the defendants attended the same trade group meetings, conventions, and conferences. They also describe a revolving door for corporate executives between Masonite and JELD-WEN. "Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and

opportunity to conspire." *SD3*, 801 F.3d at 432; *see also Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 49 (1st Cir. 2013). The plaintiffs' allegations here mirror the plaintiffs' assertions in *Text Messaging*, in which the plaintiffs alleged that trade association meetings gave cell phone companies the opportunity to conspire. *See Text Messaging*, 630 F.3d at 628 (noting that attending association meetings is not "illegal in itself," but "facilitate[s] price fixing that would be difficult for the authorities to detect"). These two things—the defendants' mutual attendance of at least eight separate annual trade association meetings and their history of swapping executives—make it more plausible that the alleged conspiracy spawned from meetings at trade shows or conventions. *See SD3*, 801 F.3d at 425 ("Actions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances.").

Second, the IMD market is highly concentrated and has high barriers to entry. IMDs are also inelastic (increasing their price does not significantly change demand) and interchangeable (any IMD can easily replace another IMD). In highly concentrated markets, fewer minds must meet to control the market. When products are inelastic, higher prices do not create lower demand. And when products are interchangeable, price is the only differentiating feature. The structure of the IMD market makes it susceptible to a price-fixing conspiracy. Because "industry structure that facilitates collusion constitutes supporting evidence of collusion," *id.* at 432, the nature of the IMD market qualifies as a significant plus factor. *See Text Messaging*, 630 F.3d at 627-28.

Moreover, concentrated markets enable firms "to agree on prices and to be able to detect 'cheating' (underselling the agreed price by a member of the group) without having to create elaborate mechanisms, such as an exclusive sales agency, that could not escape discovery by the antitrust authorities." *Id.* Because JELD-WEN and Masonite control 85 percent of the market,

each firm can easily detect "cheating" simply by observing the other firm's behavior—enabling them to carry out a conspiracy without creating any "smoking gun" evidence.

The third and fourth plus factors concern the history of antitrust violations in the IMD industry and the defendants' false explanation for their price increases. In letters to customers, the defendants blamed their price increases on rising input costs. In reality, input costs were decreasing and inflation rates were low. The defendants thus tried to conceal their true motives for raising prices—whatever those motives may have been. This behavior becomes especially troubling in light of the history of antitrust violations in the industry. The defendants' deception "suggest[s] that [they] knew their actions 'would attract antitrust scrutiny.'" *SD3*, 801 F.3d at 432 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010)). The defendants' actions also mirror the conduct of the defendants in *Text Messaging*, who similarly raised prices while their input costs simultaneously dropped.

The fifth plus factor concerns a Masonite vice president who returned from business trips with advanced knowledge of JELD-WEN's impending price increases. Shortly after his return, Masonite also announced a price increase. This alleged advanced knowledge of JELD-WEN's price increases is precisely the sort of circumstantial or contextual evidence that creates a plausible inference of a conspiracy. *See Robertson*, 679 F.3d at 289. The defendants argue that this plus factor lacks in specifics. But "specific facts are not necessary" to plead an antitrust conspiracy. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Direct evidence of a conspiracy is rarely available to antitrust plaintiffs, so they must rely on circumstantial evidence. *See Text Messaging*, 630 F.3d at 629; *Robertson*, 679 F.3d at 289 ("Conspiracies are often tacit or unwritten . . . , thus necessitating resort to circumstantial evidence.").

11

The sixth plus factor concerns Masonite's pricing activity. One would expect manufacturers of interchangeable products to engage in competitive pricing. Instead, Masonite not only raised prices, but also raised them substantially above what its own economic models predicted would be a competitive price. Masonite also never undercut JELD-WEN's perpetually increasing prices, even though doing so would have captured a larger share of the market. Thus, Masonite behaved in a manner inconsistent with the expected behavior of a competitive actor.

Finally, the plaintiffs allege that Masonite stopped selling doorskins to outside manufacturers despite its continued capacity to produce doorskins. The plaintiffs say that Masonite's decision makes no business sense absent an illegal agreement. The defendants provide an alternative explanation: that Masonite may have left the doorskins market to limit competition in the downstream IMD market. But Masonite also may have expected JELD-WEN to sell even more doorskins to outside manufacturers, continuing downstream competition and needlessly reducing Masonite's overall market share. Moreover, if Masonite needed more doorskins for its own IMD factories, it could have limited the number of doorskins it sold to independent manufacturers instead of eliminating those sales altogether.

Thus, Masonite's decision to stop selling doorskins to outside manufacturers constitutes "evidence that [it] acted contrary to its interests." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, (3d Cir. 2004). The circumstances surrounding Masonite's exit from the doorskins market make the plaintiffs' allegation of a conspiracy more plausible. *See SD3*, 801 F.3d at 430.

The defendants try to disaggregate the various plus factors, knocking down each individual allegation as insufficient to show that the defendants conspired to fix prices. But the Court will not "parse each 'plus factor' individually and ask whether that factor, standing alone, would be

sufficient to provide the 'more.'" *Id.* at 425. Taken together, the plus factors in these cases render plausible the plaintiffs' allegation that the defendants entered into an illegal agreement.

The plaintiffs set forth a combination of opportunity, market structure, and pricing plus factors similar to the facts that the Seventh Circuit in *Text Messaging* deemed sufficient to survive a motion to dismiss. 630 F.3d at 627-28. They also allege additional plus factors involving history of antitrust violations, misrepresentation, insider knowledge, and irrational business decisions. Here, as in *SD3*, the plaintiffs describe parallel conduct and "further circumstances pointing toward a meeting of the minds." 801 F.3d at 430. The plaintiffs' detailed allegations "allay[ ] the suspicion that the plaintiff[s] [are] merely speculating a conspiracy into existence from coincidentally similar action," which "after all, was *Twombly*'s principal concern." *Id.*

To be sure, the plaintiffs have not *proven* that the defendants made any agreement to fix prices in the IMD market. But their allegations of parallel conduct and plus factors are sufficient to survive a motion to dismiss. Accordingly, the Court will deny the motion to dismiss the plaintiffs' claims for failure to state a claim under § 1 of the Sherman Act.[6]

### 2. *Statute of Limitations*

Under the Sherman Act, a plaintiff must seek damages for violations "within four years after the cause of action accrued." 15 U.S.C. § 15b. In cases involving a price-fixing conspiracy, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotation marks

---

[6] Because the Court will deny the motion to dismiss the Sherman Act claim for failure to state a claim, the Court also will deny the motion to dismiss the related state antitrust claims on the same ground.

omitted). A plaintiff generally cannot "recover for the injury caused by old overt acts outside the limitations period." *Id.*

Here, the plaintiffs invoke the doctrine of fraudulent concealment to get around the four-year limitations period. The doctrine tolls the limitations period until a plaintiff discovers the fraud. *See Bailey v. Glover*, 88 U.S. 342, 349 (1874). Courts read the doctrine "into every federal statute of limitation," *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946), including antitrust laws. *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995) (applying fraudulent concealment to § 1 of the Sherman Act).

A plaintiff must plead three elements to invoke fraudulent concealment: "(1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Id.* "Inquiry notice, which charges a person to investigate when the information at hand would have prompted a reasonable person to do so, touches on the diligence requirement of part three." *Go Comput. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007).

Here, the plaintiffs do not allege that they engaged in any inquiry to satisfy the due diligence prong.[7] Instead, the plaintiffs say that they "had no reason to investigate" after the defendants sent letters to their customers falsely citing rising input costs for price increases. (*See* Dk. No. 119, at ¶ 39, 3:18-cv-718.) They contend that no reasonable investigation would have led them to discover the conspiracy between Masonite and Jeld-Wen before the *Steves* litigation, excusing them from exercising diligence.

---

[7] The defendants also argue (1) that the plaintiffs failed to show that the defendants fraudulently concealed any relevant facts, and (2) even if the plaintiffs pleaded the requisite fraud, they did not do so with particularity. Because the plaintiffs failed to satisfy the diligence requirement, the Court need not reach the defendants' additional arguments.

14

To support their argument that they need not show diligence, the plaintiffs rely on the Fourth Circuit's decision in *Supermarket of Marlinton.* In that case, the Fourth Circuit held that a plaintiff can satisfy the due diligence prong "without demonstrating that it engaged in any specific inquiry." 71 F.3d at 128. The court, however, later clarified the scope of that holding: "nothing in *Supermarket of Marlinton* excuses a negligent plaintiff from the diligence requirement—not even if a fraud is allegedly well disguised." *Microsoft*, 508 F.3d at 179. *Supermarket of Marlinton* does not categorically excuse plaintiffs from satisfying the diligence prong.

Instead, the diligence requirement is triggered when a plaintiff is on inquiry notice of its claim—when a plaintiff "knows of a pattern of particular actions that a defendant has taken against [the plaintiff], though the pattern's precise scope might be unclear and its exact legal ramifications uncertain." *Id.* at 179. Beginning in late 2012, the defendants sent multiple letters to customers falsely blaming price increases on rising input costs. At that time, the IMD industry was highly concentrated between JELD-WEN and Masonite. The industry also had a history of violating antitrust laws. The defendants' repeated false statements coupled with the surrounding circumstances of the industry at least created the "evidence of the possibility of fraud," *id.*, such that it put the plaintiffs on inquiry notice of their claims. *Cf. SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 116 (4th Cir. 2018) (Wynn, J., concurring) (noting that a plaintiff is on "actual notice" when he "plead[s] the factual allegations necessary to withstand a motion to dismiss"). "Once on inquiry notice, the plaintiff must take reasonable steps to discover the information necessary to establish actual notice." *Id.* at 113 (majority opinion).

Because the plaintiffs failed to plead that they conducted any inquiry to satisfy the diligence prong, they cannot invoke the doctrine of fraudulent concealment. Indeed, the plaintiffs "cannot simply ignore the diligence requirement and later claim the alleged fraud was 'well-disguised.'"

*Id.* at 113 (quoting *Microsoft*, 508 F.3d at 179). The Court, therefore, will dismiss with prejudice the Sherman Act claim for damages for sales that occurred before four years from the date that the plaintiffs filed their initial complaint.

### 3. *Antitrust Standing*

An antitrust plaintiff "must go beyond a showing that it meets the Article III standing requirements" and additionally show "antitrust standing."[8] *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310 (4th Cir. 2007). Although all antitrust violations cause "ripples of harm" throughout the economy, "there is a point beyond which the wrongdoer should not be held liable." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters (AGC)*, 459 U.S. 519, 535 (1983). Antitrust standing determines where this point lies. Here, the defendants argue that the indirect purchaser plaintiffs lack antitrust standing to pursue their claims for equitable relief under federal antitrust law.[9]

In *Kloth v. Microsoft Corp.*, 444 F. 3d 312, 323 (4th Cir. 2006), the Fourth Circuit distilled the Supreme Court's holding in *AGC* to the following five factors:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

---

[8] In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that a plaintiff who indirectly purchased a product from a defendant may not recover damages under federal antitrust law. The Supreme Court has not decided whether the *Illinois Brick* bar applies to equitable relief. *See Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1520 n.1 (2019) ("*Illinois Brick* did not address injunctive relief, and we likewise do not address injunctive relief in this case."). The Fourth Circuit, however, has held that *Illinois Brick* "bars only compensatory damages relief and does not apply to injunctive relief." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 n.24 (4th Cir. 2002). Here, the indirect purchaser plaintiffs only seek equitable relief and not damages under federal law, so the *Illinois Brick* bar does not apply.

[9] The defendants also challenge the indirect purchaser plaintiffs' antitrust standing as to their state claims, which the Court addresses below.

16

*Novell*, 505 F.3d at 311 (citing *Kloth*, 444 F.3d at 324). The first two factors concern whether a plaintiff alleges an "antitrust injury," and the latter three factors "focus on the directness or remoteness" of the antitrust injury. *Id.*

The latter three *AGC* factors ensure that "the most direct victims of . . . anticompetitive conduct" obtain relief and prevent multiple lawsuits. *Id.* at 317. Equitable relief, however, "raises no threat of multiple lawsuits or duplicative recoveries." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986). Indeed, "one injunction is as effective as 100." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 (1972). In other words, injunctive relief vindicates the rights of all victims equally. Accordingly, the Court will focus on the first two *AGC* factors in analyzing the indirect purchaser plaintiffs' claim for injunctive relief under the Sherman Act.

As a threshold matter, the Court first considers the defendants' argument that the indirect purchaser plaintiffs do not constitute "consumer[s] or competitor[s] in the relevant market." *Novell*, 505 F.3d at 311 n.19. In *Novell*, the Fourth Circuit declined to adopt a bright line "consumer or competitor" rule, holding that the relevant inquiry is simply whether the plaintiffs suffered "an antitrust injury." *Id.* at 311-12. Accordingly, whether the indirect purchaser plaintiffs qualify as consumers in the relevant market touches on the first two *AGC* factors.

The plaintiff in *Novell*, a software company, alleged that Microsoft limited its access to information about a new operating system. *Id.* at 316. The software company argued that it could not compete in the market for software products against Microsoft without having access to the information about the new operating system. Thus, the alleged harm occurred in the operating system market—not the software market. Even though the software company was not a consumer or competitor in the operating system market, the court deemed the "causal link" between the antitrust violation and the harm to the software company "straightforward." *Id.*

17

Here, the indirect purchaser plaintiffs allege that they "indirectly purchased one or more [IMDs]." (Dk. No. 56, at 7; No. 3:18-cv-850.) The complaint, however, does not explain whether the plaintiffs purchased an IMD in the relevant market, resulting in two possible interpretations of "indirect purchaser." An "indirect purchaser" could mean any purchaser who bought a standalone IMD indirectly from distributors or home supply outlets (the "standalone indirect purchasers").[10] Alternatively, an "indirect purchaser" could mean any purchaser who bought an IMD indirectly as a component of a larger good, such as a house (the "component indirect purchasers").[11]

First, consider standalone indirect purchasers. Standalone indirect purchasers qualify as consumers in the relevant market (the IMD market) because they bought IMDs, which are highly interchangeable. *See Brown Shoe*, 370 U.S. at 325. The causal connection between the alleged antitrust violation and the harm they suffered is thus "straightforward." *Novell*, 505 F.3d at 316. The defendants allegedly conspired to fix the price of IMDs, and the plaintiffs indirectly bought those same IMDs in the marketplace. The defendants charged inflated prices, resulting in harm to the standalone indirect purchasers who paid more for the IMDs they purchased. The harm that the standalone indirect purchasers suffered is also the type of harm that Congress intended to address through antitrust laws. Congress intended antitrust laws to protect "competition, not competitors."

---

[10] The defendants further distinguish between two groups of standalone indirect purchasers: those who bought IMDs for their own use (such as a homeowner) and those who bought IMDs to install for someone else's use (such as a contractor). For example, homeowners buy IMDs to install in their own home, whereas contractors buy IMDs to install in someone else's home for a fee or as part of a larger construction project. The defendants' distinction is one without much difference. Because the homeowner and the contractor bought standalone IMDs from distributors, both suffered the same antitrust injury and are consumers in the relevant market.

[11] At the hearing on the motion to dismiss, counsel for the plaintiffs adopted the first and more narrow interpretation: that an "indirect purchaser" means a standalone indirect purchaser—not a component indirect purchaser. (*See* Hr'g Tr. 57:5-17.)

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Standalone indirect purchasers have antitrust standing to seek injunctive relief under the Sherman Act.

Second, consider component indirect purchasers. Component indirect purchasers could have bought all sorts of products that are not "reasonabl[y] interchangeab[le]" with IMDs. *Brown Shoe*, 370 U.S. at 325 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."). A house, of course, is not a substitute good for an interior door. Whatever larger good a component indirect purchaser might have bought, that good is not reasonably interchangeable with an IMD. Component indirect purchasers lack antitrust standing to seek injunctive relief under the Sherman Act.

The Court, however, must draw all reasonable inferences in the plaintiffs' favor at this stage. *See Nemet*, 591 F.3d at 253. Accordingly, the Court will construe the complaint to mean that the plaintiffs seek relief only as to standalone indirect purchasers. Thus, the Court will deny the motion to dismiss the plaintiffs' Sherman Act claim for lack of antitrust standing.

### *B. State Law Claims*

The indirect purchaser plaintiffs assert ninety-two claims under the antitrust, consumer protection, and unjust enrichment laws of thirty-nine states. The defendants have moved to dismiss those claims on various grounds, arguing that the plaintiffs (1) lack Article III standing to invoke the laws of states where no named plaintiff resides; (2) lack antitrust standing; (3) failed to comply with the notice requirements of various states' antitrust laws; (4) did not plead their consumer protection claims with particularity; (5) failed to comply with miscellaneous provisions under various states' consumer protection laws; (6) cannot assert unjust enrichment claims to get around

19

antitrust-related bars to recovery; (7) failed to plead specific elements of unjust enrichment; and (8) cannot seek relief for claims outside the applicable statutes of limitations.

## 1. *Article III Standing*

"Under Article III, the Federal Judiciary is vested with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011). "To state a case or controversy under Article III, a plaintiff must establish standing." *Id.* at 133. Specifically, a plaintiff must establish (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

Here, the defendants argue that the plaintiffs lack Article III standing to pursue their claims under the laws of the twenty-five states where no named plaintiff resides.[12] Courts are split regarding the appropriate stage of a lawsuit to consider Article III standing in this context. *See generally Le v. Kohls Dep't Stores, Inc.*, 160 F. Supp. 3d 1096, 1112-13 (E.D. Wis. 2016) (collecting cases). Some courts view this question as "appropriately answered through the class certification process." *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06-MD-1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006); *see also In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018). Other courts have held "that a plaintiff must demonstrate standing for each claim he seeks to press." *In re Magnesium Oxide Antitrust Litig.*, Civ. No. 10-5943, 2011 WL 5008090, at *10 (D.N.J. Oct. 20, 2011) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006)) (addressing Article III standing on a motion to dismiss). For the reasons set forth

---

[12] The plaintiffs initially lacked named representatives in twenty-three states. After the defendants moved to dismiss, the plaintiffs voluntarily dismissed Thomas J. Riley and Wally Bloss. Riley was a resident of Massachusetts during the class period and purchased IMDs in New Hampshire. Bloss was a resident of Missouri during the class period. Riley and Bloss were the only named plaintiffs residing in or alleging harm in Missouri and New Hampshire. The plaintiffs have another named representative from Massachusetts.

below, the Court agrees with the defendants that standing is "a threshold issue that the Court must address." *Id.*

First, the Supreme Court's decisions in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999), do not apply here. The plaintiffs point out that in both cases, the Court described class certification as "logically antecedent" to standing. *Ortiz*, 527 U.S. at 831 (quoting *Amchem*, 521 U.S. at 612). But those cases involved the certification of global settlement classes in asbestos exposure litigation. Courts have recognized the unique posture of *Amchem* and *Ortiz*. *See, e.g., Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) (noting the "very specific situation of a mandatory global settlement class" in *Amchem* and *Ortiz* and holding that those cases "[do] not require courts to consider class certification before standing").

Second, the Fourth Circuit has characterized standing as a "threshold, jurisdictional issue [that] courts should attempt to resolve . . . as soon as possible." *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993). Specifically, in class actions, "Article III requirements must be met 'at the time the complaint is filed, and at the time the class action is certified.'" *Id.* (quoting *Sosna v. Iowa*, 419 U.S. 393, 402 (1975)).

Third, "[t]he fundamental aspect of standing is that it focuses on the *party* seeking to get his complaint before the federal court and not on issues he wishes to have adjudicated." *Flast v. Cohen*, 382 U.S. 83, 99 (1968) (emphasis added). "The question is whether the person whose standing is challenged is the proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." *Id.* Class representatives must establish a claim between themselves and the defendants and "not merely allege that 'injury has been suffered by other,

21

unidentified members of the class to which they belong and which they purport to represent.'"
*Cent. Wesleyan*, 6 F.3d at 188 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1001 n.13 (1982)).

Finally, courts must determine whether "at least one named class representative has Article III standing to raise *each class subclaim*." *Wooden v. Bd. of Regents*, 247 F.3d 1262, 1288 (11th Cir. 2001) (emphasis added). "[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Id.* Thus, the standing analysis must not only focus on each named plaintiff, but also on that plaintiff's right to assert the claim under the *specific law* that grants relief. *See Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991) ("[S]tanding should be seen as a question of substantive law, answerable by reference to the statutory . . . provision whose protection is invoked.").

In light of the above principles governing standing, the Court will address Article III standing before class certification. Indeed, Article III standing "determines the court's fundamental power to even hear the suit." *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002); *see also, e.g., Krakauer v. Dish Network, LLC*, 925 F.3d 643, 652 (4th Cir. 2019) (addressing Article III standing before class certification "as is customary").

Addressing Article III standing at this stage also promotes procedural fairness. *See Magnesium Oxide*, 2011 WL 5008090, at *10 ("Otherwise, a plaintiff could bring a class action complaint under the laws of nearly every state in the Union without having to allege concrete, particularized injuries relating to those states, thereby dragging defendants into expensive nationwide class discovery, potentially without a good faith basis."). Other courts have reached similar conclusions on this issue. *See, e.g., In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, Civ. No. 12-169, 2013 WL 5503308, at *12 (D.N.J. Oct. 2, 2013)

22

("*Amchem* and *Ortiz* do not permit a court to defer [the standing] analysis when class certification and standing issues are not presented simultaneously.").[13]

The plaintiffs cannot and do not assert that they suffered harm under many of the state laws on which they rely. Accordingly, the Court will dismiss with prejudice the plaintiffs' claims for lack of Article III standing under the laws of the states where no named plaintiff resides or has suffered an injury. Those states include Alabama, Alaska, Colorado, Connecticut, the District of Columbia, Hawaii, Idaho, Iowa, Kansas, Maine, Maryland, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Rhode Island, South Dakota, Utah, Vermont, Virginia, West Virginia, and Wisconsin. The Court will address the defendants' remaining arguments with respect to the plaintiffs' claims under the laws of Arizona, Arkansas, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, Oregon, South Carolina, and Tennessee.

## 2. *Antitrust Claims*

The plaintiffs' remaining state antitrust claims fall under the laws of Arizona, California, Michigan, Minnesota, Mississippi, New York, North Carolina, Oregon, and Tennessee. The defendants argue that (1) the plaintiffs lack antitrust standing under *AGC*, and (2) the plaintiffs have failed to comply with various state notice provisions.

---

[13] Courts have also compared the ratio between the number of states with and without named plaintiff representatives. Here, only fourteen of the thirty-nine states have named plaintiff representatives. *See Jones v. Micron Tech., Inc.*, No. 18-cv-2518-JSW, 2019 WL 4232417, at *6 (N.D. Cal. Sept. 3, 2019) ("Given that only five of the twenty-five non-federal jurisdictions have named plaintiff representatives, the Court is concerned that allowing unrepresented sister state claims to proceed would subject Defendants to discovery in these additional states before Plaintiffs have secured 'actual plaintiffs who clearly have standing and are willing and able to assert claims under these state laws.'" (quoting *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015))). *But see In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2019 WL 1397228, at *22-23 (E.D. Va. Feb. 6, 2019), *report and recommendation adopted*, 2019 WL 3761680, at *10 (Aug. 9, 2019) (declining to address Article III standing at the motion to dismiss stage).

23

### *a. Antitrust Standing*

The defendants argue that the plaintiffs lack antitrust standing under *AGC* to assert claims for damages under various state antitrust laws. Because *AGC* is a federal standard, the Court must first determine the appropriate test to apply when evaluating antitrust standing under state law.

In *Illinois Brick*, the Supreme Court barred indirect purchaser plaintiffs from seeking damages under federal antitrust law. 431 U.S. at 730-31. In the years following *Illinois Brick*, state legislatures and courts across the country enacted "*Illinois Brick* repealer" statutes and decisions, enabling indirect purchaser plaintiffs to bring antitrust claims under the laws of those "repealer states." *See In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756, at \*32 (E.D. Mich. Apr. 9, 2013).

The plaintiffs argue that "the very purpose of these statutes and high court decisions would be defeated if a federal court applied *AGC* to bar indirect purchaser plaintiffs from bringing claims." (Dk. No. 75, at 8, 3:18-cv-850). But *Illinois Brick* and *AGC* are "analytically distinct." *Illinois Brick*, 431 U.S. at 728 n.7. "It is one thing to say that a state is willing to allow someone other than a direct purchaser to have the opportunity to shoulder the burden of showing proximate causation; it is quite another thing to say that the state has thrown both the direct-purchaser rule *and* proximate causation out the window." *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 744 (7th Cir. 2018).

State supreme courts have acknowledged the distinction between *Illinois Brick* and antitrust standing. *See, e.g., Lorix v. Crompton Corp.*, 736 N.W.2d 619, 630 (Minn. 2007) ("The real difficulty lies in defining the outer limits of indirect purchaser standing in Minnesota . . . . [T]here are injuries so remotely related to antitrust violations that courts simply cannot provide relief."); *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 344 (Miss. 2004) (finding

24

indirect purchasers claims too remote to state a claim under Mississippi law). Although repealer states have removed an absolute bar to recovery for indirect purchasers, those states do not automatically grant standing to all indirect purchasers. The plaintiffs must still show that they are "sufficiently connected to the violation propagating the[ ] 'ripples of harm.'" *Novell*, 505 F.3d at 310.

Accordingly, the Court must determine which antitrust standing test governs the remaining state antitrust claims. "It is axiomatic that in determining state law a federal court must look first and foremost to the law of the state's highest court."[14] *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998). "If the state's highest court does not provide an answer, then a federal court must seek guidance from an intermediate state court." *FDIC v. Rippy*, 799 F.3d 301, 310 (4th Cir. 2015). "Decisions of the state's trial courts may also be considered to provide some light upon the subject." *Liberty Mut. Ins. Co. v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir. 1991). With these guiding principles in mind, the Court turns to the appropriate antitrust standing test with respect to the plaintiffs' remaining state antitrust claims.

*i. States Applying Alternative Antitrust Standing Tests*

## *Minnesota*

In *Lorix*, the Minnesota Supreme Court declined to apply *AGC* to Minnesota's antitrust law. 736 N.W.2d at 627. Instead, the court held that "[s]tanding under Minnesota antitrust law must be defined by some prudential limits informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law." *Id.* at 631. The plaintiff

---

[14] If the state's highest court has not addressed the issue, federal courts must predict how the state's highest court would rule. *See Wells v. Liddy*, 186 F.3d 505, 527-28 (4th Cir. 1999) (directing federal courts to consider "canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions").

in *Lorix* alleged that she paid an increased price for car tires because of the defendants' conspiracy to fix the price of rubber-processing chemicals. The court found that the plaintiff had antitrust standing, reasoning that she "allege[d] that she is an end user of a consumer good whose price was inflated by anticompetitive conduct earlier in the chain of manufacture." *Id.* The plaintiff's injury thus fell "well within" Minnesota's "prudential limits" test for antitrust standing. *Id.*

Here, the plaintiffs[15]—those who bought IMDs indirectly from distributors and home supply outlets—sustained an injury that is arguably more foreseeable and less remote than the plaintiff's injury in *Lorix*. The plaintiffs bought IMDs in their unaltered form from distributors. Because the plaintiffs fall within the "prudential limits" governing antitrust standing under Minnesota law, *id.*, the Court will deny the motion to dismiss the Minnesota antitrust claim.

### Mississippi

In *Owens Corning*, the Supreme Court of Mississippi focused on whether the plaintiffs sufficiently alleged an antitrust injury and the remoteness of the alleged injury. 868 So. 2d at 344. The plaintiff, an asbestos company, sued a tobacco company under Mississippi's antitrust law, alleging that the tobacco company conspired to conceal the harmful effects of smoking, which resulted in costly lawsuits against the asbestos company filed by smokers. *Id.* at 336. The court held that the asbestos company lacked antitrust standing, reasoning that its alleged injuries were too remote and were not "injur[ies] of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 344.

The concepts of "antitrust injury" and "remoteness" mirror the considerations underlying *AGC*. *Cf. Novell*, 505 F.3d at 311. As discussed above, *see supra* Part III.A.3, the plaintiffs have

---

[15] As explained above, *see supra* Part III.A.3, the Court construes the complaint to mean that the plaintiffs seek relief only as to standalone indirect purchasers.

shown that they suffered an "antitrust injury" under the first two *AGC* factors. With respect to "remoteness," the latter three *AGC* factors focus on the "directness or remoteness" of the antitrust injury, so the Court will use those factors as a guide in analyzing "remoteness" under Mississippi's antitrust standing test.

The latter three *AGC* factors include "(3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed." *Id.*

Factors three and four mitigate the risk of duplicative damages. Accordingly, "the existence of an identifiable, more-directly harmed class of victims with the incentive to sue under the antitrust laws weighs against granting standing to a more remote plaintiff." *Id.* at 318. "If, however, there is no more directly harmed party with the motivation to act . . . the 'risk of duplicative recoveries on the one hand, or the danger of complex apportionment of damages on the other' is mitigated." *Id.* (quoting *AGC*, 459 U.S. at 543-44).

Here, the plaintiffs bought IMDs from distributors, and thus are only one degree removed from the defendants' sale of IMDs. If the plaintiffs' injuries are too "remote," then virtually no indirect purchaser would ever have injuries sufficiently "direct" to have antitrust standing. Courts have dismissed claims as too remote under the third and fourth *AGC* factors when a plaintiff indirectly purchased a product as part of a bundle or as a component of a larger good. *See, e.g., In re Refrigerant*, 2013 WL 1431756, at \*12-13 (finding the plaintiffs' injury too remote and noting that courts "have rejected a 'component theory' of antitrust standing"). The third and fourth factors tilt in favor of granting antitrust standing.

The fifth factor concerns the difficulty of identifying and apportioning damages. This factor rises and falls with the directness of the injury. *See Novell*, 505 F.3d at 319. "Cases where

27

this factor has been found to bar standing often involve potential plaintiffs *indirectly* injured by the allegedly anticompetitive behavior, raising the specter of complex apportionment of damages among, or duplicative recoveries by, direct and indirect victims of such conduct." *Id.* Here, the plaintiffs need only show what portion of the price of the IMDs they bought resulted from the alleged conspiracy. Moreover, the direct and indirect purchasers assert distinct damages claims under federal and state law. *See ARC America Corp.*, 490 U.S. at 104-05.[16]

The latter three *AGC* factors, which touch on "remoteness," weigh in favor of granting antitrust standing. And because the plaintiffs also satisfy the "antitrust injury" considerations under the first two *AGC* factors, the plaintiffs pass Mississippi's antitrust standing test. The Court, therefore, will deny the motion to dismiss the Mississippi antitrust claim.

### North Carolina

In *Crouch v. Crompton Corp.*, a North Carolina trial court set forth a five-factor test for antitrust standing, adapted from the *AGC* test. Nos. 02 CVS 4375, 03 CVS 2514, 2004 WL 2414027 (N.C. Super. Ct. Oct. 26, 2004). Those factors include (1) "[w]hether the plaintiff is a consumer or competitor in the allegedly restrained market;" (2) "[t]he directness of the impact on the plaintiff;" (3) "[w]hether there exist other indirect purchasers in the distribution chain who are

---

[16] The fifth factor also touches on the "homeowner" versus "contractor" dispute. *See supra* Part III.A.3. The defendants insist that including contractors as plaintiffs "adds a level of complexity" to the antitrust standing analysis because it creates difficulties with apportioning damages. (Hr'g Tr. 54:4-8.) That argument overcomplicates the plaintiffs' allegations. Consider a contractor who bought a door for a home renovation. In that scenario, only the contractor—not the homeowner for whom the contractor completed the renovation—would have a claim for damages based on the sale of that door under state law as an indirect purchaser. The plaintiffs do not seek to recover twice for the sale of the same door. In any event, the defendants have not identified any specific challenges with apportioning damages that would justify dismissal of the state antitrust claims under *AGC*. *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 4955377, at *15 (N.D. Cal. Oct. 2, 2014) ("[D]efendants have failed to articulate, *with specificity*, why the measurement of plaintiffs' damages would be unascertainable and why this Court would lack the capacity to scrutinize the evidence and resolve complex issues of damages apportionment.").

more directly impacted by the alleged violation;" (4) "[t]he speculative nature of the damage claims;" and (5) "[t]he risk of duplicative recovery and danger of complex apportionment of damages." *Id.* at *18-20. In the absence of any contrary authority, the Court will consider *Crouch* to inform its prediction that the Supreme Court of North Carolina would apply the same five-factor test to determine whether indirect purchaser plaintiffs have antitrust standing. *See In re Refrigerant*, 2013 WL 1431756, at *37-40.

With respect to the first factor, the plaintiffs bought IMDs from distributors, so they qualify as consumers in the allegedly restrained market. The second and third *Crouch* factors mirror the third and fourth *AGC* factors, which weigh in favor of granting standing. The fourth and fifth *Crouch* factors mirror the fifth *AGC* factor. Based on the Court's analysis of the related *AGC* factors, the plaintiffs have satisfied the fourth and fifth *Crouch* factors. Because the plaintiffs pass North Carolina's antitrust standing test, the Court will deny the motion to dismiss the North Carolina antitrust claim for lack of antitrust standing.

### ii. States Applying the AGC Test

#### California

Two California appellate courts have applied the *AGC* test. *See Wholesale Electricity Antitrust Cases I & II*, 55 Cal. Rptr. 3d 253, 265 (Ct. App. 2007); *Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 339 (Ct. App. 1995). The Court thus will apply the *AGC* test to the California antitrust claim. *See Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 259 (E.D.N.Y. 2016) (applying *AGC* to a California antitrust claim). As discussed above, the plaintiffs pass the

*AGC* test. The Court, therefore, will deny the motion to dismiss the California antitrust claim for lack of antitrust standing.

*New York*

Similarly, a New York appellate court affirmed a trial court's decision applying *AGC*. *See Ho v. Visa U.S.A., Inc.*, No. 112316/00, 2004 WL 1118534, at \*2 (Sup. Ct. 2004), *aff'd*, 793 N.Y.S.2d 8 (App. Div. 2005). The Court will defer to the *Ho* decision and apply *AGC* to the New York antitrust claim. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 CV 3690, 2015 WL 3988488, at \*13-14 (N.D. Ill. June 29, 2015) (applying *AGC* to a New York antitrust claim). Accordingly, the Court will deny the motion to dismiss the New York antitrust claim.

*Michigan*

In *Stark v. Visa U.S.A. Inc.*, a Michigan trial court applied *AGC* to an indirect purchaser plaintiff. No. 03-055030-CZ, 2004 WL 1879003, at \*2-4 (Mich. Cir. Ct. July 23, 2004). The Court assumes that the Michigan Supreme Court would apply *AGC* to determine whether an indirect purchaser has antitrust standing. *See Dairy Farmers*, 2015 WL 3988488, at \*10 (applying *AGC* to a Michigan antitrust claim). Accordingly, the Court will deny the motion to dismiss the Michigan antitrust claim.

*iii. Arizona and Oregon*

The state legislatures in Arizona and Oregon have enacted harmonization statutes instructing courts to interpret state antitrust statutes in accordance with federal law. *See* Ariz. Rev. Stat. Ann. § 44-1412; Or. Rev. Stat. § 646.715(2). Accordingly, the Court will apply the *AGC* test to the antitrust claims asserted under antitrust laws of Arizona and Oregon. *See In re Refrigerant*, 2013 WL 1431756 at \*41 (applying *AGC* to claims asserted under the laws of states that have

enacted antitrust harmonization statutes). The Court, therefore, will deny the motion to dismiss the Arizona and Oregon antitrust claims for lack of antitrust standing.

### iv. Tennessee

Tennessee courts look to interpretations of federal antitrust law for guidance in interpreting Tennessee's antitrust law. *See State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *2 n.2 (Tenn. Ch. Ct. 1980) ("Authorities which define the character of private damage suits under the federal anti-trust statutes . . . are most persuasive."); *see also Rockholt Furniture, Inc. v. Kincaid Furniture Co.*, No. 1:96-cv-688, 1998 WL 1661384, *7 (E.D. Tenn. 1998). Absent authority to the contrary, the Court will apply *AGC* to the Tennessee antitrust claim. Accordingly, the Court will deny the motion to dismiss the Tennessee antitrust claim for lack of antitrust standing.

### b. Failure to Comply with Notice Provisions

The defendants argue that the Court should dismiss the plaintiffs' Arizona and New York antitrust claims for failure to comply with state notice requirements. *See* Ariz. Rev. Stat. § 44-1415(A); N.Y. Gen. Bus. Law § 340(5). Both states require plaintiffs in antitrust class action litigation to notify the state attorneys general before or within three days of filing a complaint. *Id.* Courts are split on the effect of state notice provisions in federal court. *Compare In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 415-16 (D.N.J. 2018) (finding that state notice provisions apply in federal court), *with In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817 (N.D. Ill. 2017) (declining to dismiss claims for failure to comply with notice provisions when the plaintiffs filed late notices with state attorneys general).

Here, the plaintiffs sent notice letters to the attorneys general of Arizona and New York on December 14, 2018—one day after the statutes require notice. The defendants have not presented

any evidence of prejudice or that the attorneys general have sought to intervene. The Court declines to dismiss the Arizona and New York claims on this basis alone. The defendants cannot use state notice provisions as a "shield to avoid answering for alleged anti-competitive behavior." *In re Aftermarket Filters Antitrust Litig.*, No. 08-c-4883, 2009 WL 3754041, at *6 (N.D. Ill. Nov. 5, 2009). Accordingly, the Court will deny the defendants' motion to dismiss the Arizona and New York antitrust claims for failure to comply with the state notice provisions.

### 3. *Consumer Protection Claims*

The defendants argue that the plaintiffs (1) failed to plead their consumer protection claims with particularity, and (2) did not comply with specific provisions of certain states' consumer protection laws.

#### a. Pleading Standard for State Consumer Protection Claims

The plaintiffs' consumer protection claims include the following allegation: "Defendants have engaged in unfair competition or unfair, unconscionable, deceptive *or* fraudulent acts or practices in violation of [a state statute]." (Dk. No. 56, at ¶¶ 226-54 (emphasis added.)) The defendants argue that including this assertion constitutes a "specific averment of fraud," so the plaintiffs must meet Rule 9(b)'s particularity standard. (Dk. No. 69, at 19, 3:18-cv-850.)

The defendants misconstrue the plaintiffs' allegations. To determine whether a claim "sounds in fraud" and thus implicates Rule 9(b), courts consider the "substance of plaintiffs' allegations." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008). Here, the plaintiffs have sued the defendants based on an alleged nationwide price-fixing conspiracy. Although the plaintiffs include "fraud" or "deception" among a disjunctive list of other potential consumer protection violations, they do not base each claim on fraudulent conduct. Accordingly, the Court denies the motion to dismiss to the extent that the defendants ask the Court to dismiss

each consumer protection claim for failure to comply with Rule 9(b). The Court thus examines the sufficiency of the plaintiffs' allegations on a state-by-state basis.

### i. California

The plaintiffs assert that "Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of [California law.]" (Dk. No. 56, at ¶ 228, 3:18-cv-850.) The plaintiffs specifically invoke the "fraud" prong of California's consumer protection law: "Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code." (*Id.* at ¶ 228(f).)

"To state a claim under the 'fraud' prong of § 17200, a plaintiff must allege facts showing that members of the public are likely to be deceived by the alleged fraudulent business practice." *Antman v. Uber Techs., Inc.*, No. 3:15-cv-1175-LB, 2015 WL 6123054, at *6 (N.D. Cal. Oct. 19, 2015). "Claims under the fraud prong of the UCL are subject to the particularity requirements of Federal Rule of Civil Procedure 9(b)." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-2617-LHK, 2016 WL 3029783, at *34 (N.D. Cal. May 27, 2016).[17] A plaintiff, therefore, must plead "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). "Additionally, 'a plaintiff stating a claim under the 'fraud' prong must plead actual reliance.'" *Anthem*, 2016 WL 3029783, at *34 (quoting *Carrier*, 78 F. Supp. 3d at 1111).

---

[17] The UCL "allows plaintiffs to bring claims for unfair, unlawful, or fraudulent business practices." *Antman*, 2015 WL 612304, at *6. To the extent that the plaintiffs are proceeding under the "unfair" or "unlawful" prongs of the UCL, Rule 9(b) does not apply. *See Anthem*, 2016 WL 3029783, at *33-34.

The plaintiffs generally allege that the defendants "provided their customers for Interior Molded Doors with pretextual justifications for price increases in the letters they sent announcing those price increases." (Dk. No. 56, at ¶ 175, 3:18-cv-850.) The plaintiffs, however, do not plead "the time, place, and contents of the false representations," *Harrison*, 176 F.3d at 784, "the identity of the person making the misrepresentation," *id.*, or "actual reliance" pursuant to the UCL. Because the plaintiffs do not plead fraud with particularity, the Court dismisses without prejudice the plaintiffs' California consumer protection claim to the extend that it relies on fraud.

## ii. Michigan

The plaintiffs allege that "Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of [Michigan law]." (Dk. No. 56, at ¶ 236.) The Michigan Consumer Protection Act ("MCPA") "is much more narrowly circumscribed" than the consumer protection laws of other states. *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1076 (S.D. Cal. 2017). "[T]he only manner in which Plaintiffs may assert a violation of the MCPA is through fraud, and therefore Rule 9(b)'s heightened pleading standard applies." *Id.*

"To validly plead a fraud-based cause of action under the MCPA, a plaintiff must plead 'with particularity that [a defendant] employed fraudulent and deceptive means with the intent to deceive[,]' and that the plaintiff 'relied on such deceptive conduct when making a purchase.'" *Id.* (quoting *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 701 (E.D. Pa. 2014)) (alterations in original). "Reliance and causation may be satisfied under the Michigan consumer protection law by demonstrating that plaintiffs purchased and consumed the product." *Suboxone*, 64 F. Supp. 3d at 701. Because the plaintiffs do not plead

34

fraud with particularity, the Court will dismiss without prejudice the plaintiffs' Michigan consumer protection claim.

### iii. Minnesota

Regarding their Minnesota consumer protection claim, the plaintiffs contend that "Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of [Minnesota law]." (Dk. No. 56, at ¶ 237, 3:18-cv-850.) "[D]istrict courts that have addressed the issue are of one mind—Rule 9(b) applies to *any* claim under Minnesota's consumer fraud provisions." *Packaged Seafood*, 242 F. Supp. 3d at 1078. The plaintiffs do not plead fraud with particularity. The Court, therefore, will dismiss without prejudice the plaintiffs' Minnesota consumer protection claim

### iv. New York

With respect to their New York consumer protection claim, the plaintiffs allege that "[t]he conduct of the Defendants . . . constitutes consumer-oriented deceptive acts or practices within the meaning of [New York law]." (Dk. No. 56, at ¶ 244(f), 3:18-cv-850.) According to the plaintiffs, "Defendants made public statements about the prices of Interior Molded Doors that Defendants knew would be seen by New York consumers; such statements either omitted material information . . . or affirmatively misrepresented the real cause of price increases for Doors." (*Id.* at ¶ 244(b).)

"Under [New York's consumer protection law], specific allegations of deceptive conduct are essential to state a claim. A plaintiff is required to plead with specificity the allegedly deceptive acts or practices that form the basis of a claim under the Consumer Protection Act." *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 666 (E.D. Mich. 2011) (dismissing a claim under § 349 for failure to "allege any deceptive conduct . . . with the required particularity even if an allegation of deception could be gleaned from the [complaint]"). As explained above, the plaintiffs do not

allege deceptive conduct with particularity. Accordingly, the Court will dismiss without prejudice the New York consumer protection claim.

## *v. North Carolina*

Regarding the North Carolina consumer protection claim, the plaintiffs allege that "Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of [North Carolina law]." (Dk. No. 56, at ¶ 245, 3:18-cv-850.) The plaintiffs further contend that "Defendants publicly provided pre-textual and false justifications regarding their price increases." (*Id.* at ¶ 245(b).)

To state a claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), a plaintiff may either plead (1) a per se violation of the statute, or (2) plead a prima facie violation under one of two theories: (a) "unfair methods of competition," or (b) "unfair or deceptive acts or practices." *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 909-11 (E.D. Pa. 2012).

"[A] violation of the Sherman Act constitutes a *per se* violation of [the UDTPA]." *Id.* at 911. Here, when viewed in the light most favorable to the plaintiffs, the defendants' alleged federal antitrust violation constitutes the basis for their UDTPA claim. Because the plaintiffs plead a per se violation of the UDTPA, the Court need not impose the heightened pleading standard of Rule 9(b). *See id.* (declining to dismiss a claim under the UDTPA for failure to comply with Rule 9(b)). Accordingly, the Court will deny the motion to dismiss the North Carolina consumer protection claim.

## *vi. States with FTC Act Harmonization Provisions*

The consumer protection statutes of many states contain a Federal Trade Commission ("FTC") Act harmonization provision. "[T]he Supreme Court has construed the FTC Act, on

36

which many state consumer protection laws are modeled, to broadly cover unfair trade practices." *Zetia*, 2019 WL 1397228, at *29 (citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986)). Rule 9(b) does not apply to allegations based on "unfair methods of competition" under the FTC Act. *See, e.g., FTC v. Innovative Mktg.*, 654 F. Supp. 2d 378, 388-89 (D. Md. 2009) (holding that Rule 9(b) does not apply to claims under § 5(a) of the FTC Act). "The standard of 'unfairness' under the FTC Act . . . emcompass[es] . . . practices that violate the Sherman Act and the other antitrust laws." *Ind. Fed'n of Dentists*, 476 U.S. at 454. The consumer protection laws of the following states contain FTC Act harmonization provisions[18]:

*Arizona.* "Arizona's consumer protection law, as amended in 2013, prohibits 'unfair' practices and contains an FTC Act harmonization provision." *Zetia*, 2019 WL 1397228, at *29. Because Arizona's amended consumer protection statute "broadly covers unfair trade practices," *Zetia*, 2019 WL 3761680, at *13, the plaintiffs need not rely on a theory of fraud. Rule 9(b) does not apply to the Arizona claim, so the Court will deny the motion to dismiss the Arizona consumer protection claim.

*Florida.* The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). A "deceptive act or practice" "encompasses antitrust violations because 'the acts proscribed by subsection 501.204(1) include antitrust violations.'" *Processed Egg*, 851 F. Supp. 2d at 900 (quoting *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996)). Because "Florida law

_____

[18] *See* Ariz. Rev. Stat. Ann. § 44-1522; Fla. Stat. § 501.204(1); Mass. Gen. Laws ch. 93(A), § 2(b); S.C. Code Ann. § 39-5-20(b). The Illinois Consumer Fraud and Deceptive Business Practices Act also contains an FTC Act harmonization provision. *See* 815 Ill. Comp. Stat. Ann. § 505/2. As explained below, *see supra* Part III.B.3.b.iii, the Court will dismiss the Illinois consumer protection claim on other grounds.

recognizes that a FDUTPA claim may arise from a violation of antitrust laws such as the Sherman Act and other state antitrust laws," *id.*, the plaintiffs need not rely on fraud. Thus, the Court will deny the motion to dismiss the Florida consumer protection claim for failure to comply with Rule 9(b).

*Massachusetts.* The Supreme Judicial Court of Massachusetts has "wholly incorporated" the FTC Act into its consumer protection statute. *Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768, 773 n.8 (Mass. 1975). The Massachusetts consumer protection statute, *see* Mass. Gen. Laws, ch. 93(A), "defines unfair acts or practices by reference to interpretations of those terms in the [FTC] Act." *Kraft Power Corp. v. Merrill*, 981 N.E.2d 671, 683 (2013). "[B]ecause Massachusetts has folded the FTC Act into Chapter 93A, unfair or deceptive conduct that violates the FTC Act also violates Chapter 93A." *McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, 122 (1st Cir. 2014). Rule 9(b) does not apply to an allegation of unfair conduct, so the Court will deny the motion to dismiss the Massachusetts consumer protection claim for failure to comply with Rule 9(b).

*South Carolina.* The South Carolina Unfair Trade Practices Act ("SCUTPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices within the conduct of any trade or commerce." S.C. Code Ann. § 39-5-209(a). The SCUTPA "provides that courts shall be guided by the FTC [Act] and federal court interpretation." *Liberty Mut. Ins. Co. v. Emp. Res. Mgmt., Inc.*, 176 F. Supp. 2d 510, 515 (D.S.C. 2001). Thus, Rule 9(b) does not apply to the plaintiffs' South Carolina consumer protection claim. The Court will deny the motion to dismiss that claim for failure to comply with Rule 9(b).

## vii. Arkansas, Oregon, and Tennessee

A plaintiff may state a claim under the Arkansas, Oregon, and Tennessee consumer protection statutes without relying on fraud. *See* Ark. Code Ann. § 4-88-107(a)(10) (prohibiting "unconscionable, false, or deceptive act[s] or practice[s] in business, commerce, or trade"); Or. Rev. Stat. § 646.608 (prohibiting "unfair or deceptive conduct in trade or commerce"); Tenn. Code § 47-18-104 (prohibiting "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce"). Here, the plaintiffs do not allege fraud under their Arkansas, Oregon, and Tennessee consumer protection claims. Accordingly, the Court will deny the motion to dismiss the Arkansas, Oregon, and Tennessee consumer protection claims for failure to comply with Rule 9(b).

### b. State-Specific Provisions Governing Consumer Protection Claims

The defendants assert various additional objections with respect to the Arkansas, Florida, Illinois, and Massachusetts consumer protection claims.

### i. Arkansas

The defendants contend that the plaintiffs failed to plead reliance as Arkansas's consumer protection law requires. The plaintiffs respond that they base their consumer protection claim on their antitrust allegations and not the Arkansas Deceptive Trade Practices Act (ADTPA). But the complaint specifically alleges a violation of the ADTPA pursuant to Arkansas Code § 4-88-107.

An amended version of the ADPTA went into effect on August 1, 2017. "Under this version, a plaintiff 'must prove individually that he or she suffered an actual financial loss proximately caused by his or her reliance on the use of a practice declared unlawful under this chapter.'" *In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145,

153 (E.D.N.Y. 2018) (quoting Ark. Code Ann. § 4-88-113(f)(2)). "Reliance, however, was not an element of the former version of the ADTPA." *Id.* at 153.

Because "the amended version of the ADTPA is not retroactive," *id.*, the plaintiffs state a viable claim for purchases before August 1, 2017. The plaintiffs, however, do not plead reliance as the amended version of the ADTPA requires. Accordingly, the Court will dismiss without prejudice the Arkansas consumer protection claim to the extent that the claim includes purchases that occurred after August 1, 2017. The Court will deny the motion to dismiss for purchases that occurred before August 1, 2017.

## *ii. Florida*

First, the defendants argue that the plaintiffs cannot use an underlying antitrust violation to state a claim under Florida's consumer protection law. But as the Court explained above, *see supra* Part III.B.3.a.vi, "Florida law recognizes that a FDUTPA claim may arise from a violation of antitrust laws such as the Sherman Act," *Processed Egg*, 851 F. Supp. 2d at 900.

Second, the defendants contend that the plaintiffs did not sufficiently allege intrastate anticompetitive conduct. That argument also fails. "[T]here is simply no language in the FDUTPA implying a limitation of its scope to harm taking place within Florida alone." *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 409 (E.D. Pa. 2010) (noting that the FDUTPA "proscribes unfair and unconscionable business practices 'in the conduct of any trade or commerce'" (quoting Fla. Stat. § 501.204(1)); *see also In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 845 (E.D. Pa. 2019) (finding that the plaintiffs' "allegations of a broad nationwide-scheme to fix generic drug prices [were] sufficient to satisfy the intrastate pleading requirements" under various state consumer protection laws,

including Florida). Accordingly, the Court will deny the motion to dismiss the Florida consumer protection claim.

### iii. Illinois

The defendants argue that the plaintiffs cannot use an underlying antitrust violation to state a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act. The Illinois Supreme Court has held that "[t]here is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism." *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990); *see Packaged Seafood*, 277 F. Supp. 3d at 1178 (citing *Laughlin* and dismissing an Illinois consumer protection claim based on an underlying antitrust violation). Here, the plaintiffs base their Illinois consumer protection claim on the same price-fixing conspiracy as their antitrust claims. The Court, therefore, will dismiss with prejudice the Illinois consumer protection claim.

### iv. Massachusetts

The defendants argue that the plaintiffs do not sufficiently allege intrastate anticompetitive conduct under the Massachusetts consumer protection statute. For the same reasons that the plaintiffs satisfy the intrastate nexus requirement with respect to their Florida consumer protection claim, they also satisfy that requirement regarding their Massachusetts consumer protection claim. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-2503, 2015 WL 5458570, at *16 (D. Mass. Sept. 16, 2015) (finding allegations of a nationwide price-fixing conspiracy sufficient to allege intrastate anticompetitive conduct under the Massachusetts consumer protection statute); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1010-11 (E.D. Mich. 2014) (same). Accordingly, the Court will deny the motion to dismiss the Massachusetts consumer protection claim.

#### 4. *Unjust Enrichment Claims*

The plaintiffs' remaining unjust enrichment claims fall under the laws of Arizona, Arkansas, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, Oregon, South Carolina, and Tennessee. The defendants argue that the plaintiffs (1) cannot claim unjust enrichment to get around various states' antitrust-related bars to recovery, and (2) do not plead specific elements of unjust enrichment.

##### a. *Arkansas, Florida, Illinois, and South Carolina*

The defendants argue that the plaintiffs cannot use state unjust enrichment laws to get around the *Illinois Brick* bar on indirect purchaser claims in states without an "*Illinois Brick* repealer." Arkansas, Florida, Illinois, and South Carolina have not enacted "*Illinois Brick* repealers." "[T]he majority of courts" have found that indirect purchasers "cannot circumvent the *Illinois Brick* prohibition absent authority from the courts of those states that would allow unjust enrichment claims to proceed." *In re Lidoderm Antitrust Litig. (Lidoderm I)*, 103 F. Supp. 3d 1155 (N.D. Cal. 2015); *accord Zetia*, 2019 WL 1397228, at *36.

The plaintiffs may not circumvent a state's bar to antitrust recovery for indirect purchasers by couching their allegations as unjust enrichment claims. Accordingly, the Court will dismiss with prejudice the Arkansas, Florida, Illinois, and South Carolina unjust enrichment claims.

##### b. *Massachusetts*

The Supreme Judicial Court of Massachusetts has held that indirect purchaser plaintiffs can recover for antitrust violations under its state consumer protection laws. *See Ciardi v. F. Hoffman-La Roche, Ltd.*, 436 Mass. 53, 63 (2002). "While Massachusetts bars indirect purchasers from bringing claims under its antitrust law . . . , Massachusetts does not bar indirect purchaser standing under its consumer protection act." *In re Flonase Antitrust Litig. (Flonase II)*, 692 F.

Supp. 2d 524, 545 (E.D. Pa. Jan. 21, 2010). In *Flonase II,* the court denied a motion to dismiss indirect purchaser plaintiffs' Massachusetts unjust enrichment claim. The Court, therefore, will deny the motion to dismiss the Massachusetts unjust enrichment claim.

## c. California

Unjust enrichment does not amount to an independent cause of action in California. *See Lidoderm*, 103 F. Supp. 3d at 1176 ("[T]he weight of authority in California state and federal court decisions is that unjust enrichment does not state an independent claim under California law."). Instead, unjust enrichment is a "general principle, underlying various legal doctrines and remedies." *McBride v. Boughton*, 123 Cal. Rptr. 3d 115, 121 (Ct. App. Oct. 21, 2004). Thus, the Court will dismiss with prejudice the California unjust enrichment claim.

## d. Failure to Plead Specific Elements of Unjust Enrichment

The defendants argue that the plaintiffs fail to plead the specific elements under each state's unjust enrichment law. The plaintiffs respond that they need only plead the general elements of an unjust enrichment claim because "the elements of unjust enrichment are materially the same throughout the United States." (Dk. No. 75, at 22, 3:18-cv-850). The plaintiffs plead unjust enrichment by incorporating and realleging their allegations in the preceding paragraphs of the complaint.

"At minimum, an unjust enrichment plaintiff must ordinarily allege receipt of a benefit by the defendant at plaintiff's expense and 'that it would be inequitable or unjust for defendant to accept and retain the benefit.'" *Zetia*, 2019 WL 1397228, at *35 (quoting *Flonase II*, 692 F. Supp. 2d at 541). Viewed in the light most favorable to the plaintiffs, the complaint alleges that (1) the defendants received a benefit by unlawfully inflating prices based on a price-fixing conspiracy, (2)

43

at the plaintiffs' expense, and (3) under circumstances that would make it unjust for the defendants to retain that benefit without paying for it.

The plaintiffs' failure to re-plead the elements of unjust enrichment does not merit the wholesale dismissal of each unjust enrichment claim. *See id.* ("Requiring recharacterization of every allegation into an unjust enrichment framework would create needlessly repetitive pleading."). Indeed, unjust enrichment laws are "materially the same throughout the United States." *Singer v. AT&T Corp.*, 185 F.R.D. 681, 692 (S.D. Fla. 1998). The Court will deny the motion to dismiss the Arizona, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, Oregon, and Tennessee unjust enrichment claims.

### 5. *Claims Outside the Statutes of Limitations*

The defendants contend that the statutes of limitations of the following states partially bar the remaining state claims: Arizona, California, Michigan, Minnesota, Mississippi, New York, North Carolina, Oregon, and Tennessee.[19] The plaintiffs argue that the discovery rule tolls their claims. The discovery rule "tends to operate when a plaintiff does not know, or could not through the exercise of reasonable diligence know, of the wrong." *Processed Egg*, 931 F. Supp. 2d at 657 (internal alterations omitted). As explained above, *see supra* Part III.A.2, the plaintiffs did not show reasonable diligence here. The plaintiffs thus cannot rely on the discovery rule.

The statutes of limitations under Arizona, California, Michigan, Minnesota, New York, North Carolina, and Oregon law impose a four-year bar on recovery.[20] Accordingly, the Court will dismiss with prejudice the plaintiffs' antitrust claims under the laws of Arizona, California,

---

[19] As explained above, *see supra* Part III.A.2, the plaintiffs cannot invoke the doctrine of fraudulent concealment to toll their claims.

[20] *See* Ariz. Rev. Stat. § 44-1410; Cal. Bus. & Prof. Code § 16750.1; Mich. Comp. Laws § 445.781(2); Minn. Stat. § 325D.64; N.Y. Gen. Bus. Law § 340; N.C. Gen. Stat. § 75-16.2; Or. Rev. Stat. § 646.800(1)-(2).

Michigan, Minnesota, New York, North Carolina, and Oregon to the extent that the plaintiffs seek to recover damages for injuries outside the four-year time bar.

The statutes of limitations under Mississippi and Tennessee law impose a three-year bar on recovery.[21] Accordingly, the plaintiffs cannot recover damages for injuries outside the three-year time bar for their claims under those state laws. The Court, therefore, will dismiss with prejudice the plaintiffs' antitrust claims under the laws of Mississippi and Tennessee to the extent that the plaintiffs seek to recover damages outside the three-year time bar.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the defendants' motions to dismiss. The Court summarizes its rulings as to the indirect purchaser plaintiffs' claims in the attached Exhibit.

To the extent that the indirect purchaser plaintiffs believe that they can cure the deficiencies with respect to their Arkansas, California, Michigan, Minnesota, or New York consumer protection claims, the plaintiffs may move for leave to amend within fourteen (14) days of this Opinion and Order. The plaintiffs may file a five-page brief explaining how the amendments would cure the deficiencies. The plaintiffs shall attach as an exhibit the proposed amended paragraphs of the complaint (not the entire complaint). The defendants may file a five-page response brief within fourteen (14) days thereafter.

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: _____ September 2019
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[21] *See* Miss. Code Ann. § 15-1-49; Tenn. Code Ann. § 28-3-105.