**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| IN RE: INTERIOR MOLDED DOORS ANTITRUST LITIGATION | Lead Civil Action No. 3:18-cv-00718-JAG |

**MEMORANDUM OF LAW IN SUPPORT OF DIRECT PURCHASER**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    FACTUAL BACKGROUND ........................................................................... 4

       A.    The Interior Molded Doors Market Was Ripe for a Conspiracy. .......... 4

       B.    Defendants Conspired to Fix IMD Prices. ............................................. 5

             1.    Onex Acquired Jeld-Wen, Installed a Respected Industry Veteran as CEO, and Acquired CraftMaster Manufacturing, Inc. ........................................... 5

             2.    Seeking a More Rapid Turnaround, Onex Fires Orsino and Installs Kirk Hachigian as CEO. ................................................................... 6

             3.    Defendants Coordinated to Impose the Largest IMD Price Increase in History. ................................................................... 7

             4.    Defendants' Coordinated Conduct Artificially Inflated IMD Prices Throughout the Class Period. ................................................. 12

             5.    Neither Cost nor Demand Explains the Drastic Run Up of Interior Molded Doors Prices. ........................................................... 16

             6.    Defendants Acted Against Their Own Unilateral Interests, in Furtherance of the Conspiracy. ................................................... 17

III.   LEGAL STANDARDS ................................................................................ 19

IV.    ARGUMENT ................................................................................................ 21

       A.    Rule 23(a) is Satisfied and the Class is Ascertainable. ........................ 21

       B.    Plaintiffs Satisfy the Requirements of Rule 23(b)(3). ......................... 23

             1.    Common Questions of Law or Fact Predominate. ..................... 23

                   a.    Common Evidence Can Prove the Existence of the Conspiracy. . 24

                   b.    Common Evidence Will Show Impact. ....................... 26

                         i.    The Conspiracy Had a General Tendency to Harm the Class by Causing Artificially Inflated Prices. ....................................... 27

                               a)    A Multiple Regression Model Demonstrates that, Without the Conspiracy, IMD Prices Would Have Been Lower. ................................................. 27

b) Defendants' Own Transactional Data Shows that Prices Rose Over the Class Period. .......................... 29

c) At a Minimum, Price Increase Announcements Set an Artificially-Inflated Base Price Upon Which Negotiations Began. ................................................. 29

ii. The Impact of the Conspiracy Was Widespread Across the Class. ................................................................ 30

a) A Pricing Structure Exists in the IMD Market Such That Prices Responded Similarly to Coordinated Pricing Activity. ......................................................... 30

b) Further Empirical Analysis Shows Impact to Virtually all Class Members on at Least One Transaction. ...... 33

c. A Methodology Exists to Prove Class-Wide Damages .............. 34

2. Class Treatment is a Superior Means of Adjudication. ........................... 35

V. CONCLUSION .................................................................................. 37

# TABLE OF AUTHORITIES

## CASES

*Am. Sales Co., LLC v. Pfizer, Inc.*,
  2:14CV361, 2017 WL 3669604 (E.D. Va. July 28, 2017) ........................................ passim

*Amaya v. DGS Constr., LLC*,
  326 F.R.D. 439 (D. Md. 2018) ........................................................................................ 19

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................................ 20

*Amgen, Inc. v. Conn. Ret. Plans and Trust Funds*,
  568 U.S. 455 (2013) ................................................................................................. passim

*Ballard v. Blue Shield*, 543 F.2d 1075, 1080 (4th Cir. 1976) ………………………………………21

*Bell v. WestRock CP, LLC*,
  3:17-CV-829, 2019 WL 1874694 (E.D. Va. Apr. 26, 2019) ..................................... 20, 35

*Brown v. Nucor Corp.*,
  576 F.3d 149 (4th Cir. 2009) ........................................................................................... 3

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015) ............................................................................ 27, 32

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .......................................................................................................... 34

*DeLoach v. Philip Morris Co.*,
  206 F.R.D. 551 (M.D.N.C. 2002) ................................................................... 20, 24, 33, 34

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) .......................................................................................... 19

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) .................................................................................... passim

*Henderson v. Trans Union LLC*,
  3:14-CV-00679-JAG, 2016 WL 2344786 (E.D. Va. May 3, 2016) ................................. 36

*In re Air Cargo Shipping Services Antitrust Litig.*,
  No. 06-MD-1175(JG)(VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .................. 24

*In re Blood Reagents Antitrust Litig.*,
  MDL No. 09–2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015).................................. 24

*In re Capacitors Antitrust Litig.*,
  No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ........................... 24

*In re Chocolate Confectionary Antitrust Litig.*,
  289 F.R.D. 200 (M.D. Pa. 2012).................................................................................. 33

*In re Domestic Drywall Antitrust Litig.*,
  MDL No. 2437, 2017 WL 3623466 (E.D. Pa. Aug. 23, 2017)....................................... 24

*In re Dynamic Random Access Memory Antitrust Litig.*,
  No. M 02–1486 PJH, 2006 WL 1530166 (N.D. Cal. Jun. 5, 2006)................................ 24

*In re Flat Glass Antitrust Litig.*,
  191 F.R.D. 472 (W.D. Pa. 1999) ................................................................................. 30

*In re High-Tech Employee Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ....................................................................... 27

*In re Indep. Gasoline Antitrust Litig.*,
  79 F.R.D. 552 (D. Md. 1978)........................................................................................ 20

*In re Interior Molded Doors Antitrust Litig.*,
  3:18-CV-00718-JAG, 2019 WL 4478734 (E.D. Va. Sept. 18, 2019)............................... 4

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002)......................................................................................... 24

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  319 F.R.D. 158 (E.D. Pa. 2016).................................................................................... 24

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015)............................................................................................. 24

*In re OSB Antitrust Litig.*,
  2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ................................................................. 24

*In re Polyester Staple Antitrust Litig.*,
  MDL 3:03CV1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007) ........................ passim

*In re Rubber Chemicals Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005).................................................................................. 24

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) ...................................................... 24

*In re Titanium Dioxide Antitrust Litig.*,
  284 F.R.D. 328 (D. Md. 2012) ............................................... passim

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ...................................... 24, 27, 29

*In re Vitamin C Antitrust Litig.*,
  279 F.R.D. 90 (E.D.N.Y. 2012) .................................................. 24

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002) ................................................... 24

*Kleen Products LLC v. Int'l Paper Co.*,
  831 F.3d 919 (7th Cir. 2016) .................................................... 24

*Krakauer v. Dish Network, L.L.C.*,
  925 F.3d 643(4th Cir. 2019) .......................................... 19, 23, 26

*Nat'l Elec. Contractors Ass'n, Inc. v. Nat'l Constructors Ass'n*,
  678 F.2d 492 (4th Cir. 1982) .................................................... 30

*Nitsch v. Dreamworks Animation SKG, Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016) ............................................... 26

*Peoples v. Wendover Funding, Inc.*,
  179 F.R.D. 492 (D. Md. 1998) ................................................... 21

*Phillips v. Crown Cent. Petroleum Corp.*,
  602 F.2d 616 (4th Cir. 1979) .................................................... 34

*Sharp Farms v. Speaks*,
  917 F.3d 276 (4th Cir. 2019) .................................................... 22

*Soutter v. Equifax Info. Servs., LLC*,
  307 F.R.D. 183 (E.D. Va. 2015) ................................................ 23

*Steves and Sons, Inc. v. JELD-WEN, Inc.*,
  345 F. Supp. 3d 614 (E.D. Va. 2018) ........................................... 4

*Steves and Sons, Inc. v. JELD-WEN, Inc.*,
  Civil Action No. 3:16-cv-00545 (E.D. Va.) ................................. 18

*Technical Learning Collective, Inc. v. Daimler Benz Aktiengesellschaft*,
    No. 77-1443, 1979 WL 1718 (D. Md. Jul. 2, 1979) ....................................................... 20

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ................................................................................................. 23, 26

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)……………………………………..........21

*Windham v. Am. Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) ......................................................................................... 24, 33

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)........................................................................................................... 34

## OTHER AUTHORITIES

6 *Newberg on Class Actions*, § 18.28 at 102 (4th ed. 2002) ........................................................ 24

6 William B. Rubenstein, *Newberg on Class Actions* § 20:52 (5th ed. 2011)............................. 20

Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation:*
    *A Pocket Guide for Judges*, Federal Judicial Center, § 2C (2005) .................................. 36

## RULES

Fed. R. Civ. P. 23 ................................................................................................................. passim

## I.      INTRODUCTION

Direct Purchaser Plaintiffs Grubb Lumber Co., Inc. and Philadelphia Reserve Supply Company (collectively, "DPPs" or "Plaintiffs") bring this price-fixing class action on behalf of themselves and a proposed class ("Class") of direct purchasers of interior molded doors ("IMDs") from Defendants[1] in the United States during the Class Period.[2] The central issues that will resolve Plaintiffs' claims—the existence of a price-fixing conspiracy (the "Conspiracy"),[3] Defendants' acts in furtherance thereof, and the Conspiracy's impact on the Class—are issues (1) for which proof will be common to the Class, and (2) that predominate over any individual issues. Like almost all price-fixing cases, the existence and scope of the Conspiracy will be resolved with common evidence focused on Defendants' conduct.

Further, Plaintiffs' expert economist, Dr. Russell Lamb, demonstrates that: (1) all or nearly all Class members paid artificially-inflated IMD prices due to the Conspiracy (*i.e.*, common impact), and (2) the damages stemming from those artificially-inflated prices can be established on a class-wide basis. *See* Class Certification and Trial Expert Report of Dr. Russell L. Lamb ("Lamb Rep."), attached as Ex.[4] 1, ¶¶ 264-265. Dr. Lamb's findings regarding common impact and aggregate Class damages are based on analyses and evidence entirely common to the Class as a whole.

---

[1] "Defendants" are JELD-WEN, Inc., JELD-WEN Holding, Inc. (together, "Jeld-Wen") and Masonite Corporation ("Masonite").

[2] The "Class Period" is October 19, 2014 to December 31, 2018.

[3] While the Second Amended Consolidated Complaint (Doc. No. 119) ("SAC") alleges the Conspiracy started "at least as early as 2012," *see* ¶¶ 83, 116, based on a thorough review of the record evidence, Plaintiffs have now determined that the alleged Conspiracy started in March 2014.

[4] "Ex." refers to Exhibits attached to this Motion.

This is a tale of two companies—Masonite and Jeld-Wen—that conspired to artificially inflate IMD prices, causing widespread injury to DPPs and the Class. They did so by coordinating their conduct at the highest levels, including through direct communications between Jeld-Wen CEO Kirk Hachigian and Masonite CEO Fred Lynch.[5] This coordination enabled them to impose nearly uniform price increases in the IMD market with limited competitive constraints, leading to an overcharge of ███ on the Class's IMD purchases during the Class Period.[6] *See* Lamb Rep. ¶ 187.

Defendants also solicited each other's price lists from customers and monitored each other's earnings calls, which allowed them to quickly detect any cheating on their agreement. Consequently, Defendants were able to and did fix and maintain their artificially-inflated IMD prices throughout the Class Period. *See, e.g.*, Lamb Rep. ¶ 168. In addition, Masonite publicly announced (1) an end to its longstanding practice of supplying independent IMD manufacturers (the "independents") with molded doorskins ("Doorskins"), the largest input cost in the manufacture of IMDs,[7] and (2) that its customers in North America would now have to purchase Doorskins from Jeld-Wen. *See, e.g.*, *id.* ¶¶ 40-41.

---

[5] These inter-company communications flagrantly violated Defendants' respective corporate antitrust policies. *See, e.g.*, Ex. 2 (Kirk Hachigian Deposition Exhibit ("[Hachigian] Dep. Ex.") 356) at JELD-WEN-00798852 ███████ REDACTED ███████ (emphasis added); *see also* Ex. 3 (Virostek Dep. Ex. 136) (Masonite Antitrust Policy).

[6] While DPPs are limited by the applicable 4-year statute of limitations to seeking damages for a period no earlier than October 19, 2014, DPPs allege that (1) the Conspiracy started in March 2014, and (2) the effects of the Conspiracy started in August 2014, when Defendants imposed the ███ REDACTED ███." Lamb Rep. ¶¶ 136, 192.

[7] Over the years, Defendants acquired most of the independents, thereby consolidating the industry. *See* Lamb Rep. ¶¶ 50-52, 55-56. The few remaining independents depend on Defendants to supply them with Doorskins in order to produce their own IMDs.

Class-wide evidence makes clear that Defendants' conduct took place in a market well suited for collusion. First, Defendants are a near-duopoly. Second, significant barriers to entry prevent potential competitors from entering the IMD (and Doorskin) markets. Third, IMDs are near-commodities, so that competition among IMD manufacturers is based primarily on price. Fourth, there are no reasonable, economic substitutes for IMDs, resulting in significant pricing inelasticity.[8] Fifth, IMD prices had been flat or declining prior to the start of the Conspiracy, as Defendants had failed in their attempts to raise IMD prices, with each Defendant complaining about being undercut by the other. Sixth, there are hundreds of direct purchasers, which increased Defendants' market power and reduced any incentive to undercut their anti-competitive prices. Seventh, Defendants had ample opportunities to conspire, including direct communications at the highest levels and by attending the same trade shows. Thus, Defendants were able to successfully implement, monitor, and enforce their Conspiracy.

At the class certification stage, Plaintiffs need only show that their claims can be resolved with evidence predominantly common to the Class and need not prove the merits of their claims. *See Amgen, Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013); *Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir. 2009). This case is on all fours with the numerous antitrust price-fixing cases that federal courts have certified as class actions. The trial will focus almost entirely on proof that Defendants conspired to fix IMD prices, and were successful in doing so, causing Class members to pay supra-competitive prices.

---

[8] Pricing is inelastic when a price increase for a product does not lead to a proportional decrease in demand for that product. "For a product with inelastic demand, it is profitable to increase prices as part of an alleged anticompetitive agreement because the loss in volume is more than compensated by the increase in revenue generated by the higher price." Lamb Rep. ¶ 79.

Plaintiffs satisfy the elements of Fed. R. Civ. P. 23(a) and (b)(3), warranting certification of the Class, *i.e.*, all persons or entities that purchased IMDs in the United States during the Class Period directly from either or both Defendants, their subsidiaries, affiliates or joint-ventures.

## II.    FACTUAL BACKGROUND[9]

### A.    The Interior Molded Doors Market Was Ripe for a Conspiracy.

Class-wide evidence shows that the IMD market possesses characteristics that facilitate (1) collusion, and (2) widespread harm on all Class members. These include:

- **Dominant market power**:[10] Masonite and Jeld-Wen are the only two "vertically integrated" IMD manufacturers, *i.e.*, firms that manufacture both IMDs and Doorskins. *See* Lamb Rep. ¶ 31. During the Class Period, Defendants controlled on average more than ▮▮▮ of the IMD market and ▮▮▮ of the domestic Doorskin market. *Id.* ¶¶ 52, 53. Doorskins comprise the largest cost in the manufacture of IMDs, *id.* ¶ 54, the purchase of which is essential for the independents. *Id.* ¶ 25 n.41.

- **Significant barriers to entry exist**: High barriers to entry made it unfeasible for new suppliers to enter the IMD market and thwart the Conspiracy. *Id.* ¶ 55. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[11] *See, e.g.*, Ex. 5 (Steves Dep. Ex. 261) at STEVES-IMD-000713-14. Masonite announced tha▮▮▮▮▮▮▮ REDACTED ▮▮▮▮▮▮▮▮▮▮ ."[12] *See* Lamb Rep. ¶ 59. Further, Defendants have cost

---

[9] For general background on IMDs, *see In re Interior Molded Doors Antitrust Litig.*, 3:18-CV-00718-JAG, 2019 WL 4478734, at *1 (E.D. Va. Sept. 18, 2019).

[10] "Economics teaches us that when the market for a product is dominated by a small number of firms, it is easier to form and maintain a cartel … over time because coordination among firms is easier." Lamb Rep. ¶ 48.

[11] Sam Steves, CEO of Steves and Sons, Inc. ("Steves")—the largest independent IMD manufacturer—testified ▮▮▮▮▮▮▮ REDACTED ▮▮▮▮▮▮▮ Ex. 4 (Deposition Transcript of Sam Steves ("[Steves] Dep. Tr.")) at 37:12-25. Steves was both an independent IMD supplier competing with Defendants in the IMD market and a Jeld-Wen Doorskin customer.

[12] This District Court reached the same conclusion in *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 636-37 (E.D. Va. 2018) (Payne, J.) ("The record establishes that JELD-WEN will continue to engage in this same sort of conduct …. because, as [Steves' expert] Shapiro testified, the entry of another doorskin supplier besides JELD-WEN and Masonite into the U.S. market is unlikely."). This litigation is discussed further, *infra* at n.41.

advantages and proprietary technologies that also effectively deter new entrants. *Id.* ¶¶ 59-62.

- **<u>Demand for IMDs is inelastic as there are no reasonable economic substitutes</u>**: There are no economic substitutes for IMDs, so Defendants' customers could not have avoided increased prices by switching to other products. *Id.* ¶¶ 88-92. Thus, Class members could not have turned to another product as IMD prices rose, facilitating Defendants' ability to impose conspiratorial price increases across the Class. *Id.* ¶ 92.

- **<u>IMDs are commodities</u>**: IMDs are interchangeable commodities, making it easier for Defendants to track the prices of one another's products. *Id.* ¶¶ 69-78, 161. That in turn allowed Defendants to monitor compliance with, or cheating on, their Conspiracy. *Id.* ¶¶ 77-78.

- REDACTED

  . *Id.* ¶ 94-97. "'[F]irms characterized by low profits and low rates of sales growth demonstrate a tendency towards collusive behavior.'" *Id.* ¶ 93 (citation omitted).

- **<u>There are many direct purchasers</u>**: Defendants' incentive to cheat on the Conspiracy was reduced because "when there are many smaller customers [over 450 here] as opposed to a handful of larger customers, … each potential new customer that could be gained by undercutting the cartel is relatively small, compared to the loss of cartel-inflated profits on the sales to the entire market if the cartel fails." *Id.* ¶¶ 99-101.

- **<u>Ample opportunities to conspire</u>**: The IMD industry provided ample opportunities for Defendants to conspire. REDACTED

  Moreover, Defendants' executives regularly attended the same trade association meetings, trade shows and investor conferences, monitored each other's investor calls, and hired each other's senior executives and other employees.

**B.     Defendants Conspired to Fix IMD Prices.**

   **1.     Onex Acquired Jeld-Wen, Installed a Respected Industry Veteran as CEO, and Acquired CraftMaster Manufacturing, Inc.**

In October 2011, Onex Partners ("Onex"), a Canadian institutional investor, acquired a majority interest in and management control of Jeld-Wen for $871 million. *See, e.g.*, Ex. 6 (Ross Dep. Tr.) at 208:4-209:14. Soon after the acquisition, Onex installed Philip Orsino as President

5

of Jeld-Wen.[13] Orsino had previously served as President and CEO of Masonite (and its predecessor entities) from 1984 to 2005, and was well known in the IMD industry.[14] Ex. 8 (Orsino Dep. Tr.) at 20:24-23:16, 26:18-20.

In October 2012, Jeld-Wen acquired CraftMaster Manufacturing, Inc. ("CMI"), the third vertically-integrated IMD manufacturer, solidifying Defendants' domination of both the IMD and Doorskin markets. As part of that transaction, Orsino appointed Bob Merrill, CMI President and CEO and former Masonite VP of Sales, as Jeld-Wen's Executive VP, Sales and Marketing. *See* Ex. 7 (Merrill Dep. Tr.) at 35:19-36:6. Not surprisingly, given the close-knit nature of the IMD industry, Merrill remained friendly with some of his former colleagues and other business contacts, including Masonite CEO Fred Lynch and Masonite VP of "Special Initiatives" Dale Mayfield. *See id.* at 66:24-70:8.

> **2.    Seeking a More Rapid Turnaround, Onex Fires Orsino and Installs Kirk Hachigian as CEO.**

REDACTED

---

[13] Orsino became CEO roughly one year later. Ex. 6 (Ross Dep. Tr.) at 104:22-105:5.

[14] Robert (Bob) Merrill, a former high-level executive at Masonite, CMI and Jeld-Wen, testified that Orsino "created the largest door company in the world, sold it, and then came and helped Onex buy, the second largest door company in the world." *See* Ex. 7 (Merrill Dep. Tr.) at 37:3-14.

REDACTED    REDACTED

REDACTED.[15]

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED,[16]    REDACTED.[17]

### 3.    Defendants Coordinated to Impose the Largest IMD Price Increase in History.

With Orsino out of the way, the high-level inter-Defendant communications got

underway.    REDACTED

---

[15]    REDACTED

        *See* Ex. 10 (MAS-0000039580) at MAS-0000039582.
        REDACTED
        *See* Ex. 11 (Hair Dep. Ex. 211) at p. 2.

[16] Per Jeld-Wen's former President and CEO, Mark Beck,

        *See* Ex. 13 (Beck Dep. Tr.) at 153:14-154:3.

[17]    REDACTED
        *See* Ex. 6 (Ross Dep. Tr.) at 158:25-159:12.

7

[REDACTED]

[REDACTED] [18] Ex. 15 (Lynch Dep. Ex. 307) at

JELD-WEN-01084142. [REDACTED]

[REDACTED].[19] *Id.*

[REDACTED]

[REDACTED]

[REDACTED] [20] [REDACTED]

[REDACTED] Ex. 17 (Repar

Dep. Ex. 167) at MAS-0000657574.[21]

On April 1, 2014, Hachigian officially became Jeld-Wen's CEO. [REDACTED]

[REDACTED]

---

[18] [REDACTED]

[REDACTED]

[REDACTED]. Ex. 12 (Lynch Dep. Tr.) at 147:3-6, 171:2-8. [REDACTED] 16

(Hachigian Dep. Tr.) at 205:1-23.

[19] [REDACTED]

[REDACTED] Ex. 16 (Hachigian Dep. Tr.)

at 103:6-105:7. [REDACTED]

[REDACTED]. *Id.* at 105:16-106:14. [REDACTED]

[REDACTED]

[20] *See* Exs. 17 (Repar Dep. Ex. 167) at MAS-0000657574; 12 (Lynch Dep. Tr.) at 151:25-153:9.

[21] Tony Hair, Masonite VP and Business Leader, NA Residential, testified that [REDACTED] Ex. 18 (Hair Dep. Tr.) at

93:24-94:22. [REDACTED]

[REDACTED] Ex. 17 (Repar Dep. Ex. 167) at MAS-0000657573.

REDACTED.[22] But far from being daunted by those "REDACTED," REDACTED

REDACTED.              REDACTED

REDACTED

REDACTED

REDACTED

              Ex. 6 (Ross Dep. Tr.) at 195:13-196:7.[23]     REDACTED

REDACTED

REDACTED

REDACTED

       REDACTED

REDACTED.

REDACTED

REDACTED

REDACTED   Ex. 20 (Lynch Dep. Ex. 309) at MAS-0000158784 (emphasis added).[24] Further, on

May 7, 2014, during Masonite's Q1 2014 Earnings Conference call, Fred Lynch made several

statements concerning Masonite's pricing, *e.g.*, "we plan to continue raising prices…." Ex. 21

---

[22] When asked, "REDACTED?,"
Hachigian testified: REDACTED
REDACTED

REDACTED Ex. 16 (Hachigian Dep.
Tr.) at 126:25-127:16 (quotation marks omitted).

[23] Hachigian was not the only one emboldened by the events of March 2014. REDACTED
REDACTED Exs. 19 (Ross Dep. Ex. 293) at p. 8; 6 (Ross Dep. Tr.) at 210:2-8.

[24] REDACTED
REDACTED *See* Ex. 20 (Lynch Dep. Ex. 309) at MAS-0000158728.

(Lynch Dep. Ex. 315) at JELD-WEN-00710891; *see also* Ex. 12 (Lynch Dep. Tr.) at 233:22-

242:16. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Ex. 22

(Brosterhous Dep. Ex. 197) at JELD-WEN-00697928-29.[25]

[REDACTED]

[REDACTED] Ex. 24 (Merrill Dep.

Ex. 53) at JELD-WEN-00891800. [REDACTED]

[REDACTED]

[REDACTED] *See id.* at JELD-

WEN-00891798. [REDACTED]

[REDACTED] Again, like most of the [REDACTED]

[REDACTED], and despite Hachigian's testimony that he " [REDACTED]

[REDACTED]," Defendants produced no emails or notes associated with this call.

[REDACTED]

[REDACTED]

[REDACTED] Ex. 25 (Hachigian Dep. Ex. 367)

at JELD-WEN-00576398; *see also, e.g.*, Exs. 7 (Merrill Dep. Tr.) at 137:19-138:8; 16

(Hachigian Dep. Tr.) at 172:2-172:6. In connection with the upcoming increase, Jeld-Wen

---

[25] *See also* Ex. 23 (Mercier Dep. Ex. 243) at JELD-WEN-00290045 (Chris Mercier, a Jeld-Wen Sales VP, told a customer that [REDACTED]
[REDACTED] ).
[26] [REDACTED]
[REDACTED]. Ex. 16 (Hachigian Dep. Tr.) at 166:13-167:7.



REDACTED . Ex. 26

(Merrill Dep. Ex. 54) at JELD-WEN-00928624.

REDACTED

Ex. 27 (Beeken Dep. Ex. 3). REDACTED

"27 REDACTED

. Ex. 29 (Merrill Dep. Ex. 58). In connection

with the Jeld-Wen announcement, Hachigian stated in two separate emails on June 10, 2014:

(1) " REDACTED

," *see* Ex. 28 (Merrill Dep. Ex. 57) at JELD-WEN-00956493; and (2) "REDACTED

." *See* Ex. 30 (Hachigian Dep. Ex. 369) at JELD-WEN-

00798257.

Having received confirmation that Jeld-Wen had announced its increase, Masonite

immediately took steps to announce its own increase. Ex. 31 (Beeken Dep. Ex. 4). REDACTED

Ex. 32 (Merrill

Dep. Ex. 64). REDACTED

*See, e.g.*, Ex.

33 (Beeken Dep. Ex. 7) at MAS-0000018747. REDACTED

---

[27] *See* Ex. 28 (Merrill Dep. Ex. 57) at JELD-WEN-00956495.

[REDACTED] *See* Ex. 34 (Merrill Dep. Ex. 63) at JELD-WEN-00935168.[28]

[REDACTED]

[REDACTED] *See* Ex. 36 (Brosterhous Dep. Ex. 199) at JELD-WEN-00697911.

As intended, the Conspiracy led to dramatic price increases as Defendants shifted the dynamics of the IMD market.[29]

### 4.    Defendants' Coordinated Conduct Artificially Inflated IMD Prices Throughout the Class Period.

Defendants' next IMD price increase announcement came less than six months after the June 2014 announcement and was similarly preceded by multiple inter-Defendant contacts. [REDACTED]

[REDACTED]

[REDACTED]. Ex. 37 (Merrill Dep. Ex. 67).[30] [REDACTED]

[REDACTED]. *See, e.g.*, Ex. 39

---

[28] [REDACTED]

[REDACTED] Ex. 35 (Steves Dep. Ex. 263) at STEVES-IMD-006932.
According to Sam Steves, [REDACTED]

[REDACTED]

[REDACTED] Ex. 4 (Steves Dep. Tr.) at 70:9-18.
According to Mr. Steves' notes, [REDACTED]. Ex. 35 (Steves Dep. Ex. 263) at STEVES-IMD-006932.

[29] For example, [REDACTED]

[REDACTED]" Lamb Rep. ¶ 179.

[30] Plaintiffs directed an interrogatory to Masonite to determine who Mayfield spoke to on this call, and then moved to compel Masonite to respond. Pursuant to the Court's Order of January 16, 2020, Masonite responded but claimed it was unable to determine the identity of the Jeld-Wen caller. Ex. 38 (Masonite Supp. Response to Pls. Second Set of Interrogatories at pp. 4-5).

(MAS-0000206993).[31] [REDACTED]

[REDACTED] . Exs. 12 (Lynch Dep. Tr.) at

192:20-195:12; 41 (Merrill Dep. Ex. 70).[32]

[REDACTED]

[REDACTED] Ex. 42 (Merrill Dep. Ex. 75) at JELD-WEN-00831285-86. [REDACTED]

[REDACTED]

[REDACTED] Ex. 43 (Merrill Dep. Ex. 76) at JELD-

WEN-00355102. The next day, Masonite VP John Beeken e-mailed [REDACTED]

[REDACTED]

[REDACTED] Ex. 44

(Beeken Dep. Ex. 10) at MAS-0000018793.[33]

The Conspiracy continued in the form of numerous parallel price increases:

---

[31] Shaun Alsdorf, Masonite's Senior Director, North America Interior Business, testified that
[REDACTED]
[REDACTED] Ex. 40 (Alsdorf Dep. Tr.) at 50:12-51:4.
[32] [REDACTED]
[REDACTED]
[REDACTED] Ex. 12 (Lynch Dep. Tr.) at 193:14-194:25. [REDACTED]
*See also id.*
at 140:21-143:8.
[33] [REDACTED]
*See* Ex. 45 (Merrill Dep. Ex. 82) [REDACTED]
[REDACTED] *See* Ex. 7 (Merrill Dep. Tr.) at 211:16-215:19. Jeld-
Wen's then-CEO Mark Beck testified that he did not know about these texts, and added, "I think
there are potentially innocent reasons. But per our code of conduct, **I would have advised him
this doesn't look good**, even if -- even if he had an innocent reason." Ex. 13 (Beck Dep. Tr.) at
77:23-78:21 (emphasis added).

13

| Price Increase | Company | Notice Date | Effective Date | Increase Amount |
|---|---|---|---|---|
| Mid 2014 | Jeld-Wen | 6/9/2014 | 8/11/2014 | 9.5% |
| | Masonite | 6/17/2014 | 8/18/2014 | 8% |
| Early 2015 | Masonite | 12/1/2014 | 3/2/2015 | 7% |
| | Jeld-Wen | 12/3/2014 | 3/2/2015 | 5-6% |
| Early 2016 | Masonite | 10/26/2015 | 2/1/2016 | 3-5% |
| | Jeld-Wen | 10/26/2015 | 2/1/2016 | 3% |
| Early 2017 | Masonite | 10/4/2016 | 1/1/2017 | 5-7% |
| | Jeld-Wen | 10/18/2016 | 1/3/2017 | 5% |
| Mid 2017 | Masonite | 8/25/2017 | 10/30/2017 | 5-7% |
| | Jeld-Wen | 9/7/2017 | 11/6/2017 | 5% |
| Mid 2018 | Jeld-Wen | 3/6/2018 | 5/7/2018 | 6% |
| | Masonite | 3/22/2018 | 6/1/2018 | 6% |
| Late 2018 | Jeld-Wen | 10/8/2018 | 12/17/2018 | 7% |
| | Masonite | 9/17/2018 | 12/15/2018 | 7%[34] |

REDACTED

,[35]                                                                    See Ex. 46

(Beck Dep. Ex. 98) at JELD-WEN-00563810. Under Beck, as with Hachigian,

See Ex. 47 (Beck Dep. Ex. 100) at JELD-WEN-00198941. Throughout the

Hachigian/Beck regime, Fred Lynch remained as Masonite's CEO.

Moreover, Defendants' high-level contacts continued:

- REDACTED                                          See Ex. 48 (Hachigian Dep. Ex. 387).[36]

---

[34] See Lamb Rep. ¶ 134, Table 2.

[35] REDACTED

Ex. 6 (Ross Dep. Tr.) at 263:3-10, 266:3-17. Mr. Hachigian remained Jeld-Wen's
Executive Chairman until May of 2019. Id. at 261:25-262:6.

[36] REDACTED . See Exs. 49-50
(JELD-WEN-00924955) at JELD-WEN-00924956; (MAS-0000471100-101).

- REDACTED *See* Ex. 51 (Merrill Dep. Ex. 91). Lynch testified that REDACTED *see* Ex. 12 (Lynch Dep. Tr.) at 203:24-205:5, but Merrill, who had been demoted and was soon after asked to leave Jeld-Wen, did not recall them. Ex. 7 (Merrill Dep. Tr.) at 240:2-241:7. In fact, Merrill could think of no reason why he would be speaking with Lynch while he was CEO of Masonite, *see id.* at 241:12-15, and when asked if it would have been improper to do so, Merrill replied, "In most instances, yes." *Id.* at 184:9-15. Jeld-Wen then-CEO Beck essentially agreed. He testified that not only did he not know about the Lynch-Merrill calls, but added, "I think the layman's way of saying that is '**They look bad**.'" Ex. 13 (Beck Dep. Tr.) at 80:4-82:13 (emphasis added).

- REDACTED *See* Ex. 51 (Merrill Dep. Ex. 91). Merrill testified that he thought that call involved Lynch congratulating him on his retirement from Jeld-Wen, *see* Ex. 7 (Merrill Dep. Tr.) at 239:14-241:3, though he did not leave Jeld-Wen until December 2018. *Id.* at 48:8-15.

In addition to the numerous high-level contacts described above, REDACTED

REDACTED

REDACTED

REDACTED .[37] Further,

Defendants sought to avoid even the appearance of price competition because just the rumor of

such competition would hurt stock prices. REDACTED

---

[37] REDACTED . *See* Ex. 52 (compilation of Virostek Dep. Exs. 124-133, 135; Linker Dep. Exs. 174-75). Inter-company contacts that violated Defendants' Codes of Conduct were not limited to high level executives. REDACTED Ex. 53 (Breymeyer Dep. Tr.) at 38:14-19. REDACTED . *Id.* at 37:4-16; Ex. 54 (Baker Dep. Tr.) at 46:3-11. REDACTED Ex. 53 (Breymeyer Dep. Tr.) at 38:24-40:19; Ex. 54 (Baker Dep. Tr.) at 48:10-50:4.

REDACTED

_____ :

REDACTED

Ex. 55 (Beck Dep. Ex. 117) at JELD-WEN-00760012-13 (emphasis added).[38]

### 5. Neither Cost nor Demand Explains the Drastic Run Up of Interior Molded Doors Prices.

Defendants' price increases cannot be explained by increases in input costs or demand. *See* Lamb Rep. ¶¶ 139-144, 170-186. Applying a regression model and other economic analyses, Dr. Lamb shows that (1) prices after August 2014 were at levels substantially higher than could be explained by competitive factors alone, *id.* ¶¶ 187-263, and (2) prices rose despite the presence of market factors consistent with stable or falling prices, including REDACTED

_____, [39] REDACTED

_____ .[40] *See id.* ¶¶ 170-186.

---

[38] REDACTED . *See, e.g.*, Ex. 56 (Linker Dep. Tr.) at 225:2-9 ( REDACTED

Masonite's stock price dropped much more dramatically. *See* Ex. 57 (Linker Dep. Ex. 188).

[39] Sam Steves testified REDACTED . Ex. 4 (Steves Dep. Tr.) at 202:7-19.

[40] In a December 2015 email regarding REDACTED , Masonite VP of Sales John Beeken stated REDACTED

6.     **Defendants Acted Against Their Own Unilateral Interests, in Furtherance of the Conspiracy.**

Defendants' ability to raise prices was facilitated by their joint refusal to provide Doorskins to independent IMD manufacturers at competitive prices, as evidenced by Defendants announcing the then-largest ever IMD price increases in June 2014, just when Masonite abruptly announced that it had stopped selling Doorskins to the independents. Prior to Jeld-Wen's acquisition of CMI in October 2012, Masonite, CMI, and Jeld-Wen aggressively competed in the sale of Doorskins to the independents. In furtherance of the Conspiracy, however, Jeld-Wen and Masonite redefined their relationship with the independents.

REDACTED

. *See* Ex. 60 (JELD-WEN-00128648-50). Shortly thereafter, first in May and then again in June 2014, Masonite publicly announced it would no longer sell Doorskins to the independents. Ex. 61 (Merrill Dep. Ex. 51) (transcript from May 8, 2014 Masonite Company Conference Presentation) at p. 8. At a June 25, 2014 investor presentation, Masonite executive Glen Coulter stated: "And we at Masonite have determined that we will not sell our facings [i.e., Doorskins] into a competition. **So that only leaves one other outlet [for them] to get their facings from in North America.**" Ex. 62 (Steves Dep. Ex. 262) at JELD-WEN-00787853 (emphasis added). Masonite's decision came at a time when (1) the profit margin on Doorskins

---

REDACTED                         Ex. 58 (Beeken Dep. Ex. 17) at MAS-0000019722
(emphasis added).                         REDACTED

" Ex. 59 (Mercier Dep. Ex. 258) at JELD-WEN-00220093.

was higher than on IMDs, and (2) Jeld-Wen was experiencing significant quality problems with its Doorskins. Lamb Rep. ¶¶ 54, 157-58.



REDACTED

. *See* Ex. 5 (Steves Dep. Ex. 261) at STEVES-IMD-000698.

REDACTED

. *See, e.g.*, Ex. 4 (Steves Dep. Tr.) at 25:18-27:6, 60:3-61:11, 90:1-10; Ex. 63 (Steves Dep. Ex. 264). REDACTED

.[41] Ex. 64 (Steves Dep. Ex. 265). A REDACTED

Ex. 63 (Steves Dep. Ex. 264).

REDACTED

REDACTED

" Exs. 4 (Steves Dep. Tr.) at 109:15-111:13; 65 (Steves Dep. Ex. 268) at STEVES-IMD-000001373. REDACTED

. Ex. 4 (Steves Dep. Tr.) at 109:15-111:3.

---

[41] Steves later sued Jeld-Wen over the termination of the LTA. A jury found that Jeld-Wen violated the antitrust laws and awarded Steves over $58 million in damages, which, when trebled under § 4 of the Clayton Act, came to almost $176 million. *See generally Steves and Sons, Inc. v. JELD-WEN, Inc.*, Civil Action No. 3:16-cv-00545 (E.D. Va.) (Payne, J.).

Masonite's announcement that it was exiting the Doorskin market, essentially handing over that lucrative business to Jeld-Wen, was economically irrational absent Defendants' collusion. Lamb Rep. ¶¶ 153-168. Because (1) the Doorskin industry is characterized by high fixed costs and low variable costs, and (2) REDACTED .

*Id.* ¶¶ 153, 155-156. In addition, REDACTED . *Id.* ¶¶ 157-158. By ceding the U.S. Doorskin market to Jeld-Wen at a time when Jeld-Wen's Doorskin quality was poor, Masonite decided not to take advantage of a vulnerable Jeld-Wen and instead enabled Jeld-Wen to lower its average production costs and sell more Doorskins. *Id.* ¶¶ 54, 153, 156. Masonite benefitted from its public announcement in that it enabled Jeld-Wen to raise the prices of Doorskins paid by Defendants' IMD competitors, thereby limiting the independents' ability to undercut Defendants' collusive IMD prices. *Id.* ¶¶ 160-168.

## III.   LEGAL STANDARDS

Plaintiffs satisfy the test for class certification set forth in Fed. R. Civ. P. 23(a) and (b)(3). *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654-55 (4th Cir. 2019), *cert. denied*, 19-496, 2019 WL 6833425 (U.S. Dec. 16, 2019) (citation omitted). Plaintiffs also satisfy the implicit requirement that a class be "'ascertainable' by the court through 'objective criteria.'" *Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 446-47 (D. Md. 2018) (citing *EQT Prod. Co. v. Adair*, 764 F.3d 347, 359-60 (4th Cir. 2014). To certify a class, courts must find that each of the requirements of Rule 23 has been met by a preponderance of the evidence. *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 336 (D. Md. 2012), *amended*, 962 F. Supp. 2d 840 (D. Md. 2013).

"Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

19

*Amgen*, 568 U.S. at 466. The Fourth Circuit recognizes that "federal courts should give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and promote judicial efficiency." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (internal citation, quotation marks and alteration omitted). *Accord Bell v. WestRock CP, LLC*, 3:17-CV-829, 2019 WL 1874694, at *2 n.3 (E.D. Va. Apr. 26, 2019) (Gibney, J.).

The Supreme Court stated that Rule 23's requirements are "readily met in certain cases alleging … violations of the antitrust laws." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also* 6 William B. Rubenstein, *Newberg on Class Actions* § 20:52 (5th ed. 2011) ("Classes alleging horizontal price-fixing conspiracies will typically satisfy the predominance requirement because all of the customers that purchased the product from the defendants paid higher prices than they would have paid absent the anticompetitive acts and were therefore impacted in the same way."). And courts in this Circuit have routinely certified classes in horizontal price-fixing actions.[42]

This is not surprising, given that cases brought under § 1 of the Sherman Act, 15 U.S.C. § 1, focus on two issues—proof of a conspiracy and proof of its inflationary impact on prices— both of which are susceptible to class-wide proof. Plaintiffs will be able to resolve those issues with common evidence.

---

[42] *See, e.g.*, *Titanium Dioxide*, 284 F.R.D. 328 (D. Md. 2012); *In re Polyester Staple Antitrust Litig.*, MDL 3:03CV1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007); *DeLoach v. Philip Morris Co.*, 206 F.R.D. 551 (M.D.N.C. 2002); *Technical Learning Collective, Inc. v. Daimler Benz Aktiengesellschaft*, No. 77-1443, 1979 WL 1718 (D. Md. Jul. 2, 1979); *In re Indep. Gasoline Antitrust Litig.*, 79 F.R.D. 552 (D. Md. 1978).

IV.     **ARGUMENT**

A.      **Rule 23(a) is Satisfied and the Class is Ascertainable.**

Under Rule 23(a), the Class must satisfy four prerequisites: "(1) numerosity of parties; (2) commonality of factual or legal issues; (3) typicality of claims and defenses of class representatives; and (4) adequacy of representation." *Gunnells*, 348 F.3d at 423 (citing Fed. R. Civ. P. 23(a)).

**Numerosity.** Rule 23(a)(1), which requires a sufficient number of Class members, is satisfied here given that the Class is comprised of over 450 members that are geographically dispersed across the country. Lamb Rep. ¶ 100. "[C]ourts find classes of at least 40 members sufficiently large to satisfy the impracticability requirement [of Rule 23(a)(1)]." *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 497 (D. Md. 1998).

**Commonality.** Rule 23(a)(2) requires questions of law or fact common to the Class. At least one common issue must be central to the action.[43] As discussed *infra*, because common issues include the existence of a conspiracy and its market effects, antitrust plaintiffs generally satisfy the commonality requirement.[44]

**Typicality.** Rule 23(a)(3) requires that Plaintiffs' claims be typical of those of the Class. "[T]he typicality requirement determines 'whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly

---

[43] *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("[A] common contention … must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

[44] *See, e.g., Ballard v. Blue Shield*, 543 F.2d 1075, 1080 (4th Cir. 1976) ("Class actions are frequently maintained in antitrust cases because of the many questions of law and fact that are common to the members of the class."); *Titanium Dioxide*, 284 F.R.D at 337-38 ("[I]n the antitrust context, 'courts have held that the existence of an alleged conspiracy or monopoly is a common issue that will satisfy' the commonality requirement.") (citation omitted).

attribute a collective nature to the challenged conduct.'" *Titanium Dioxide*, 284 F.R.D. at 338 (citations omitted). In antitrust cases, typicality "'will be established by plaintiffs and all class members alleging the same antitrust violations by defendants.'" *Am. Sales Co., LLC v. Pfizer, Inc.*, 2:14CV361, 2017 WL 3669604, at *11 (E.D. Va. July 28, 2017) (Miller, M.J.), *report and recommendation adopted*, 2:14CV361, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017) (Wright Allen, J.) (citation omitted). *Accord Titanium Dioxide*, 284 F.R.D. at 339.

Plaintiffs' claims satisfy typicality because Plaintiffs allege they were injured in the same way the Class was injured: by purchasing IMDs at allegedly anticompetitive prices. The facts necessary to advance Plaintiffs' claims are the same as those for Class members.

**Adequacy.** Rule 23(a)(4) requires that a class action may be maintained if "the representative parties will fairly and adequately protect the interests of the class," *Sharp Farms v. Speaks*, 917 F.3d 276, 290 (4th Cir. 2019) (citation omitted), and are able to do so without a fundamental conflict of interest. *See Titanium Dioxide*, 284 F.R.D. at 338-39 (citing *Gunnells*, 348 F.3d at 430-31 (internal quotations and citations omitted)). Plaintiffs have advanced the interests of the proposed Class vigorously and without any conflicts, let alone fundamental conflicts. In this case, as in other price-fixing actions, the incentives of Plaintiffs and the other Class members are aligned. *Id.* at 339 (citing *Gunnells*, 348 F.3d at 431).

Rule 23(a)(4) also requires that Interim Co-Lead Counsel protect the interests of the Class and to do so without conflicts of interest.[45] Interim Co-Lead Counsel have (1) extensive experience prosecuting antitrust, class action, and complex civil litigation, (2) no conflicts of

---

[45] "Congress in 2003 'adopted Rule 23(g) that creates an explicit textual mooring for the class counsel analysis[,] but most courts continue to employ the substantive standards generated under Rule 23(a)(4) prior to Rule 23(g)'s adoption in their analysis of counsel's adequacy.'" *Sharp*, 917 F.3d at 290 n.7 (citation omitted).

interest with Plaintiffs or the Class, and (3) the resources to effectively litigate the action.[46] *See*

*Am. Sales*, 2017 WL 3669604, at *13.

**Ascertainability.** In addition, "a class cannot be certified unless a court can readily

identify the class members in reference to objective criteria." *Krakauer*, 925 F.3d at 654-55

(citation omitted). Plaintiffs have defined the Class so that Class members can be identified using

objective criteria, *i.e.*, entities that purchased IMDs directly from one or both Defendants during

the Class Period. Defendants' transactional sales data identifies all Class members, *see* Lamb

Rep. ¶ 100, and that is legally sufficient. *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183,

197-98 (E.D. Va. 2015) (Payne, J.).

**B.      Plaintiffs Satisfy the Requirements of Rule 23(b)(3).**

Rule 23(b)(3) requires that "questions of law or fact common to class members

predominate over any questions affecting only individual members," and that "a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.

R. Civ. P. 23(b)(3).

**1.      Common Questions of Law or Fact Predominate.**

Predominance requires that "questions common to the class predominate, not that those

questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459. "Rule

23(b)(3) … does not require a plaintiff seeking class certification to prove that each 'elemen[t] of

[her] claim [is] susceptible to classwide proof,'" but rather that "common questions

'*predominate* over any questions affecting only individual [class] members.'" *Id.* at 469 (citation

omitted); *accord Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). When

considering the predominance requirement, "a court's rigorous analysis begins with the elements

---

[46] *See*: https://bonizack.com/; http://srkattorneys.com/.

of the underlying cause of action." *Titanium Dioxide*, 284 F.R.D. at 344 (citation omitted). "[T]here are three essential elements in every private anti-trust action: … (1) a violation of the anti-trust law, (2) direct injury to the plaintiff from such violations, and (3) damages sustained by the plaintiff." *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 (4th Cir. 1977).

### a.   Common Evidence Can Prove the Existence of the Conspiracy.

Proof of a price-fixing conspiracy is particularly well suited for class treatment. *Titanium Dioxide*, 284 F.R.D. at 344, 348; *Polyester Staple*, 2007 WL 2111380, at *14 (citing 6 *Newberg on Class Actions*, § 18.28 at 102 (4th ed. 2002)); *DeLoach*, 206 F.R.D. at 560-61. As with plaintiffs in the many opinions certifying horizontal price-fixing classes,[47] Plaintiffs' claims focus on Defendants' illegal agreement to fix IMD prices. Plaintiffs can prove the Conspiracy with common evidence, including:

- Market characteristics conducive to collusion and enabling Defendants to profit from it;

- The scale and timing of Defendants' parallel price increase announcements;

- Inter-Defendant communications and efforts to monitor compliance with the Conspiracy.

---

[47] In addition to the cases cited from this Circuit, *see, e.g., Kleen Products LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016); *In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015); *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 148 (3d Cir. 2002); *In re Capacitors Antitrust Litig.*, No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018); *In re Domestic Drywall Antitrust Litig.*, MDL No. 2437, 2017 WL 3623466 (E.D. Pa. Aug. 23, 2017); *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158 (E.D. Pa. 2016); *In re Blood Reagents Antitrust Litig.*, MDL No. 09–2081, 2015 WL 6123211, at *1 (E.D. Pa. Oct. 19, 2015); *In re Air Cargo Shipping Services Antitrust Litig.*, No. 06-MD-1175(JG)(VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90 (E.D.N.Y. 2012); *In re OSB Antitrust Litig.*, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007); *In re Dynamic Random Access Memory Antitrust Litig.*, No. M 02–1486 PJH, 2006 WL 1530166 (N.D. Cal. Jun. 5, 2006); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002).

24

First, evidence common to the Class can show that the IMD industry was ripe for the Conspiracy. Plaintiffs incorporate by reference Section II.A., *supra*, which identifies seven market characteristics demonstrating as much: Defendants' dominant market power; significant barriers to entry; IMDs are commodities; inelastic IMD demand, given the absence of reasonable economic substitutes; REDACTED ; many buyers purchasing IMDs directly from Defendants; and ample opportunities for Defendants to conspire. *See also* Lamb Rep. ¶¶ 14, 46-122.

Second, Plaintiffs will also prove the Conspiracy using common evidence as to the scale and timing of Defendants' price increase announcements. Defendants announced and implemented lock-step price increases, *see* chart, *supra* at 14, that were different in size and effectiveness than those they implemented before the Conspiracy, and that included the then-largest price increase in the industry's history. Lamb Rep. ¶¶ 130-147. The Conspiracy allowed Defendants to more effectively implement the price increases, REDACTED . *Id.* ¶¶ 148-152. Moreover, as Defendants were increasing prices, REDACTED g. *Id.* ¶¶ 175, 201-203. These facts, among others, led Dr. Lamb to conclude that " REDACTED ." *Id.* ¶ 186.

Third, Plaintiffs will prove the Conspiracy with common evidence of the multitudinous inter-Defendant communications identified *supra* at 7-16.

The issue of whether Defendants conspired to fix IMD prices is *alone* sufficient to satisfy Rule 23(b)(3), because predominance is assessed from the perspective of the case *as a whole*— not element by element. *See Amgen*, 568 U.S. at 469 (predominance does not require "that each elemen[t] of [her] claim [is] susceptible to classwide proof" (emphasis in original)).

### b.   Common Evidence Will Show Impact.

Plaintiffs will need to prove at trial that the Conspiracy impacted the Class, *i.e.*, caused Class members to pay more for IMDs than they would absent the Conspiracy. At this stage, however, Plaintiffs need only show that they will be able to do so with common proof. *Polyester Staple*, 2007 WL 2111380, at *19. Predominance requires that "*questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459 (emphasis in original). Common evidence will be able to establish that all or nearly all Class members were overcharged.[48]

Plaintiffs offer not merely a proposal to prove common impact—which would suffice— but actual class-wide proof of common impact. Dr. Lamb employed the standard two-step analysis using class-wide evidence to show that: (1) the Conspiracy had a general tendency to harm the Class by causing price inflation above competitive levels; and (2) the vast majority of Class members paid supra-competitive prices. *See Nitsch v. Dreamworks Animation SKG, Inc.*, 315 F.R.D. 270, 297-98 (N.D. Cal. 2016) (granting class certification where plaintiffs' expert

---

[48] Plaintiffs are not required to show that every Class member was injured by the conspiracy. A class may be certified as long it does not contain "a great many persons who have suffered no injury." *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 397 (M.D.N.C. 2015), *aff'd*, 925 F.3d 643 (4th Cir. 2019). Indeed, the Supreme Court has held that the presence of some non-injured entities will not defeat class certification. *See Tyson Foods*, 136 S. Ct. at 1049; *Halliburton*, 573 U.S. at 276. Although not required under Supreme Court precedent, Dr. Lamb determined that each Class Member paid an overcharge on at least one transaction, and thus there is no risk that uninjured Class members will recover damages. Lamb Rep. ¶ 257.

analyses proceeded in two steps, first concluding that "classwide evidence was capable of showing that the alleged conspiracy suppressed compensation of class members generally," then that "economic studies and theory, documentary evidence, and statistical analyses were capable of showing that this compensation suppression had widespread effects on all class members"); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847 (D.N.J. 2015) (the "two-step method to prove antitrust impact is not novel"); *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1206 (N.D. Cal. 2013) (plaintiffs "followed a roadmap widely accepted in antitrust class actions that use evidence of general price effects plus evidence of a price structure to conclude that common evidence is capable of showing widespread harm to the class").

As to the first step—the general tendency to artificially inflate prices—Plaintiffs rely on documents, testimony, and various forms of economic and econometric evidence showing that the Conspiracy artificially inflated prices by REDACTED As to the second step—showing widespread harm to the Class—Plaintiffs rely on two methods of proof that courts have found independently sufficient. Notably, while Plaintiffs do not rely here on any such inference, under "the prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *Urethane*, 768 F.3d at 1254.

###### i. The Conspiracy Had a General Tendency to Harm the Class by Causing Artificially Inflated Prices.

###### a) A Multiple Regression Model Demonstrates that, Without the Conspiracy, IMD Prices Would Have Been Lower.

Dr. Lamb applied a standard, well-accepted econometric analysis to the Class as a whole, to examine whether rising pricing during the Class Period could be explained by factors other

than the Conspiracy.[49] He compared prices during a "Benchmark Period," *i.e.*, from before Defendants implemented their anti-competitive pricing (October 24, 2012 to August 10, 2014), with prices they imposed after implementing that pricing (August 11, 2014 to December 31, 2018).[50] *Id.* ¶ 187. Dr. Lamb then employed a multiple regression analysis to control for relevant variables to ensure that the observed price inflation was directly attributable to the effects of the Conspiracy and not to unrelated factors. *Id.* ¶¶ 193-97. As Dr. Lamb explains:

> Multiple regression analysis is well established both as a statistical tool and as a tool in econometric analysis. There are a variety of factors that might affect IMD prices, especially those factors which cause the cost of production, or demand in the market, to go up or down. A multiple regression "controls" for the effect of these other variables by isolating the impact of each individual factor on the dependent variable as if everything else were constant. This allows one to examine the effect, or impact, of one factor upon another, while holding the rest of the world constant. That is, multiple regression analysis allows me to filter out the effect of all the other factors that might impact the prices customers paid for IMDs, and to determine whether there was a conspiracy that had an impact on price, and what that effect was, as if everything else in the market was the same.

*Id.* ¶ 196.

Dr. Lamb's multiple regression analysis demonstrates that the IMD price increases cannot be explained by demand, supply, and other competitive factors alone. *Id.* ¶¶ 211-15. He reached this conclusion after evaluating approximately REDACTED transactions from October 24, 2012 through December 31, 2018 (*i.e.*, the start of the Benchmark Period through the end of the Class Period). *Id.* ¶ 198. After analyzing the actual transaction prices for each IMD sale to each direct purchaser as reflected in Defendants' transactional sales data, Dr. Lamb concluded that IMD prices were REDACTED higher during the Effective Cartel Period than they would have been

---

[49] *See In re Titanium Dioxide Antitrust Litig.*, CIV.A. RDB-10-0318, 2013 WL 1855980, at *16-18 (D. Md. May 1, 2013) (recognizing that Dr. Lamb's multiple regression analysis was an accepted econometric methodology for calculating overcharges).

[50] Dr. Lamb refers to this period as the "Effective Cartel Period."

absent the Cartel. *Id.* ¶ 213. This analysis, based on evidence and methods common to the Class as a whole, is capable of showing that the Conspiracy had the intended effect of raising prices above levels that would have prevailed in its absence. *Id.* ¶ 215.

> **b)  Defendants' Own Transactional Data Shows that Prices Rose Over the Class Period.**

In contrast to prior attempts to increase IMD prices in the period before the Conspiracy,

REDACTED . Lamb Rep. ¶ 170. REDACTED

*Id.* Moreover, Defendants themselves attributed their financial turnaround to pricing. *See id.* ¶ 179 REDACTED

*id.* ¶ 180 REDACTED

*See also id.*

¶¶ 207-211.

> **c)  At a Minimum, Price Increase Announcements Set an Artificially-Inflated Base Price Upon Which Negotiations Began.**

Even if Defendants did not implement their price increases uniformly, their announcements set an artificially-high base level upon which Defendants began negotiations, resulting in Class members paying artificially high prices.[51] For example, Masonite's John

---

[51] The fact that some Class members might have arrived at their prices through negotiations with Defendants does not defeat class certification, as abundant evidence and analysis, including the existence of a price structure (*see infra*), shows that the negotiated prices would necessarily be determined from an artificially-inflated base level. *See, e.g.*, *Urethane*, 768 F.3d at 1254 ("[P]rice-

Beeken explained that Masonite would "announce a price increase and then you enter into a negotiation with the customer, and … if we deem through the process that it's in our best interest to maintain the business to concede a portion of the price increase to keep them competitive, then we might do that." Ex. 66 (Beeken Dep. Tr.) at 142:17-22; *see* Lamb Rep. ¶ 218. Thus, even if certain individual customers did not receive the full price increase, they would have been unable to avoid paying higher prices stemming from the increase. *See, e.g.*, *Titanium Dioxide*, 284 F.R.D. at 346 ("'[T]his case falls within the line of cases holding that class-wide injury-in-fact can be proven at trial by showing that the allegedly conspiratorial [price increases] were the starting point from which negotiations for discounts began.'") (citation omitted). *Accord Nat'l Elec. Contractors Ass'n, Inc. v. Nat'l Constructors Ass'n*, 678 F.2d 492, 500 & n.12 (4th Cir. 1982) ("To be guilty of price fixing, the conspirators do not have to adopt a rigid price, substantially less has been found to be price fixing"; citing, as an example, "establishing price list from which negotiations began").

      **ii.**      **The Impact of the Conspiracy Was Widespread Across the Class.**

            **a)**      **A Pricing Structure Exists in the IMD Market Such That Prices Responded Similarly to Coordinated Pricing Activity.**

Common evidence and methods will demonstrate that the alleged Conspiracy artificially inflated the prices that all or nearly all members of the Class paid for IMDs. In addition to (1) the common evidence of IMD market characteristics that make it ripe for collusion and nearly

---

fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated."); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Pa. 1999) ("[E]ven though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied.").

impossible for purchasers to avoid impact, and (2) his regression showing prices were artificially-inflated generally, Dr. Lamb found that (3) the IMD market was characterized by a pricing structure. *Id.* ¶ 220. This means that the prices customers paid, regardless of the seller, tended to move together over time, and that a common factor affecting prices (such as conspiratorial behavior) will be experienced across the market. *Id.* Combined with a showing that the Conspiracy successfully inflated prices generally, finding a price structure is sufficient to show that the Conspiracy's effects would be experienced class-wide. *See, e.g.*, *Titanium Dioxide*, 284 F.R.D. at 346 (finding common impact when plaintiffs presented a "pricing structure analysis that attempts to show that prices for [the product at issue] would have responded similarly to coordinated pricing activity"); *Polyester Staple*, 2007 WL 2111380, at *26 (endorsing price structure analysis, which showed prices moving together, as a method of proving common impact).

Dr. Lamb began with a study that economists call "price determinants," *i.e.*, the underlying factors that go into prices. Lamb Rep. ¶ 221. He found that Defendants' IMD prices were driven by the same supply and demand factors, making a pricing structure far more likely. *Id.* ¶ 226. He then studied Defendants' transactional data and found that their IMD prices moved together over time. *Id.* ¶¶ 225-27.

Dr. Lamb confirmed the pricing structure by REDACTED . The results of this analysis led Dr. Lamb to conclude that the "REDACTED

31

REDACTED

." *Id.* ¶ 231.

As a further method of analysis, Dr. Lamb performed regressions that examined each Defendant's sales in each month of the Class Period, because "[b]y taking monthly snapshots of the data, I am implicitly able to control for any factors that affect price which might vary over time, such as changes to supply and demand conditions, and isolate what factors affect price at a given point in time." *Id.* ¶ 237. The results of this regression analysis show that "REDACTED

." *Id.* ¶ 238.

Dr. Lamb's determination that there is a pricing structure in the IMD market is consistent with his analysis of the structural characteristics of the IMD market. *See* Lamb Rep. ¶ 240. Given Defendants' market dominance, the lack of available economic substitutes for IMDs, and the presence of barriers to entry, individual Class members could not have avoided increased prices, nor could a new supplier have readily entered the market to undercut Defendants' prices. *Id.* ¶ 241; *see also* Section II.A., *supra*. This analysis provides additional common proof that all or nearly all Class members were impacted by the Conspiracy.

Combined with his finding that the alleged Conspiracy artificially inflated IMD prices during the Class Period, and relying on his price-structure finding,[52] market factor analysis, and the documentary record, Dr. Lamb concluded that all or nearly all members of the Class paid artificially-inflated prices due to the alleged Conspiracy and thus were impacted by it. *Id.* ¶ 252.

---

[52] Showing that prices were artificially-inflated and that all or nearly all class members paid those artificially-inflated prices is a well-accepted methodology for proving common impact. *See Castro*, 134 F. Supp. 2d at 847-48 (citing cases).

**b)** **Further Empirical Analysis Shows Impact to Virtually all Class Members on at Least One Transaction.**

Dr. Lamb did not stop there. He performed another analysis—one built on the regression model used to find that the Conspiracy artificially inflated prices during the Class Period—that used a "predicted pricing approach" to estimate Class member-specific overcharges. That analysis confirmed near-universal impact, showing that REDACTED .

*Id.* ¶ 257. REDACTED

. *Id.* And *any* purchase at a supra-competitive price constitutes antitrust injury. *See, e.g.*, *Am. Sales*, 2017 WL 3669604, at *8 (finding that "'[A]ntitrust injury occurs and is complete when the defendant sells at the illegally high price" and that "[i]f a particular company bought the drug at a price below the average but-for competitive price, that does not mean it suffered no antitrust injury"); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 221 (M.D. Pa. 2012) ("The court is persuaded that Dr. McClave reasonably defines an impacted customer as one who 'tak[es] at least one transaction at a supracompetitive price.'").[53] Dr. Lamb's predicted

---

[53] Defendants are expected to rely on *Windham v. Am. Brands, Inc.,* 565 F.2d 59 (4th Cir. 1977), but it is distinguishable. In contrast to the present case, the *Windham* plaintiffs offered no methodology for proving the effects of a conspiracy across the market, meaning there would have to be a multitude of individual trials to resolve the class members' claims. *Id.* at 66-67; *see also DeLoach*, 206 F.R.D. at 558 (finding that *Windham* "operate[d] on the assumption that there [was] no means of determining classwide impact because no economic formulas were available"). This was, in large part, because the *Windham* plaintiffs challenged a series of separate conspiracies, as opposed to a single overarching conspiracy encompassing the entire market like the one alleged here. *Windham*, 565 F.2d at 67; *see also DeLoach*, 206 F.R.D. at 559. The district court's denial of class certification in *Windham*, which was upheld by the Fourth Circuit, was based largely on concerns about manageability of the proposed class action— concerns that do not exist here. *Windham*, 565 F.2d at 65.

pricing analysis, like the regression and other analyses discussed above, is capable of showing that the Conspiracy had the intended effect of artificially raising prices across the Class.

Significantly, Dr. Lamb's analyses have been considered in certifying class actions across the country, including in this Circuit: "Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry, and the facts in this case. While his model may not be perfect, this Court concludes that a regression model is certainly *capable* of proving class-wide impact at trial. In light of the structural factors in the TiO2 industry, this case falls squarely within the type of case that courts have found well-suited to regression analyses." *Titanium Dioxide*, 284 F.R.D. at 347.[54]

### c.    A Methodology Exists to Prove Class-Wide Damages.

Plaintiffs can also reliably measure damages with common evidence. They have satisfied the requirements set out in *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013), *i.e.*, that damages be both "capable of measurement on a classwide basis" and "susceptible of measurement across the entire class." In *Comcast*, the Court also confirmed the long-standing rule that a damages model in an antitrust class action "need not be exact." *Id.* Courts have held that, when a defendant's wrongful conduct renders it difficult to precisely quantify damages, a defendant cannot complain if damages cannot be measured with exactness. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969); *Phillips v. Crown Cent. Petroleum Corp.*, 602 F.2d 616, 633 (4th Cir. 1979).

Dr. Lamb's report set out a widely accepted methodology for calculating the overcharges

---

[54] *See also Polyester Staple*, 2007 WL 2111380, at *14-18, 26 (endorsing evidence of price increase announcements, market structure, and regression analysis to show common impact); *DeLoach*, 206 F.R.D. at 563 (endorsing expert's conclusion that "the tobacco market has a basic price structure that would have been depressed in its entirety by the alleged price-fixing conspiracy" as proof of common impact).

to the Class. Lamb Rep. ¶¶ 188-215. He performed a multiple regression analysis—utilizing Defendants' transactional data, empirical industry data, and standard econometric techniques—to determine the percentage overcharge to Class members. *Id.* ¶¶ 211-15. Based on this econometric analysis, Dr. Lamb concluded that IMD prices were [REDACTED] higher than they would have been absent the Conspiracy. *Id.* ¶ 213. By multiplying the total volume of qualifying Class sales during the Class Period by this [REDACTED] overcharge, Dr. Lamb pegged the total overcharges to the Class at [REDACTED] million. *Id.* ¶ 263. Courts widely accept this economic analysis in determining overcharges. *See, e.g.*, *Am. Sales*, 2017 WL 3669604, at *16 ("Plaintiffs rely upon a widely-accepted mathematical formula for assessing damages with class wide proof. The fact that individualized inquiry may be necessary to allocate those damages will not defeat class certification.") (citations omitted); *Polyester Staple*, 2007 WL 2111380, at *30.

At this stage, however, this Court need not even consider whether Plaintiffs have proven by a preponderance of evidence the class-wide overcharge. Plaintiffs need only show that overcharges are *capable* of class-wide proof, which they are, and any inquiry into the amount of individual damages is insufficient to defeat class certification.[55]

### 2.    Class Treatment is a Superior Means of Adjudication.

As class treatment is far superior to Class members potentially bringing hundreds of individual actions, Plaintiffs satisfy Rule 23(b)(3)'s requirement that class adjudication be the superior method of resolving an action. "In determining whether the class mechanism is truly superior, the court should consider '(1) the interest in controlling individual prosecutions; (2) the existence of other related litigation; (3) the desirability of concentrating the litigation in the

---

[55] *See Gunnells*, 348 F.3d at 427 (citing Fed. R. Civ. P. 23 advisory committee's note); *Bell*, 2019 WL 1874694, at *5 (finding predominance satisfied because "'if liability is found, the issue of damages can be decided by a special master or by another method'") (citation omitted).

forum; and (4) manageability.'" *Henderson v. Trans Union LLC*, 3:14-CV-00679-JAG, 2016 WL 2344786, at *5 (E.D. Va. May 3, 2016) (Gibney, J.) (citation omitted).[56]

These factors demonstrate that a class action is the superior method of adjudicating this case. The first and second factors are related. Many Class members likely do not have damages large enough to warrant bringing an individual lawsuit, and thus do not have an interest in pursuing individual litigation. For them, a class action is virtually the only means of redress. *See Gunnells*, 348 F.3d at 426. And because there is no related direct-purchaser litigation, the first and second factors support class-wide adjudication. The third factor, desirability of the forum, is also satisfied given the experience gained by this Court in presiding over this action to date, as well as this District's familiarity with the IMD industry gained from its experience with the *Steves & Sons* litigation against Jeld-Wen. *See* Order Denying Defendants' Motion to Transfer (Doc. No. 109).

The fourth factor, manageability, also supports class treatment. It would be highly inefficient and wasteful to require Plaintiffs to present the same evidence for each Class member in potentially hundreds of separate trials. Either Defendants colluded or they did not; either their Conspiracy artificially inflated prices to their customers or it did not. *See, e.g.*, *Am. Sales*, 2017 WL 3669604, at *17 (finding that "[a]djudicating the class members' claims individually would be unnecessarily time consuming, expensive, and duplicative," and that "class resolution will ensure that all affected and properly certified class members are able to pursue valid antitrust claims where they might otherwise be financially prevented from doing so"); *Titanium Dioxide*,

---

[56] Courts should consider "'whether the resolution of common issues advances the litigation as a whole, as opposed to leaving a large number of issues for case-by-case adjudication.'" *Polyester Staple*, WL 2111380, at *31 (quoting Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges*, Federal Judicial Center, § 2C (2005)).

284 F.R.D. at 349-50 ("[T]his Court concludes that because common issues predominate, class action treatment is superior to other available methods of adjudicating the Plaintiffs' claims.").

Plaintiffs satisfy both the "predominance" and "superiority" prongs of Rule 23(b)(3), as well as the requirements of Rule 23(a). The Class should be certified.

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for class certification.

Dated:  February 21, 2020

/s/ Wyatt B. Durrette, Jr.
Wyatt B. Durrette, Jr., Esq. (VSB No. 04719)
Christine A. Williams, Esq, (VSB No. 47074)
Kevin J. Funk, Esq. (VSB No. 65465)
DURRETTE, ARKEMA, GERSON & GILL PC
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Tel:  (804) 775-6900
Fax:  (804) 775-6911
Email:  wdurrette@dagglaw.com
            cwilliams@dagglaw.com
            kfunk@dagglaw.com

*Interim Liaison Counsel for Plaintiffs and the Proposed Class*

Michael J. Boni (*pro hac vice*)
Joshua D. Snyder (*pro hac vice*)
John E. Sindoni (*pro hac vice*)
Robert E. Haimes (*pro hac vice*)
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: 610-822-0200
Fax: 610-822-0206
Email: mboni@bonizack.com
            jsnyder@bonizack.com
            jsindoni@bonizack.com
            rhaimes@bonizack.com

Jeffrey J. Corrigan (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge (*pro hac vice*)
SPECTOR ROSEMAN & KODROFF PC
2001 Market Street
Suite 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
Email: jcorrigan@srkattorneys.com
            jspector@srkattorneys.com
            ietheridge@srkattorneys.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 21, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically e-mail notification of such filing to all counsel of record.

To the best of my knowledge, there are no other attorneys or parties who require service by U.S. Mail.

_/s/  Wyatt B. Durrette, Jr._
Wyatt B. Durrette, Jr., Esq. (VSB No. 04719)
DURRETTE, ARKEMA, GERSON & GILL PC
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Tel:  (804) 775-6900
Fax:  (804) 775-6911
Email:  wdurrette@dagglaw.com

*Interim Liaison Counsel for Plaintiffs and the Proposed Class*
